# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### SOUTHERN DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF TEACHERS, et al.,<br><br><br>Plaintiffs,<br><br>v.<br><br>SCOTT BESSENT, et al.,<br><br><br>Defendants. | Case No. 8:25-cv-430-DLB |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

I.      The United States Department of Governmental Efficiency Service ............... 2

II.     The Department of the Treasury ....................................................................... 4

      A. Review of and access to Bureau of Fiscal Service payment
          systems to effectuate the USDS EO ....................................................... 4

      B. Litigation Involving Department of the Treasury ................................... 6

III.    The Department of Education ............................................................................ 7

IV.   The Office of Personnel Management ............................................................... 8

V.     Plaintiffs' claims and motion for a TRO ........................................................... 9

STANDARD OF REVIEW ............................................................................................. 10

ARGUMENT ................................................................................................................... 11

I.      Plaintiffs' Suit Improperly Attacks the President's Article II Powers ............ 11

II.     Plaintiffs are not likely to succeed on the merits. ........................................... 13

      A.    Plaintiffs lack Article III standing. ...................................................... 13

      B.    The APA forecloses Plaintiffs' claims. ................................................ 16

      C.    Plaintiffs cannot prevail on any of their claims. .................................. 20

III.    Plaintiffs cannot satisfy the other preliminary injunction factors. ................... 27

      A.    Plaintiffs cannot show irreparable harm. ............................................. 27

      B.    The balance of the equities and public interest weigh
           in Defendants' favor. ............................................................................ 28

CONCLUSION ............................................................................................................... 29

Defendants the U.S. Department of the Treasury; Scott Bessent, in his official capacity as Secretary of the Treasury; U.S. Office of Personnel Management; Charles Ezell, in his official capacity as Acting Director of the U.S. Office of Personnel Management; the U.S. Department of Education; and Denise Carter, in her official capacity as Acting Secretary of Education submit this Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order[1] (ECF No. 14).

## INTRODUCTION

Plaintiffs bring this lawsuit in the wake of several other suits making similar allegations—suits that the government has defended in public filings in multiple courts. But instead of looking to the sworn factual averments filed in those cases, Plaintiffs base this suit on inaccurate speculation pulled from the news media. They use that inaccurate speculation to demand yet another overlapping temporary restraining order ("TRO") that would limit the Executive Branch's ability to manage its own internal affairs, to exercise politically accountable oversight of agency activities, and to implement the Office of the President's policy priorities. Contrary to the rumors on which Plaintiffs rely, none of the Defendants have made any public disclosure, nor violated the Privacy Act in any way. And even if such a claim were viable here, Plaintiffs do not have standing to raise it, and it is not cognizable under the Administrative Procedures Act.

---

[1] As an initial matter, the Court should exercise its discretion to convert Plaintiffs' motion to one for a preliminary injunction because Defendants have "had a fair opportunity to oppose it." *U.S. Dep't of Lab. v. Wolf Run Mining Co.*, 452 F.3d 275, 283 (4th Cir. 2006) ("[W]e [have] held that the district court could properly consider a motion for a TRO as a request for a preliminary injunction, based on the fluidity of the relationship between TROs and preliminary injunctions, focusing not on a specific time period but on whether the opposing party had a fair opportunity to oppose it.").

This Court should deny Plaintiffs' request for a TRO because none of the injunctive-relief factors weighs in favor of relief. First, Plaintiffs are unlikely to succeed on the merits—their claims fail both at the threshold and on the merits. Plaintiffs lack standing because they have not suffered any cognizable Article III injury; their claims are not cognizable under the APA; and they have not alleged a Privacy Act violation because only authorized federal employees have accessed protected data. Second, Plaintiffs' speculation has not shown that they likely face imminent irreparable harm. And finally, both the equities and the public interest support permitting the government to exercise its lawful authority to hire employees and give those employees access to systems as required for their job duties. In sum, the entirety of Plaintiffs' motion relies on one claim: that it's unlawful for one employee of a federal agency to share information with another authorized federal employee specifically for the purpose of carrying out an Executive Order of the President. That claim cannot be correct, so their motion fails.

For all of these reasons, Plaintiffs' motion should be denied.

## BACKGROUND

### I.    The United States Department of Governmental Efficiency Service

On January 20, 2025, President Trump signed Executive Order 14,158, which directs changes to the previously established United States Digital Service, an agency that was designed to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." 90 Fed. Reg. 8441, § 4 ("USDS EO"). The USDS EO redesignated the United States Digital Service as the Department of Governmental Efficiency Service, or U.S. DOGE Service. *Id.* § 3(a). Similarly, it established a "U.S. DOGE Service Temporary Organization" within the Executive Office of the President pursuant to 5 U.S.C. § 3161, which will terminate on July 4, 2026. USDS EO § 3(b).

Agency heads are required under the USDS EO to establish within their respective agencies a DOGE Team of at least four employees, which may include Special Government Employees. *Id.* § 3(c).

The USDS EO directs USDS to collaborate with Executive agencies to modernize the technology and software infrastructure of the federal government to increase efficiency and productivity as well as ensure data integrity. USDS EO § 4. As to the Department of the Treasury, the need to modernize and ensure data integrity is uniquely critical: the Government Accountability Office ("GAO") has identified "problems in accounting for transactions between federal agencies," resulting in potentially improper payments totaling approximately 2.7 trillion dollars. *See* GAO Report, "Financial Statement Audit: Bureau of the Fiscal Service's FY22 Schedules of the General Fund" (March 30, 2023), *available at* https://www.gao.gov/products/gao-23-104786 (last visited Feb. 17, 2025). And as to OPM, GAO has identified sixteen "priority recommendations" involving "preventing improper payments," "improving payroll data," and "strengthening IT security and management." *See* GAO Report, "Priority Open Recommendations: Office of Personnel Management" (May 28, 2024) at 1-2, *available at* https://www.gao.gov/assets/gao-24-107323.pdf (last visited Feb. 13, 2025) (capitalization and bold removed). GAO stated that, "[f]ully implementing these open recommendations could significantly improve both OPM's operations and its efforts to assist federal agencies in addressing various human capital management issues." *Id*. at 1.

To accomplish its objectives, the USDS EO directs USDS to work with relevant agency heads, and vice versa, to ensure that USDS has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with law." USDS EO § 4(b). At all times, the USDS EO instructs, USDS must "adhere to rigorous data protection standards." *Id.*

## II.  The Department of the Treasury
### A.  Review of and access to Bureau of Fiscal Service payment systems to effectuate the USDS EO

As background, the Bureau of the Fiscal Service ("BFS") is a component of the Department of the Treasury, established in October 2012 by then-Secretary of the Treasury Timothy Geithner. *See Treasury Order Establishing the Bureau of the Fiscal Service*, 78 Fed. Reg. 31,629 (May 24, 2013) (Treasury Order 136-01).   Among other responsibilities, the Bureau is responsible for "manag[ing] the government's accounting, central payment systems, and public debt, and . . . serv[ing] as the central payment clearinghouse for most payments to and from federal agencies." *See* Ex. 1, Declaration of Thomas H. Krause ("Krause Decl.") ¶ 5.   The Federal Disbursement Services ("FDS"), TRO Mem. at 5, is housed within BFS.   Ex. 2, Declaration of Vona S. Robinson ("Robinson Decl."), ¶ 1.   FDS is responsible for disbursing 87.8% of the U.S. Government's payments, valued at 5.46 trillion dollars annually.  *Id*., ¶ 2.

Currently, Mr. Krause is the only member of the Treasury Department's DOGE team.[2] *See* Krause Decl., ¶ 3; Ex. 3, Declaration of Joseph Gioeli III ("Gioeli Decl.") ¶ 4; Ex.4, Declaration of Michael J. Wenzler ("Wenzler Decl.") ¶¶ 3-5; Robinson Decl., ¶ 6. Mr. Krause is an employee of the Treasury Department and is the DOGE Team lead at the agency. Krause Decl., ¶ 2. His position at Treasury as Senior Advisor for Technology and Modernization was created to effectuate the mission of DOGE by reducing and eliminating improper and fraudulent payments, addressing the problems of waste, fraud, and abuse, and improving the accuracy of financial reporting. *Id*. Although Mr. Krause coordinates with officials at USDS and provides them with regular updates on the team's progress, he is not an employee of USDS. *Id*., ¶4. Instead, he is an employee of Treasury with an ethics designation of Special Government Employee. *See* Wenzler Decl., ¶¶ 3-4. As of February 13, 2025, Mr. Krause has been delegated the duties of the Fiscal Assistant Secretary, in a Temporary Transition Schedule C position. *Id*., ¶ 7.

---

[2] A second Treasury DOGE team member, Marko Elez began working at the Treasury Department on January 21, 2025, but resigned from his role on February 6, 2025. Krause Decl. ¶ 3. Treasury had hired Mr. Elez as a Special Advisor for Information Technology and Modernization. *Id*. In this role, Mr. Elez was a Treasury employee tasked with working closely with engineers at BFS on information technology matters in service of BFS's mission to promote financial integrity and operational efficiency of the federal government through accounting, financing, collection, payment, and other relevant BFS services. *Id*.; Wenzler Decl. ¶ 9. In the course of his work and subject to close supervision and a number of cybersecurity measures, Mr. Elez was provided with copies of certain BFS information and source code with which to work in a secure environment on his BFS-provided devices. Gioeli Decl., ¶¶ 4, 12, 16. Mr. Elez never "wrote" code directly to (or otherwise directly altered) any BFS systems, nor does BFS have any reason to believe that Mr. Elez transmitted any BFS data or other information outside the federal government. *Id*., ¶¶ 20-21. On February 6, 2025, Mr. Elez submitted his resignation from this role. *Id*., ¶ 23; Wenzler Decl., ¶ 11. On that same day, he turned in his government-issued laptops, access card, and other government devices; his BFS systems access was terminated; and he has not conducted any work related to the BFS payment systems since that date. Gioeli Decl., ¶ 23. The Department of the Treasury is conducting forensic analysis of Mr. Elez's laptops and accounts, *see* Gioeli Decl. ¶¶ 18-20, and counsel will update the Court if that analysis reveals anything relevant to this suit.

Mr. Krause's role at Treasury is to find ways to use technology to make the Treasury Department more effective, more efficient, and more responsive to the policy goals of the current Administration. Krause Decl. ¶ 2. As part of the President's DOGE efforts, Mr. Krause's mandate is to understand how BFS's end-to-end payment systems and financial reporting tools work, recommend ways to update and modernize those systems to better identify improper and fraudulent payments, and better allow federal agencies to quickly adapt to changing conditions. Krause Decl. ¶ 11. Mr. Krause has never had any direct access to any BFS payment system. His only access to those systems was so-called "over the shoulder" access to review activity others performed in the system or data others accessed from the system. *Id.* at ¶ 16. However, under the terms of the temporary restraining order in place due to litigation in the Southern District of New York, Mr. Krause does not currently have any access to BFS systems or certain payee data. *Id*.

### B.  Litigation Involving the Department of the Treasury

Prior to the instant suit and application for Temporary Restraining Order, several other lawsuits were filed against Treasury seeking relief similar to that sought here.  In *Alliance for Retired Americans v. Treasury*, 25-313 (D.D.C.), the court held argument on plaintiffs' application for a TRO on February 5, 2025.  On February 6, the parties agreed to a consent order to preserve the status quo.  The court thereafter converted the TRO to a preliminary injunction, and scheduled oral argument for February 24, 2025.  The parties' consent order remains in place.

Suit was also filed against Treasury in the Southern District of New York.  *See State of New York, et al. v. Treasury, et al,* Civil Action No. 25-1144 (SDNY).  The emergency "Part I" judge entered an *ex parte* restraining order in the early hours of February 8, 2025. *Id*., ECF # 8. That order was amended in part on February 11.  *Id*., ECF # 28. The order prohibits the DOGE team at Treasury (Mr. Krause) from accessing Treasury systems containing personal or financial

information of payees pending disposition of the preliminary injunction proceedings. *Id.* Oral argument on the preliminary injunction was heard February 14, 2025. The TRO remains in place pending the court's forthcoming order.

Finally, a third suit was filed against Treasury on February 11, 2025, in the Eastern District of Virginia. See *EPIC v. Treasury, et al*, Civil Action No. 25-255 (E.D.Va). Treasury's opposition to the application for a TRO is due February 18, 2025.

### III.    The Department of Education

There are six employees at the Department of Education whose principal role is to help advance the goals of Executive Order 14,158. *See* Ex. 5, Declaration of Adam Ramada ("Ramada Decl."), filed in *University of California Student Association v. Carter*, Civil Action No. 25-354 (D.D.C) (ECF # 16-1), ¶ 4-6; Ex. 6, Supplemental Ramada Declaration ("Supp. Ramada Decl.) (ECF # 18-2). All six work to audit contract, grant and related programs for waste, fraud and abuse. Supp. Ramada Decl. ¶ 5. In addition, these employees help senior leadership  to obtain access to accurate data and data analytics to inform policy decisions at the Department. *Id.*

Of the six employees at the Department of Education working to implement Executive Order 14,158, two were detailed to the Department from the USDS. Two others were detailed from other federal agencies, and two were employees the Department of Education. Supp. Ramada Decl., ¶ 3. Only these six employees have been granted access to the Department's information technology and data systems. *Id.*, ¶ 7; Ex. 7, Declaration of Thomas Flagg ("Flagg Decl."), ¶ 4. Further, these employees have not disclosed any protected information from these systems to individuals not employed by the Department of Education in connection with the implementation of Executive Order 14,158. *Id.*, ¶ 5.

In *University of California Student Association*, on February 11, 2025, the parties entered into an agreement to last at least through February 17, in order to preserve the status quo pending the court's ruling. The agreement provided that "Defendants will not permit (1) any federal employee, consultant or volunteer that has onboarded or will onboard at the Department of Education as either an agency employee or detailee to the agency, and whose responsibilities include implementation of President Trump's Executive Order titled "Establishing and Implementing the President's Department of Government Efficiency, (2) any employees or contractors volunteers and special government employees) of the U.S. DOGE Service, or (3) any other special government employee or government employee detailed to the Department of Education after January 19, 2025, to access any of the following [ 13] Department of Education systems." *See* Order, *University of California Student Association Litigation*, Civil Action No. 25-354 (D.D.C) (ECF # 12). The court heard argument on the matter on February 14, 2025.

## IV.    The Office of Personnel Management

OPM plays a critical role in overseeing and managing the federal workforce. *See* Ex. 8, Declaration of Greg Hogan ("Hogan Decl."), ¶ 8. Given that central role, numerous OPM employees, both political and career, have contributed to facilitating the President's initiatives related to workforce reform, including the deferred resignation program that closed on February 12, 2025. *Id.*, ¶ 9. All individuals with access to OPM records systems who are working to implement Executive Order 14,158 are employees of OPM. They were all hired directly by OPM as employees, or in one case, was detailed to OPM by another agency. *Id.*, ¶¶ 12, 13. All such OPM employees who have participated in workforce reform, like all OPM employees, are subject to applicable privacy, ethics, and other requirements. Many OPM employees involved in these efforts hold policymaking, legal, or similar positions that do not require access to sensitive data

systems. *Id., ¶¶* 9-10. For systems engineers who require access to sensitive systems, such as eOPF and EHRI, the Chief Information Office ("CIO") will periodically review access permissions to ensure that they are limited to those with a need to know. For example, in early February, the CIO removed access to eOPF and EHRI for three engineers whose job duties do not require prospective access. *Id*., ¶ 11.

Like the Departments of Treasury and Education, OPM is a defendant in multiple lawsuits similar to this one. In *EPIC v. OPM, et al, 25-255* (E.D. Va), OPM's opposition to an application for a TRO is due February 18, 2025. Similarly, OPM is a defendant in a related suit in the Southern District of New York. *See AFL/CIO, et al v. OPM, et al,* Civil Action No. 25-1237 (S.D.NY). An application for a TRO was filed February 14, 2025, and a briefing schedule is due February 18.

### V.    Plaintiffs' claims and motion for a TRO

Plaintiffs filed an amended complaint on February 12, 2025. Am. Compl. (ECF No. 13). Plaintiffs are several labor organizations, a nonprofit organization, and six individuals, all of whom are military veterans. *Id*. ¶¶ 19-27. Defendants are three federal government agencies—the Department of the Treasury, the Office of Personnel Management, and the Department of Education—and the head (or acting head) of each agency. *Id.* ¶¶ 28-33.

The Complaint states three causes of action. In Count One, Plaintiffs allege that Treasury, OPM, and Education have violated the Privacy Act of 1974 by "disclos[ing]" Plaintiffs' personal data in violation of 5 U.S.C. § 552a(b), and that those disclosures must therefore be "set aside" under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Am. Compl. ¶¶ 145-151. In Count Two, Plaintiffs allege that Defendants' conduct is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law under the APA, 5 U.S.C. § 706(2)(A), because they have "failed to consider the consent requirements of the Privacy Act," "their duty to protect the sensitive

data on their systems," "the risks that their disclosures would result in corrupted data," and "the security threats that are likely to result from their action."  Am. Compl. ¶¶ 152-156; *see* 5 U.S.C. §§ 552a(b), 552a(e)(1).  And in Count Three, Plaintiffs allege that Defendants acted "in excess of statutory authority" under the APA, 5 U.S.C. § 706(2)(C), by violating their "non-discretionary duty to protect records on individuals from unauthorized disclosure."  Am. Compl. ¶¶ 157-159.

Plaintiffs filed a motion for temporary restraining order on February 12. Mot. (ECF No. 14); TRO Mem. (ECF 14-1). Plaintiffs seek (1) to enjoin Treasury, OPM, and Education "from providing access to their respective systems of records and the records contained therein" to DOGE-affiliated persons; and (2) to require Defendants "to retrieve and destroy any such information that has already been obtained by DOGE representatives and is not housed within a system of records itself."  Mot. at 1.

## STANDARD OF REVIEW

"A TRO or preliminary injunction[3] is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'" *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008)). A preliminary injunction is "intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017); *Fed. Trade Comm'n v. Pukke*, 795 F. App'x 184, 188 (4th Cir. 2020) ("The purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held and to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to

---

[3] "The standard for a temporary restraining order is the same as a preliminary injunction." *Maages Auditorium v. Prince George's Cnty.*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014).

preserve the court's ability to render a meaningful judgment on the merits.") (internal quotation marks and citation omitted).

"A party 'seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), as amended (Jan. 14, 2020) (quoting *Winter*, 555 U.S. at 20). If a plaintiff fails to succeed on any one of these requirements, the motion for a preliminary injunction must be denied. *Mountain Valley Pipeline*, 918 F.3d at 366 ("Each of these four requirements must be satisfied.") (citing *Winter*, 555 U.S. at 20).

## ARGUMENT

Plaintiffs are not entitled to the relief they seek. They are not likely to succeed on the merits because they lack standing; they do not challenge a "final agency action" under the APA; and Defendants have not violated the Privacy Act or the APA. They are not likely to suffer irreparable harm. And the equities and the public interest do not favor injunctive relief, particularly where the defendant agencies have already been enjoined during the pendency of preliminary injunction proceedings. Plaintiffs' motion should be denied.

## I.    Plaintiffs' Suit Improperly Attacks the President's Article II Powers

By Executive Order on January 20, the President set in motion a "government-wide" initiative "to improve the quality and efficiency of . . . software, network infrastructure, and information technology (IT) systems." USDS EO § 4(a). The need for this urgent intervention is well documented. The Government Accountability Office's 2024 Annual Report identified the opportunity for the federal government to achieve billions of dollars in savings from implementing various efficiency and effectiveness measures. Gov't Accountability Off., 2024 Annual Report,

GAO-24-106915, https://www.gao.gov/assets/gao-24-106915.pdf.    To meet that need, the Executive Order calls for federal employees in each federal agency to collaborate with the United States DOGE Service, an entity within the Executive Office of the President.  USDS EO § 4(b), (c).  As relevant here, two federal employees have played a principal role at the U.S. Department of the Treasury in implementing the USDS EO at that agency; six have done so at the Department of Education; and others are doing the same at the Office of Personnel Management.  Understood in the proper light, the implementation of the USDS EO is entirely unremarkable:  the President, as head of the Executive Branch, has identified a policy priority and has directed federal employees to implement it.  *See Seila Law, LLC v. CFPB*, 591 U.S. 197, 203-04 (2020) ("Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'  Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." (quoting U.S. Const. art. II, § 1, cl. 1; *id.*, § 3)).

Plaintiffs have conjured a very different, more sinister, image of events.  The thrust of their narrative is that "dozens of individuals operating at the direction of well-known entrepreneur Elon Musk" have "help[ed] themselves" to private data at the Defendant agencies.  TRO Mem. at 2.  But Plaintiffs' attempt to distinguish "DOGE representatives," *id.,* from federal employees performing their job duties rests entirely on distinctions that do not exist in the relevant statutes.  As described in greater detail *infra*, the Privacy Act utilizes the term "employee" in establishing the parameters of access to certain personal information.  And the relevant employees, quite straightforwardly, are employees of the federal government, and of their respective agencies in particular.

The following Parts explain why Plaintiffs' claims fail for both threshold (jurisdictional, APA) and merits reasons.  Because this suit does not belong in federal court at all, and because it fails even if it did, there is no occasion for the Court to address the constitutional principles at which Plaintiffs, seeking to impose their preferred policies through litigation, take direct aim.  It is nevertheless appropriate to highlight that those principles are, ultimately, implicated by the relief Plaintiffs seek.  In particular, the United States Constitution requires that the federal bureaucracy be supervised and directed by political leadership that is ultimately accountable to the President. *Cf. Seila Law*, 591 U.S. at 223-24.  Federal employees charged with carrying out executive functions may be called upon by the President to gather information, and to share that information with the President.  *See United States v. Nixon*, 418 U.S. 683 (1974) ("The President's need for complete candor and objectivity from advisors calls for great deference from the courts.").  An order restraining them from doing so would thus be an extraordinary interference with the President's ultimate constitutional obligation to oversee the Executive Branch.

If the statutes in question required such interference, they could raise serious constitutional questions. *Cf. Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989) (interpreting the Federal Advisory Committee Act to avoid separation of powers concerns).  Because they do not require that result, *see infra*, the Court may leave these weighty questions for another day.

## VI.    Plaintiffs are not likely to succeed on the merits.

### A.    Plaintiffs lack Article III standing.

The Court should deny the temporary restraining order at the threshold because both the organizational and the individual plaintiffs lack standing.  "One 'essential aspect' of the limitations that Article III of the Constitution imposes on federal courts is the requirement 'that any person invoking the power of a federal court must demonstrate standing to do so.'" *Coreas v. Bounds*, 451 F. Supp. 3d 407, 417 (D. Md. 2020), quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704

(2013). To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citations omitted). "Those specific standing requirements constitute an essential and unchanging part of the case-or-controversy requirement of Article III." *Id*. (internal quotation marks and citations omitted).   Facts demonstrating each of these elements "must affirmatively appear in the record" and "cannot be inferred argumentatively from averments in the [plaintiff's] pleadings." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (citation omitted).  And "[t]he party seeking to establish standing carries the burden of demonstrating these elements." *Chambers Med. Techs. of S.C., Inc. v. Bryant*, 52 F.3d 1252, 1265 (4th Cir. 1995).

For the injury-in-fact requirement, a plaintiff must show a "concrete" ("real," not "abstract") injury-in-fact, which is "particularized" to the plaintiff and not a "generalized grievance." *Alliance*, 602 U.S. at 381.  The injury must be "certainly impending," and "allegations of possible future injury are not sufficient."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  And "'[w]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish.'" *N. Virginia Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 489 (4th Cir. 2025) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493–94 (2009)).

*The Employee Organizations lack organizational standing*

As organizations, the organizational Plaintiffs representing employees ("Employee Orgs.") cannot "demonstrate Article III standing either in their own right or as a representative of their members." *Maryland Election Integrity, LLC v. Maryland State Bd. of Elections*, No. 24-1449,

2025 WL 377752, at *3 (4th Cir. Feb. 4, 2025) (internal quotation marks and citation omitted). Here, the Employee Orgs. do not rely on alleged injury to the organization itself but instead cite to the privacy interests of their members. TRO Mem. at 21-22; Am. Compl. ¶¶ 14, 18-21. "To establish representational standing," the Employee Orgs. "must demonstrate that" their "members would otherwise have standing to sue in their own right." *Maryland Election Integrity, LLC*, 2025 WL 377752, at *3 (internal quotation marks and citation omitted). To do so, the Employee Orgs. must establish injury-in-fact as to those members. *Id.* As described below, however, the individual plaintiffs also lack standing, thereby defeating the standing of the representative organizations.

*The Individual Plaintiffs Lack Standing.*

As a basis for standing, the individuals all allege the same types of injury – concern and anxiety over the alleged disclosure of their personal information in alleged violation of the Privacy Act. *See* Am. Compl. ¶¶ 22-27. Plaintiffs argue, for example, that absent emergency relief, "Defendants will continue to run roughshod over Plaintiffs' right to privacy." TRO Mem. at 22. Plaintiffs appear to allege that any statutory violation creates irreparable harm and confers standing. *Id.* But that argument is demonstrably incorrect.

As an initial matter, there have been no third party or unauthorized disclosures at the defendant agencies, as Defendants have only granted access to the information at issue to authorized government officials, as set forth below. But even assuming—solely for purposes of the injury-in-fact analysis, *see, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 502 (1975)—that there had been such access, Plaintiffs still fail to establish standing. This is because unauthorized access alone would not give rise to an actual, concrete harm sufficient to establish standing. The Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), leaves no doubt that a statutory violation is not, by itself, a cognizable Article III injury. *Id.* at 426-27. Rather, "[o]nly

those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that . . . defendant over that violation in federal court."  *Id.* at 427 (emphasis in original).

For Plaintiffs to demonstrate standing based on a disclosure theory, they would need to show not just *access* to their information but also that the information access caused them some concrete harm, such as if it had been publicly disclosed.  *See Hunstein v. Preferred Coll. & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240, 1245-50 (11th Cir. 2022) (en banc) (no cognizable injury from disclosure of private information where plaintiff's information was sent from hospital to collection agency because disclosure was not public); *id.* at 1246 (citing cases); *see also TransUnion*, 594 U.S. at 434 n.6 ("Many American courts did not traditionally recognize intra-company disclosures as actionable publications for purposes of the tort of defamation.") (citations omitted).  An alleged disclosure of Plaintiffs' information solely within a government agency, therefore, is insufficient to establish injury in fact.

### B.    The APA forecloses Plaintiffs' claims.

Plaintiffs' claims – all of which are brought under the APA – fail to satisfy multiple threshold prerequisites.  Am. Compl., ¶¶ 145-159.  First, APA review is limited to "final agency action."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61-62 (2004) (quoting 5 U.S.C. § 704) ("*SUWA*").  Agency action is final only when it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow."  *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Plaintiffs attempt to meet that requirement by arguing that "Defendants' decisions to provide representatives of DOGE with access to sensitive record systems constitute 'final agency actions' subject to judicial review."  TRO Mem. at 15.  According to Plaintiffs, those actions were reviewable "decision[s] to disclose."  *Id.*  But the cases Plaintiffs identify involve *public* disclosure

pursuant to a statutory process (FOIA) that specifically provides a mechanism for reviewing agency disclosure decisions—not intra-agency disclosure consistent with ordinary agency operations. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1978); *Brancheau v. Sec'y of Lab.*, 2011 WL 4105047, at *2 (M.D. Fla. Sept. 15, 2011).

It is difficult to understand how providing new employees with system access necessary to their functions "consummat[es]" the agency's decisionmaking process in any formal sense. *Hawkes Co.*, 578 U.S. at 597. And "informal" agency actions, as a general matter, have not been considered "final" under *Bennett*'s first prong. *See Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 151 (1967)).

Nor is it apparent how an agency employee's access to agency systems and the data therein has "direct and appreciable legal consequences" for anyone at all. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019). Instead, government agencies' decisions regarding the employees given access to various internal systems are precisely the day-to-day operation of governmental programs that do not fall into APA review. *SUWA*, 542 U.S. at 63-64.

Further, even if the agencies' decision to grant their new employees access to agency systems were final vis-à-vis the agency, it creates no immediate legal effects for the plaintiffs, so it is not final with respect to them and does not satisfy *Bennett*'s second prong. *See Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 551 (D.C. Cir. 1993) (describing the second prong as "whether the result of [the agency's decisionmaking] process will directly affect *the parties*" (emphasis added)). The mere fact that some negative consequence for Plaintiffs could eventually theoretically flow from the agency's internal operation decision does not establish finality or directly affect Plaintiffs. By analogy, an agency's decision to give an employee a work computer

is not itself final agency action, even if the employee might conceivably use the computer to effect

final agency action (*e.g.*, in approving or denying benefits).

In addition, Plaintiffs' APA claims fail for a second, independent reason:  the APA does

not provide a cause of action where there is "[an]other adequate remedy in any court."  5 U.S.C.

§ 704.  This statutory provision "makes it clear that Congress did not intend the general grant of

review in the APA to duplicate existing procedures for review of agency action."  *Bowen v.*

*Massachusetts*, 487 U.S. 879, 903 (1988).  Accordingly, a plaintiff has adequate relief—and thus

cannot avail herself of § 704—"'where a statute affords an opportunity for *de novo* district-court

review' of the agency action."  *Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009) (quoting

*El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d

1265, 1270 (D.C. Cir. 2005)).  Stated differently, where an agency action is subject to review in a

specified manner under a statutory review scheme, then the general rule is that action must be

reviewed within the confines of that scheme.  In other words, the mode of review established by

the statutory review scheme is presumed exclusive.  This is true even where a statutory review

scheme only provides for review of issues by certain parties; other parties are presumptively

precluded from obtaining review of those issues under the APA.  *Block v. Cmty. Nutrition Inst.*,

467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial

consideration of particular issues at the behest of particular persons, judicial review of those issues

at the behest of other persons may be found to be impliedly precluded."); *see also Dew v. United*

*States*, 192 F.3d 366, 372 (2d Cir. 1999).

That is the case here.  The Privacy Act establishes "a comprehensive and detailed set of

requirements" for federal agencies that maintain systems of records containing individuals'

personal information, *FAA v. Cooper*, 566 U.S. 284, 287 (2012), and authorizes adversely affected

18

individuals to bring suit for violations of those requirements, 5 U.S.C. § 552a(g)(1)(D).  Relief under the Privacy Act is carefully circumscribed.  Civil remedies are available—and thus the United States' sovereign immunity has been waived—in four circumstances: (1) when the agency "makes a determination . . . not to amend an individual's record in accordance with his request," (an "Amendment Action"), 5 U.S.C. § 552a(g)(1)(A), (2) when the agency refuses to comply with an individual's request for access to her records, (an "Access Action"), *id.* § 552a(g)(1)(B), (3), when the agency fails to maintain an individual's records "with such accuracy, relevance, timeliness, and completeness" as is necessary for a government action and "consequently a determination is made which is adverse to the individual," (a "Benefits Action"), *id.* § 552a(g)(1)(C), or (4) where the government "fails to comply with any other provision of this section . . . in such a way as to have an adverse act on an individual," (an "Other Action"), *id.* § 552a(g)(1)(D).  For Benefits Actions or Other Actions, a plaintiff may be entitled to "actual damages sustained by the individual as a result of the refusal or failure," subject to a $1,000 statutory minimum, but only if the "agency acted in a manner which was intentional or willful" and if that plaintiff could prove "actual damages," which is "limited to proven pecuniary or economic harm."  *Cooper*, 566 U.S. at 291, 299.

Beyond these monetary damages, the Act allows for injunctive relief in only two narrow circumstances:  (1) to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records of an individual, 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A); and (2) to order an agency to allow an individual access to his records, *id.* § 552a(g)(1)(B), (g)(3)(A).  Injunctive relief, as the Fourth Circuit has recognized, is not available for other situations arising out of the Privacy Act.  *See Doe v. Chao*, 435 F.3d 492, 504-05 (4th Cir. 2006) (holding that "subsection (g)(1)(D) of the Privacy Act does not allow courts to grant injunctive or declaratory relief"); *see also Sussman v. U.S.*

*Marshal Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs . . ."); *Cell. Assocs., Inc. v. NIH*, 579 F.2d 1155, 1161-62 (9th Cir. 1978).

Given the Privacy Act's comprehensive remedial scheme, courts have repeatedly recognized that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also Poss v. Kern*, No. 23-cv-2199, 2024 WL 4286088, at *6 (D.D.C. Sept. 25, 2024) (citing cases). That is consistent with the principle that "[w]here [a] 'statute provides certain types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief.'" *Parks v. IRS*, 618 F.2d 677, 84 (10th Cir. 1980) (citing *Cell. Assocs.*, 579 F.2d at 1161-62). This is especially true with the Privacy Act because Congress "link[ed] particular violations of the Act to particular remedies in a specific and detailed manner[,]" which "points to a conclusion that Congress did not intend to authorize the issuance of [other] injunctions." *Cell. Assocs.*, 579 F.2d at 1158-59.

Indeed, as the Ninth Circuit concluded, were injunctive relief available for violations of the Privacy Act generally, "the detailed remedial scheme adopted by Congress would make little sense. We think it unlikely that Congress would have gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board." *Id.* at 1160. Plaintiffs' efforts to obtain an agency-wide injunction on both information sharing and personnel actions by channeling Privacy Act claims through the APA would be an end-run around these common-sense principles and should be rejected.

### C.    Plaintiffs cannot prevail on any of their claims.

Even if the Court were to reach the merits, Plaintiffs are not likely to succeed on any of their claims. Rather, Plaintiffs' entire theory rests on the erroneous notion that DOGE Team

members at the Department of the Treasury, the Department of Education, and OPM are not employees of those agencies. They are. What is more, they need access to large datasets (including material that may be covered by the Privacy Act) to carry out their Presidentially-directed functions. Plaintiff has thus not established any chance of success, let alone a likelihood, on its theory that Defendants are acting in excess of their authority or contrary to law. Nor has Plaintiff established that Defendants have acted arbitrarily or capriciously. For these merits reasons, a temporary restraining order is not warranted.

### 1) Plaintiffs have not shown a violation of the Privacy Act because § 552a(b) permits intra-agency disclosure for official duties.

Plaintiffs are not likely to succeed on their claims that Defendants' actions violated the Privacy Act. At the heart of Plaintiffs' theory is the baseless allegation that "DOGE representatives" at the Defendant agencies are somehow outside the category of federal employees, or outside the category of federal employees in their respective agencies. Neither criticism withstands scrutiny. The Privacy Act therefore expressly allows disclosure of information protected under that statute in the circumstances of this case.

In brief, the Privacy Act establishes a general ban absent consent on disclosure of covered personal information, but excludes "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." *Id.* § 552a(b)(1). For present purposes, the lawfulness of disclosure under the Privacy Act therefore turns on whether the members of each agency's DOGE Team are employees of their respective agencies. The answer is plainly yes.

Start with the initial question of federal employment. The Privacy Act uses the term "employee" (in addition to "officer"). 5 U.S.C. § 552a(b)(1). "[F]or purposes of" Title 5 of the U.S. Code, "employee" "means an officer and an individual who is" first "appointed in the civil

service by one of the following acting in an official capacity"; as relevant here, the ensuing list of potential appointers includes "the President" and "an individual who is an employee under this section." *Id.* § 2105(a)(1)(A), (D).  An employee must also be "engaged in the performance of a Federal function under authority of law or an Executive act; and . . . subject to the supervision of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position." *Id.* § 2105(a)(2).  Because the Privacy Act is part of Title 5, § 2105's definition of employee directly applies to its use of the term "employee." *See* 5 U.S.C. § 552a(b)(1).[4]

The relevant employees at the Department of the Treasury, OPM, and the Department of Education satisfy § 2105(a)'s definition of "employee." All have been appointed to their positions under federal law, including the detailees.  Krause Decl. ¶¶ 1-3; Hogan Decl. ¶ 12; Ramada Decl. ¶¶ 4-7. All are "engaged in the performance of a Federal Function under authority of … an Executive act," *i.e.*, Executive Order 14,158.  Krause Decl. ¶ 17; Hogan Decl. ¶ 8; Ramada Decl. ¶¶ 3-4.  And all are ultimately subject to the supervision of the senior leadership of their respective agencies, whether because they have been appointed as agency employees under agency-specific statutes directly or because they are detailed to those agencies.  *See, e.g.*, Ramada Decl. ¶ 13; Hogan Decl. ¶ 9; Krause Decl. ¶ 17.

---

[4] Because the Privacy Act expressly permits disclosure to agency "employees" generally, the Plaintiffs' attempt to artificially parse the term into different categories of employee for purposes of disallowing access has no basis in the Privacy Act's text and is therefore irrelevant. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (explaining that a court's interpretive "inquiry begins with the statutory text, and ends there as well if the text is unambiguous"); TRO Mem. at 17 (objecting to the use of Special Government Employees allegedly "charged with accomplishing goals" that, according to their view, "are entirely incompatible with the legitimate aims of the Defendant Agencies").

The relevant employees also satisfy the requirement that they be employees "of" the Department of the Treasury, OPM, and the Department of Education.  *See* 5 U.S.C. § 552a(b)(1). At each agency, some of the employees were hired directly by the Department, clearly resolving their status.  Wenzler Decl. ¶¶ 3-4, 7-10; Krause Decl. ¶¶ 1, 3; Hogan Decl. ¶ 12; Ramada Decl. ¶ 6.  The detailees from other components of the Executive Branch qualify, too.  While courts in the Fourth Circuit do not appear to have considered the question, the D.C. Circuit in evaluating the employment status of detailees has adopted a functional approach, looking to the subject matter and purpose of the individual's work, their supervision, and their physical worksite as illustrative (but not conclusive) factors.  *Judicial Watch v. Dep't of Energy*, 412 F.3d 125, 131-32 (D.C. Cir. 2005).  Here, those factors clearly cut in favor of the detailees' status as employees of their respective agencies.  At OPM, employees are responsible for facilitating the President's initiatives related to workplace reform, including the deferred resignation program that closed on February 12.  Hogan Decl. ¶ 8.  At Education, their responsibilities include identifying "waste, fraud, and abuse" in the Department's student loan portfolio.  Ramada Decl. ¶¶ 4-6.  They are subject to the supervision of senior Department leadership.  *Id.* ¶ 10.  They have physical access to the Department of Education building, where they have physical workspace at the Department.  Supp. Ramada Decl. ¶ 4.  At Treasury, there are presently no detailees assigned to the DOGE Team, though Treasury is working to onboard additional DOGE staff.

These facts lead to the inescapable conclusion that all of the involved individuals are, detail or no detail, employed by their respective agencies.  *See Judicial Watch*, 412 F.3d at 131-32; *Freeman v. EPA*, No. 02-0387, 2004 WL 2451409, at *4-5 (D.D.C. Oct. 25, 2004) (finding that disclosure of plaintiffs' drug testing schedules and results by EPA OIG to an EPA-hired DOD investigator did not violate Privacy Act because "according to the OMB 1975 Guidelines, an

agency that hires a member of another agency to serve in a temporary task force or similar, cross-designated function can share otherwise protected information with that hired person and still satisfy exception (b)(1)"); *cf. Ciralsky v. CIA*, 689 F. Supp. 2d 141, 155 (D.D.C. 2010) (permitting disclosure to "a group of Agency contractors engaged specifically to conduct an official CIA investigation into allegations of anti-Semitism at the Agency"); *Mount v. United States Postal Serv.*, 79 F.3d 531, 532, 533 (6th Cir. 1996) (describing "physician under contract with [United States Postal Service]" as an employee or agent of Postal Service under § 552a(b)(1)); *Liable v. Lanter*, 91 F.4th 438, 442 (6th Cir. 2024) (local employee detailed to federal task force was a federal employee for purposes of the Westfall Act).

Further, those employees have a "need to know" under the statute.  Executive Order 14,158 provides that these individuals have a need to know "*all* unclassified agency records, software systems, and IT systems" to perform their duties. 90 Fed. Reg. 8441, § 4 (emphasis added). Indeed, the relevant personnel at the Department of the Treasury have a need to access Privacy Act-protected records to assess and modernize payment systems and financial report tools, Krause Decl. ¶¶ 2, 5, the OPM personnel need to access such records to execute their direction to implement workplace reform, Hogan Decl. ¶¶ 6, 8, and the Department of Education personnel need to access such records in order to audit student loan programs for waste, fraud, and abuse, Ramada Decl. ¶ 9.  *Cf.* Feb. 14, 2025 Order, *Am. Fed. of Labor of Indus. Orgs. v. Dep't of Labor*, No. 1:25-cv-339, at 3-4, 8 (D.D.C. Feb. 14, 2025) (Bates, J.).

In response, Plaintiffs contend that DOGE Team members are "charged with accomplishing goals that are entirely incompatible with the legitimate aims of the Defendant Agencies," and that the Privacy Act's "need to know" provision therefore does not cover those goals.  Pls.' Mem. at 18.  But compliance with the President's Executive Orders cannot be

"incompatible" with the aims of the agencies that the same President controls. *Cf. Collins v. Yellen*, 594 U.S. 220, 252 (2021) (emphasizing that "because the President, unlike agency officials, is elected" Presidential control "is essential to subject Executive Branch actions to a degree of electoral accountability"). Although the President's policy choices may not be Plaintiffs', that alone cannot be the basis to invalidate their implementation.

In the alternative, Defendants' actions are permissible under the Privacy Act's exception for "routine use." *See* 5 U.S.C. § 552a(b)(3) (permitting disclosure absent consent for certain "Routine Uses" that are defined in a published Systems of Record Notice ("SORN")). Treasury's published Routine Use 17 permits disclosure to a federal agency "for the purpose of identifying, preventing, or recouping improper payments to an applicant for, or recipient of, federal funds." *Privacy Act of 1974: System of Records*, 85 Fed. Reg. 11,776, 11,780 (2020). Treasury's DOGE Team is tasked with doing just that. Krause Decl. ¶¶ 2-4. Education's SORNs likewise cover the DOGE Team's ambit. For example, they allow for disclosure "to support the investigation of possible fraud and abuse and to detect and prevent fraud and abuse" in program funds. *See* 88 Fed. Reg. 41,942, 41,949 (2023); 88 Fed. Reg. 42,200, 42,222 (2023); 73 Fed. Reg. 117 (2008); *see also* 84 Fed. Reg. 47,265, 47,269 (2019) (permitting disclosure to "support governmental researchers and policy analysts"). So too with OPM's SORNs, which permit disclosure in certain circumstances "to help eliminate waste, fraud, and abuse in Governmental programs." 77 Fed. Reg. 73,694, 73,697 (2012).

### 2) Plaintiffs are not likely to establish that Defendants have acted arbitrarily and capriciously.

Finally, Plaintiff claims that Defendants acted arbitrarily and capriciously by purportedly "fail[ing] to consider … the security risks associated with allowing such sweeping access to sensitive" information and "fail[ing] to properly vet officials receiving the records or install

security precautions." TRO Mem. at 20. Specifically, Plaintiffs identify an internal report at Treasury that recommended suspending access for DOGE employees. *Id.* at 20-21. But this claim also fails.

The agencies in fact *did* consider security risks and take action to ensure that data protected by the Privacy Act were properly protected. *See* Gioeli Decl. ¶ 15; Hogan Decl. ¶ 11; Ramada Decl. ¶¶ 7-8. For example, the Department of the Treasury—the only agency for which the Plaintiffs identify any specific risk issue—took particular risk-mitigation efforts with respect to its DOGE Team members, such as limiting access to Treasury payment systems to a laptop connected with those systems and providing "read-only" access to payment data.[5] Gioeli Decl. ¶¶ 12-13. OPM provides only certain DOGE Team members with access to sensitive systems, and the agency's Chief Information Officer reviews access permissions to ensure that only employees with a need to know are granted access. Hogan Decl. ¶¶ 10-11. The Department of Education has likewise required all DOGE Team members to complete information security training, sign agreements designated for privileged users, and familiarize themselves with the rules governing access to the agency's data systems. Ramada Decl. ¶¶ 7-8. In short, Plaintiffs' arbitrary and capricious claim is unfounded. The agencies did grapple with the risks of granting new employees access to their data, and they took appropriate steps to mitigate those (routine) risks. That is no basis to set aside agency action.

---

[5] Mr. Elez was briefly provided with read/write access in error. That access was revoked and there is no indication that Mr. Elez ever knew that he had such access or used that functionality. *See* Gioeli Decl. ¶¶ 18-20.

**VII.    Plaintiffs cannot satisfy the other preliminary injunction factors.**

**A.    Plaintiffs cannot show irreparable harm.**

"[F]or a preliminary injunction to issue, Plaintiffs must show they are 'likely to suffer irreparable harm in the absence of preliminary relief.'" *Roe*, 947 F.3d at 228 (quoting *Winter*, 555 U.S. at 20). Plaintiffs must make a "clear showing" that the irreparable injury is "likely" because "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. And, "[t]o establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir.) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991), cert. denied sub nom. *Givens v. Mountain Valley Pipeline, LLC*, 140 S. Ct. 300(2019).

For all of the reasons Plaintiffs have failed to show cognizable injury for the purposes of Article III standing, they have necessarily failed to show any irreparable harm. The failure to make that showing by itself disposes of their motion. *Mountain Valley Pipeline*, 918 F.3d at 366 ("Each of these four requirements must be satisfied.").

Even if they had shown a cognizable injury, Plaintiffs nonetheless fail to make a clear showing of actual and imminent harm. While Plaintiffs identify a *possibility* of harm from the alleged disclosure of their personal data, *see* TRO Br. at 21-22 ("PII *can* be used to commit identity theft") (emphasis added); *id.* at 22 (Plaintiff's declarant "worried" that disclosure would compromise personal safety), they offer nothing to suggest that possibility will in fact come to pass. They instead rest on speculation that duly-appointed federal employees will "make unauthorized copies" of personal data or "feed [those data] into AI systems." *Id.*  But speculation

cannot form the basis for emergency injunctive relief. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

### B.    The balance of the equities and public interest weigh in Defendants' favor.

The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Neither the balance of the equities nor the public interest favors Plaintiff's request for preliminary relief.

Plaintiffs' argument for why the equities and the public interest fall in their favor largely collapse into the merits. It says that because the injunction is seeking to "end an unlawful practice," and the agency's action is "unlawful," its proposed injunction is proper. Pls.' Mem. at 23-24. To be clear, Defendants' practice is *not* unlawful, for the reasons stated above. Regardless, the Supreme Court has made clear that considering only likelihood of success is insufficient to justify injunctive relief. *See, e.g.*, *Winter*, 555 U.S. at 376-77 ("In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (citations and quotation marks omitted).

The proposed injunction would harm the public interest. At its core, it would harm the public interest by limiting the President's ability to effectuate the policy choices the American people elected him to pursue by limiting his advisors and other employees' ability to access information necessary to inform that policy. And it would not merely "delay" the government in pursuing its lawful ends, *see* Pls'. Mem. at 24—it would cause cascading harms by preventing

federal employees from doing their jobs.  It would also frustrate the President's ability to identify fraud, waste, and abuse throughout the federal government.  *See supra* at 5-7, 23.  And it would draw false distinctions between different types of employees, unsupported in the statutory text, frustrating the flexibility that Congress itself provided in allowing multiple avenues to federal employment.

Finally, a restraining order is unnecessary here.  Both Treasury and Education have paused access to data systems pending the outcome of preliminary injunction proceedings.  Multiple lawsuits, relying on identical theories to those Plaintiffs advance, are further along procedurally than this suit.  Accordingly, there is no need for this Court to enter emergency relief.

## CONCLUSION

The Court should deny Plaintiff's Motion for a Temporary Restraining Order.

Dated:  February 17, 2025          Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
*Special Admission Pending*
Deputy Branch Director
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street, N.W., Twelfth Floor
Washington, D.C. 20005
Tel: (202) 514-2705
Fax: (202) 616-8470
Elizabeth.Shapiro@usdoj.gov

EMILY HALL
*Special Admission Pending*
Counsel to the Assistant Attorney General
Civil Division
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Tel: (202) 307-6482
emily.hall@usdoj.gov


Philip L. Selden
Acting U.S. Attorney

*/s/ Ariana Wright Arnold*
ARIANA WRIGHT ARNOLD
USDC Md Bar No. 23000
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
Tel: (410) 209-4813 Ph
Fax: (410) 962-2310 Fax
Ariana.Arnold@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 17, 2025, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send a notification of such filing (NEF) to all

counsel of record.

/s/ *Ariana Wright Arnold*
ARIANA WRIGHT ARNOLD
USDC Md Bar No. 23000
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
Tel: (410) 209-4813 Ph
Fax: (410) 962-2310 Fax
Ariana.Arnold@usdoj.gov