UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF TEACHERS, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>SCOTT BESSENT, *et al.*,<br><br>*Defendants*. | No. 8:25-cv-00430-DLB |

.

I, Thomas H. Krause, Jr., declare under penalty of perjury:

1. I am employed as the Senior Advisor for Technology and Modernization at the Department of the Treasury. I started serving in this role on January 23, 2025. This role is currently unpaid, and I am not seeking compensation, as permissible by law. I am also designated as a Special Government Employee (SGE). While in this Treasury role, I have also maintained my employment as Chief Executive Officer (CEO) of Cloud Software Group, Inc., which is a privately held company comprised of several enterprise software businesses. Treasury's ethics office determined, based on my role as an SGE, that this arrangement was permissible. In addition to serving as Senior Advisor for Technology and Modernization, as of February 13, 2025, I am also performing the duties of the Fiscal Assistant Secretary.

2. My role at Treasury as Senior Advisor for Technology and Modernization was created to help effectuate the mission of the President's Department of Government Efficiency (DOGE). Under the President's January 20, 2025 Executive Order establishing the U.S. DOGE Service (USDS/DOGE) as a temporary organization within the Executive Office of the President that

seeks to maximize governmental efficiency and productivity, the President directed each Agency Head to establish a DOGE team of at least four employees, which may include Special Government Employees, within 30 days. In this role, I am responsible, among other duties, for reducing and eliminating improper and fraudulent payments; waste, fraud, and abuse; and improving the accuracy of financial reporting. To that end, I am focused on improving the controls, processes, and systems that facilitate payments and enable consolidated financial reporting. I serve as the DOGE team lead for the Treasury Department (Treasury DOGE Team).

3. Currently, I am the only Treasury DOGE team member. A second Treasury DOGE team member, Marko Elez, began working at the Treasury Department on January 21, 2025, but resigned from his role on February 6, 2025. Marko Elez is a highly qualified software engineer who previously worked at several of Elon Musk's companies, including SpaceX and X (formerly Twitter). In January, USDS/DOGE recommended to me, and to incoming Treasury leadership, that Mr. Elez be selected as the Treasury DOGE Team's technical team member. Treasury hired Mr. Elez as a Special Advisor for Information Technology and Management. In this role, Mr. Elez was a Treasury employee tasked with working closely with engineers at the Bureau of the Fiscal Service (BFS) on information technology (IT) matters in service of BFS's mission to promote financial integrity and operational efficiency of the federal government through accounting, financing, collection, payment, and other relevant BFS services. On February 6, 2025, Mr. Elez submitted his resignation from this role.[1] On that same day, he turned in his Treasury laptop, BFS laptop, access card, and other

---

[1] Treasury is seeking to hire a new candidate to fill Mr. Elez's previous role. However, we will ensure that any such new hire complies with relevant court orders, including any TROs to the extent they apply when that person is onboarded.

government devices; his BFS systems access was terminated; and he has not conducted any work related to the BFS payment systems since that date.

4. Although I coordinate with officials at USDS/DOGE, provide them with regular updates on the team's progress, and receive high-level policy direction from them, I am not an employee of USDS/DOGE. My role on the Treasury DOGE Team is to find ways to use technology to make the Treasury Department more effective, more efficient, and more responsive to the policy goals of this Administration.

5. In my role performing the duties of the Fiscal Assistant Secretary, I am the official primarily responsible for overseeing the activities of the Bureau of the Fiscal Service (BFS), which manages the government's accounting, central payment systems, and public debt, among other tasks, and which serves as the central payment clearinghouse for all payments to and from federal agencies. BFS is responsible for disbursing the majority of U.S. Government payments, valued at more than $5 trillion annually.

6. I bring to my work at Treasury a wealth of experience from my long and successful business career in the technology industry, helping make major software enterprises more efficient, effective, innovative, and profitable. As noted above, I am currently the CEO of Cloud Software Group, one of the largest privately held enterprise software companies globally. Over the last two years, we have dramatically improved the company's effectiveness and efficiency by, among other things, improving our business processes and integrating and modernizing our technology systems. Prior to my employment at Cloud Software Group, I spent over a decade at Broadcom, where I was an executive officer serving as CFO and most recently as President of Broadcom Software. Broadcom is one of the most valuable companies in the world today and was built largely by acquiring underperforming

3

semiconductor and enterprise software businesses and improving their effectiveness and efficiency. I am proud of this work, and I bring this focus on effectiveness and efficiency to my work for the Treasury Department and in service of the President's DOGE mission, to help maximize value for the American taxpayer and make our Government better for future generations.

7. As illustrated by several reports released by the Government Accountability Office (GAO), we have our work cut out for us. On January 16, 2025, GAO released a report entitled "Financial Audit: FY2024 and FY2023 Consolidated Financial Statements of the U.S. Government." In the report, GAO summarizes that they were not able to determine if the Financial Report of the U.S. Government is fairly presented. Among other reasons, GAO highlighted "problems in accounting for transactions between federal agencies." GAO found many material weaknesses including "the federal government's inability to determine the full extent to which improper payments, including fraud, occur and reasonably assure that appropriate actions are taken to reduce them." GAO also reported that Treasury and Office of Management and Budget (OMB) officials expressed their continuing commitment to addressing the problems this report outlines. In short, the GAO report identifies the Federal government's inability to account for all of the improper payments including waste, fraud and abuse across federal agencies.

8. On September 10, 2024, the GAO released a report entitled "Payment Integrity: Significant Improvements are Needed to Address Improper Payments and Fraud." The report found that since 2003, cumulative improper payments[2] by executive branch agencies have totaled about

---

[2] Improper payments and fraudulent payments are related but distinct concepts. An improper payment is a payment that should not have been made, or that was made with an incorrect amount; fraudulent payments occur due to willful misrepresentation. All fraudulent payments are improper, but not all improper payments are fraudulent.

4

$2.7 *trillion* dollars. Some of GAO's top concerns included fraudulent or improper Earned Income Tax Credit refunds, Social Security payments, unemployment insurance payments, and Medicare and Medicaid payments. In fiscal year 2023 alone, federal agencies estimated $236 billion in improper payments across more than 70 federal programs. In addition, GAO estimated that the total annual financial losses across the government from fraud are between $233 and $521 billion. These numbers are truly staggering—billions and billions in hard-earned American taxpayer dollars are being misspent every year. GAO highlighted a number of steps that Congress and federal agencies could take to help reduce fraud and improper payments, including that "[a]gencies should improve oversight to ensure that funds aren't paid to ineligible recipients" and that "[a]gencies should improve their collection and use of data for preventing and detecting fraud."

9. Similarly, GAO has identified areas for improvement in BFS's systems related to identifying and tracing transactions to determine whether they were complete and properly recorded in the correct general ledger accounts and line items within the Schedules of the General Fund. *See* GAO Report, "Financial Statement Audit: Bureau of the Fiscal Service's FY22 Schedules of the General Fund" (March 30, 2023). Specifically, GAO has found inconsistent reporting, lack of traceability, and need for improved controls with the Treasury's Central Accounting and Reporting System (CARS), which federal agencies use to track their spending for budgetary and accounting purposes. These kinds of improvements and others can enhance BFS's ability to ensure accountability in the spending of taxpayer dollars.

10. BFS is well positioned to help agencies and the federal government holistically understand and take stock of the problems GAO has reported on, and assist agencies in the government-wide mission to stop fraudulent and improper payments, including by enhancing our ability

to help agencies identify payments that may potentially be directed to fraudulent accounts, payments to individuals or entities which may be barred from receiving government payments, payments that are potentially improperly sent to deceased individuals, may have a mismatch between payee and account data, or have other indicators of problems.

11. For this reason, an important aspect of the President's DOGE efforts has been to quickly place me into the Treasury Department so I can understand how BFS's end-to-end payment systems and financial report tools work, recommend ways to update and modernize those systems to better identify potentially improper and fraudulent payments, and find ways for BFS to assist federal agencies in responding to statutes, regulations, and Executive Orders that affect the Government's payment authorities and spending priorities.

12. As soon as I arrived at the Treasury Department, I met with Treasury leadership to begin operationalizing the Treasury DOGE Team's work. This early work included: (1) initiating conversations with BFS regarding our shared payment integrity and efficiency goals, and setting up a plan to achieve those goals; and (2) ensuring that the Treasury DOGE Team was leveraging its unique technological expertise to help operationalize the President's policy priorities for the early days of the Administration, including by helping identify payments that may be improper under his new Executive Orders.

13. Coming out of these early conversations, on January 26, 2025, BFS initiated a 4-6 week payment process engagement plan ("engagement") in which BFS would support the Treasury DOGE Team in understanding payment processes and identifying opportunities to advance payment protection, government efficiency, and fraud reduction goals. The objective of the engagement is to gain insight into the full, end-to-end payment process across multiple BFS

payment systems, and to identify data gaps that, if resolved, would make the system to work more efficiently and securely.

14. One initial goal of the engagement was to ensure that all payments through BFS's payment systems included Treasury Account Symbols (TAS) and Business Event Type Codes (BETCs), which are used to identify what type of payment and accounts each payment request is associated with. These are the kinds of enhanced controls suggested in the March 30, 2023 GAO Report. BFS has three separate primary payments systems (PAM, ASAP, ITS.gov) that support payments on behalf of nearly 250 agencies. These payment systems feed into CARS, which is a system that agencies use to track how payments should be accounted for budgetary purposes. PAM, or Payment Automation Manager, is the most widely used of BFS's payment systems. Within PAM, there are two types of payments, known as Type A and Type B—Type A is for high value, low volume payments, while Type B applies to lower value, higher volume payments. At present, a significant number of Type B payments are often missing TAS and BETC codes, meaning that payor agencies are required to modify the payment records in CARS well after payments have been certified and processed. As a result, I believe that certain of these payments cannot be accounted for accurately in CARS, and cannot be correctly connected in CARS to particular programs or purposes even after the money has been spent. The Treasury DOGE Team agreed to help address this issue as part of its preliminary work plan, in support of its goal of modernizing and identifying efficiencies.

15. Because an important part of our work was to understand the full end-to-end payment process, across multiple payment systems, this work required review of the source code for BFS's payment systems and databases across multiple BFS payment systems as well as the

ability to review sensitive payment data. The Treasury Secretary, through his Chief of Staff, approved the engagement in the early days of the new Administration. Because such access could present risks, including potential disruptions to BFS's payments systems, cybersecurity vulnerabilities, insider threat risks, and other risks that are inherent to any user access to sensitive IT systems, BFS recommended multiple mitigation measures. While these measures could not fully guarantee that the risks would not materialize, they would significantly reduce their likelihood. BFS and the DOGE Team implemented a number of mitigation measures, including physical and technical controls, instructions on proper data handling and safeguarding, and BFS staff oversight, to protect sensitive data and minimize the potential of disruptions to systems from the DOGE Team's work, as further explained in the accompanying Declaration of Joseph Gioeli.

16. The engagement remains in its initial stages—the Treasury DOGE Team was still in the process of being granted the agreed-upon levels of access to BFS databases and source code when Mr. Elez resigned. To my knowledge, as of the date of his resignation, Mr. Elez had access to and was analyzing copies of the source code for certain BFS payment systems in a secure, contained environment that was not connected to any production or test environments; thus, Mr. Elez had no ability to change BFS payments or the BFS payment system. Further, Mr. Elez had read-only access to the PAM and SPS[3] payment databases, subject to the agreed-upon mitigations and BFS oversight. My only access to these systems was so-called "over the shoulder" access to watch as other people were working within the systems or with data from the system. However, on February 8, 2025,

---

[3] As noted in the Gioeli Declaration, I understand from BFS that there was briefly an error that provided Mr. Elez read/write access to the SPS system, but that Mr. Elez did not access that system during that time, and was likely unaware that he had any such read/write access.

an Order issued by Judge Vargas in a related matter in the Southern District of New York, *see State of New York* v. *U.S. Dep't of Treasury*, No. 1:25-cv-1144-JAV (S.D.N.Y.), Dkt. No. 6, *as amended by* Dkt. No. 28 (Feb. 11, 2025), restricted my access to certain BFS data and systems. I have received guidance on compliance with that Order from Treasury attorneys and am complying with that guidance.

17. As part of the Treasury DOGE Team's efforts to assist payor agencies in identifying payments that may have been improper under the President's Executive Orders, we received direction from Treasury leadership that the Treasury DOGE Team and BFS help agencies effectuate the President's Executive Orders requiring pauses to certain types of financial transactions, including with respect to foreign development assistance. Specifically, under the President's January 20, 2025 Executive Order, entitled "Reevaluating and Realigning United States Foreign Aid," the President required that agencies pause all foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy. Section 3(e) of the order authorized the Secretary of State to issue waivers that would authorize specific payment programs to move forward notwithstanding the pause.

18. The Treasury DOGE Team, with assistance from BFS, was well positioned to facilitate the State Department's review of potentially applicable payments to determine if an exemption under Section 3(e) applied. Upon direction from Treasury leadership, we worked with BFS to identify particular categories of payments potentially implicated by the Executive Order, that should be reviewed by the State Department prior to payment, consistent with the Executive Order's requirements.

19. Specifically, the Treasury DOGE Team and BFS developed a process that would allow

the State Department to review such payments prior to the payor agency's certification of the payments for BFS processing. In the normal course, when an agency initially provides a payment file to BFS through its PAM system, BFS conducts certain reviews of that file (known as "pre-edit") before requesting that the agency certify the payment, after which point the file is processed through BFS's systems. An example of a check that occurs during the pre-certification phase is to compare the payments in the file against the Do Not Pay working system, which is used to identify payments that may be improper or fraudulent. If transaction(s) in a payment file lead to a match when screened through the Do Not Pay working system, BFS notifies the submitting agency, which is given an opportunity to reexamine the payment file to determine whether to ultimately certify it for processing.

20. Our work to implement the President's foreign aid Executive Order was intended to operate similarly. The plan we implemented included identifying payments files in the pre-edit phase, prior to certification and processing, that may fall within the scope of the Executive order and, thus, require review by the State Department, as the authorized agency under the Executive Order, to determine whether they fall within the scope of the Executive Order but should receive a waiver, or whether instead the payor agency should pause the payment pursuant to the Executive Order.

21. Starting on January 31, 2025, BFS and the Treasury DOGE Team collaborated to operationalize this process for the State Department, by identifying incoming payments that matched certain Treasury Account Symbols (TAS) associated with foreign aid payments, and flagging those payments for the State Department for review consistent with the Executive Order. BFS and the Treasury DOGE Team emphasized to the State

Department that its review of identified payments should be conducted within one business day to minimize delays where payment should be authorized. At no point did BFS refrain from transmitting a payment that had been duly certified by the payor agency, because, once certified, BFS is obliged to process the payment. As described further in the Declaration of Vona S. Robinson filed concurrent with my declaration, only two sets of payments have thus far been flagged through this process; the first, on February 7, 2025 was determined by the State Department not to fall within the scope of the Executive Order. Those payments proceeded as planned. The second, on February 10, was flagged for the State Department and later canceled by the requesting agency.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 2/14/25      Signed: /s/ Thomas H. Krause, Jr.

Thomas H. Krause, Jr.
Senior Advisor for Technology and Modernization
United States Department of the Treasury