**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| American Federation of Teachers, *et al.*, | Case No. 8:25-cv-00430-DLB |
| *Plaintiffs*, | |
| vs. | Judge:  Hon. Deborah Boardman |
| SCOTT BESSENT, in his official capacity as Secretary of the Treasury, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR EXTRA-RECORD DISCOVERY**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...........................................................................................................................1

STATEMENT OF FACTS ...........................................................................................................2

LEGAL STANDARD....................................................................................................................4

ARGUMENT .................................................................................................................................4

I.     The Administrative Record Is Manifestly Deficient...........................................................4

      A.    Education ................................................................................................................5

      B.    OPM......................................................................................................................7

      C.    Treasury ..............................................................................................................10

II.    Extra-Record Discovery Is Required ...............................................................................11

      A.    The Court Should Order Discovery Because the Record Prevents
            Adequate Judicial Review.....................................................................................11

      B.    The Court Should Order Extra-Record Discovery Because Defendants
            Acted in Bad Faith ...............................................................................................12

III.   The Necessary Evidence Will Not Be Before the Court by March 17 and
      Defendants' Gamesmanship Should Not Be Rewarded ...................................................14

      A.    The Court Should Convert the TRO Into A Preliminary Injunction and Set
            a Discovery and Summary Judgment Schedule....................................................15

            1.    The TRO Should Be Converted to a Preliminary Injunction...................15

            2.    The Court Should Order a Discovery Schedule........................................16

      B.    The Court Should Set a Preliminary Injunction Hearing Relating to
            Defendant Treasury and Order Expedited Discovery ...........................................18

CONCLUSION.............................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*ABX Air, Inc. v. Int'l Bhd. of Teamsters*,
  2016 WL 7117388 (S.D. Ohio Dec. 7, 2016) ..........................................................16

*AFL-CIO v. U.S. Dep't of Lab.*,
  No. 1:25-cv-00339 (D.D.C. Feb. 27, 2025) ......................................................11, 12

*Camp v. Pitts*,
  411 U.S. 138 (1973) ..................................................................................................11

*ClearOne Advantage, LLC v. Kersen*,
  No. CV JKB-23-03446, 2024 WL 278917 (D. Md. Jan. 25, 2024) .........................19

*Com. Drapery Contractors, Inc. v. United States*,
  133 F.3d 1 (D.C. Cir. 1998) .....................................................................................11

*Fund for Animals v. Williams*,
  391 F. Supp. 2d 191 (D.D.C. 2005) ..........................................................................13

*Green v. Nat'l Archives & Recs. Admin.*,
  992 F. Supp. 811 (E.D. Va. 1998) ............................................................................12

*Kravitz v. U.S. Dep't of Com.*,
  336 F. Supp. 3d 545 (D. Md. 2018) .............................................................12, 13, 14

*Maages Auditorium v. Prince George's County*,
  4 F. Supp. 3d 752 (D. Md. 2014),
  aff'd, 681 F. App'x 256 (4th Cir. 2017) ...................................................................16

*Maritime Mgmt. v. United States*,
  242 F.3d 1326 (11th Cir. 2001) ................................................................................13

*Mayor & City Council of Baltimore v. Trump*,
  429 F. Supp. 3d 128 (D. Md. 2019) ............................................................................4

*New Medium Techs. LLC v. Barco N.V.*,
  242 F.R.D. 460 (N.D. Ill. 2007) ...............................................................................19

*New York v. Trump*, No. 25-CV-01144-JAV,
  2025 WL 573771 (S.D.N.Y. Feb. 21, 2025) ............................................................18

*Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*,
  2017 WL 3189446 (D. Md. July 27, 2017) ...............................................................13

*Saratoga Dev. Corp. v. United States*,
    21 F.3d 445 (D.C. Cir. 1994) ......................................................................................13

*Sheet Metal Workers' Nat. Pension Fund v. Metals and Mach'g Fabs., Inc.*,
    637 F. Supp. 50 (D.D.C. 1986) ...................................................................................16

*U.S. Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ...............................................................................................13, 14

*Walter O. Boswell Mem. Hosp. v. Heckler*,
    749 F.2d 788 (D.C. Cir. 1984) ......................................................................................1

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
    485 F. Supp. 3d 1 (D.D.C. 2020) ................................................................................18

**FEDERAL STATUTES**

5 U.S.C. § 552a .................................................................................................................4

**OTHER AUTHORITIES**

Dep't of Educ., Privacy Impact Assessment (PIA) for the Common Origination
    and Disbursement Systems, at 22 (Sept. 29, 2023),
    https://www.ed.gov/sites/ed/files/notices/pia/fsa-pia-cod.pdf .................................5

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR EXTRA-RECORD DISCOVERY

## INTRODUCTION

The "administrative records" created by Defendants are so threadbare and incomplete that they compel the conclusion that Defendants intended to frustrate Plaintiffs', and this Court's, ability to meaningfully review Defendants' decision to grant various DOGE affiliates access to Plaintiffs' personally identifiable information ("PII"). That conclusion is underscored by the fact that Defendants simultaneously (1) refused to agree to extend the TRO by a week, necessitating a hearing on March 17, and (2) insisted that creating these administrative records was a "substantial undertaking" that would take nearly two weeks. That "substantial undertaking" apparently constituted assembling just *eleven* non-public documents for the Department of Education ("Education"), *twenty-six* for the Department of the Treasury ("Treasury"), and *twenty* for the U.S. Office of Personnel Management ("OPM")—totaling just 149 non-public pages, many clearly cherry-picked.

Defendants' gamesmanship has put Plaintiffs, and the Court, in an untenable position: the "records" hand-selected by Defendants are plainly incomplete and, in several instances, pretextual, yet there is no time for Defendants to produce a proper record prior to March 17, before the restraining order expires. Courts have long recognized the dangers of reviewing anything "less than the full administrative record," which would enable the agency to "withhold evidence unfavorable to its case." *Walter O. Boswell Mem. Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984). That is precisely the danger Defendants have introduced here.

Plaintiffs are left with no other choice but to request that the Court give Defendants what they have said they wanted all along, and convert the temporary restraining order against Education and OPM into a preliminary injunction, *without a hearing*, to ensure that Plaintiffs'

PII remains protected while Defendants produce the records necessary for the Court to exercise meaningful judicial review.[1]

Basic principles of judicial review and fairness demand nothing less.  Proceeding to a preliminary injunction hearing now, on a facially incomplete record that includes post hoc documents intended to bolster Defendants' arguments while withholding unfavorable evidence, would prejudice Plaintiffs, both in seeking an injunction here and in any appeal.  And it would force this Court to rule on a preliminary injunction without a proper administrative record.  Defendants should not be so rewarded for their tactics.  Instead, the Court should convert the TRO to a preliminary injunction and order (1) a three-month discovery schedule to be followed by a summary judgment hearing on Plaintiffs' request for a permanent injunction and (2) a three-week expedited discovery schedule relating only to Treasury, to be followed by a preliminary injunction hearing against Treasury.[2]

## STATEMENT OF FACTS

On February 19, 2025, this Court held a hearing on Plaintiffs' Motion for Temporary Restraining Order.  During that hearing, Defendants could not answer basic questions from the Court regarding DOGE affiliates' access and use of Plaintiffs' PII including: whether Plaintiffs' PII had been fed into artificial intelligence software or tools ("AI"), Hu Decl., Ex. A ("TRO Tr.")

---

[1] Consistent with the Court's February 26 Order, *see* ECF No. 46, Plaintiffs intend to file their Preliminary Injunction Motion by 5 p.m. on March 10 and are prepared to appear for the currently scheduled hearing on March 17.  For the reasons set out in this Memorandum of Law, however, Plaintiffs respectfully submit that the appropriate path forward is for the Court to convert the restraining order against Defendants Department of Education, Office of Personnel Management, Carter, and Ezell into a preliminary injunction based on the record supporting the restraining order, with expedited preliminary injunction proceedings regarding Defendants Treasury and Bessent.

[2] Because Treasury is currently subject to a preliminary injunction, Plaintiffs have a brief window in which their privacy remains protected even without relief from this Court.  Plaintiffs wish to have this Court hear their request for relief as soon as possible, as the existent injunction could expire as soon as March 24, 2025.

at 50:12–24, how Treasury's DOGE affiliates had used Social Security numbers, *id.* at 73:17–22, or even which systems had been accessed by DOGE affiliates within OPM, *id.* at 90:7–91:18.

On February 24, 2025, this Court granted Plaintiffs' Motion for Temporary Restraining Order. Per the Court's order, the parties met and conferred the next day. Hu Decl. ¶ 3. In the meet and confer, Defendants said they were unable to provide any definitive information about the contents of the administrative record, as they were in the process of assembling it. *Id.* At a status conference on February 26, Defendants represented to the Court that creating and producing the record was a "substantial undertaking" that could not be completed before March 7 and refused to consent to an extension of the restraining order until March 31. *Id.*, Ex. C ("Status Conf. Tr.") at 10:3. Plaintiffs expressed their concern that they would be seriously prejudiced if Defendants produced an administrative record on March 7 that failed to answer basic questions about Defendants' decision to grant DOGE affiliates access to Plaintiffs' PII. *Id.* at 12:20–13:6. The Court asked if Defendants would object to converting the restraining order into a preliminary injunction to allow for more time to assemble a record. *Id.* at 6:21–7:4. Defendants represented, consistent with their prior request, that they would consent to converting the restraining order into a preliminary injunction but acknowledged they planned to challenge the adequacy of the record on appeal. *Id.* at 6:21–7:4. The Court accordingly recognized that converting the restraining order to a preliminary injunction before Defendants produced the administrative record would be "unfair to the Plaintiffs." *Id.* at 8:11.

Following the status conference, Defendants rebuffed Plaintiffs' repeated requests for information about basic contours of the record such as the categories of documents Plaintiffs could expect. *See* Hu Decl., Exs. B, D. Defendants insisted as late as March 5, 2025—*ten days*

after the Court issued its restraining order—that they still did not know even the broad categories of information that would be contained in the record.  Hu Decl., Ex. D.

## LEGAL STANDARD

Ordinarily, "the focal point for judicial review" under the Administrative Procedure Act ("APA") "should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Mayor & City Council of Baltimore v. Trump*, 429 F. Supp. 3d 128, 137 (D. Md. 2019) (internal quotations and citation omitted).  But that rule is subject to several exceptions.  "Discovery beyond the record may be appropriate where the record is incomplete; where additional information would provide helpful context; where supplemental information would assist the court in determining whether the agency failed to consider relevant factors; and, where the record's integrity has been impugned."  *Id.*

## ARGUMENT

### I.     The Administrative Record Is Manifestly Deficient

The central question in this case "is whether the DOGE affiliates 'have a need for the record[s] in the performance of their duties.'"  Mem. Op. at 22 (quoting 5 U.S.C. § 552a(b)(1)).  The administrative record that Defendants produced does not answer that question in any way, shape, or form.  The record for all three agencies *combined* totals just 64 documents and 312 pages, and even those figures are inflated by the inclusion of lengthy public documents.

|           | Total Documents | Total Pages | Total Non-Public Documents | Total Non-Public Pages |
|-----------|-----------------|-------------|----------------------------|------------------------|
| Education | 12              | 29          | 11                         | 27                     |
| OPM       | 25              | 74          | 20                         | 54                     |
| Treasury  | 27              | 209         | 26                         | 68                     |
| All       | 64              | 312         | 57                         | 149                    |

Those scant few pages do not answer basic questions about each agency's decision to permit unfettered access to their data systems, including who the DOGE affiliates are, where

they work, when they were granted access, which systems of records they are accessing, and what they are doing with the data contained in those systems.

### A.     Education

***DOGE Affiliate Identities***:  The record does not identify all the DOGE affiliates at Education.  In a sworn declaration submitted by Defendants, Adam Ramada, a DOGE employee, represented that, including himself, "[t]here are six employees at the Department of Education whose principal role is to help advance the goals of Executive Order 14,158."  *See* ECF No. 27 ("TRO Opp'n") at 7 (citing ECF No. 27-5 ("Ramada Decl.") ¶¶ 4–6).  But the administrative record mentions only four DOGE affiliates.  *See* ECF No. 51-3 ("ED-AR"), at 13–26.  It contains no reference to Mr. Ramada or the sixth DOGE affiliate.

***DOGE Affiliate Agency***:  The record contains few facts that would enable the Court to decide whether the six DOGE affiliates are actually Education "employees," a pivotal issue that the Court assumed without deciding in its TRO opinion.  *See* Mem. Op. at 21.

***Systems of Records Access***:  The record does not clarify which of Education's 110 systems of records the DOGE affiliates can access.  A half-page memorandum "authorize[d] USDS personnel onboarded to the Department of Education DOGE team full and prompt access to all unclassified IT systems and data."  ED-AR at 29.  But it did not explain what counts as "*unclassified* IT systems and data" or if that includes student loan program systems, some of which requires security clearances but which DOGE affiliates apparently have had access to. *See* Ramada Decl. ¶¶ 9–11; Dep't of Educ., Privacy Impact Assessment (PIA) for the Common Origination and Disbursement Systems, at 22 (Sept. 29, 2023), https://www.ed.gov/sites/ed/files/ notices/pia/fsa-pia-cod.pdf (access to "moderate" security COD system restricted to people with corresponding security clearances).  It also does not answer when each DOGE affiliate was

granted access.  Mr. Ramada, for example, appears to have gained access as early as January 28, 2025, a week before the memorandum.  Ramada Decl. ¶ 4.

   *Use of Records*:  The record does not reveal how the DOGE affiliates are using the accessed data, including whether DOGE affiliates are feeding this information into AI systems.

   *Omitted Documents*:  The record is missing numerous documents.  Mr. Ramada swore that "[a]ll six employees" at Education "attended an ethics briefing, received information security training, and signed an information technology rules of behavior and user agreement for privileged Users."  *Id.* ¶ 7.  The record does not reflect this.  Mr. Ramada also represented in a supplemental declaration that one DOGE affiliate had "not yet completed ethics or information security trainings" and "has been directed to complete both [that] week."  *See* Supp. Ramada Decl. ¶ 9.  That is not in the record.  The record also contains inconsistent evidence on whether DOGE affiliates have undergone background screening:  One DOGE affiliate appears to have passed a "preliminary review," ED-AR at 14, another had their review temporarily waived, *id.* at 26, another's employment form (dated February 12) says they must obtain clearance before starting without any indication of whether that occurred, *see* Hu Decl., Ex. H at 3, and there is no mention of what security precautions were taken as to the three other DOGE affiliates before they were granted access to PII.

   The record is also a plain attempt to manufacture a post-hoc paper trail.  A half-page memo from February 5 states:  "[T]his memorandum documents the need to know and authorizes USDS personnel onboarded to the Department of Education DOGE team full and prompt access to all unclassified IT systems and data."  ED-AR at 29.  It does nothing of the sort.[3]  Presumably

---

[3] It is unclear whether pages are missing, as the memorandum is composed mainly of an "introduction" section with nothing to follow.

aware of this deficiency, Education added two documents into the administrative record (the "Terms and Conditions of Reimbursable Work" and "Memorand[a] of Understanding") that purportedly expound on the DOGE affiliates' "scope of work," such as improving software infrastructure to increase efficiency. *See id.* at 5–12. But these documents were both drafted on February 12, 2025—**two days *after* Plaintiffs filed this lawsuit**—and are obviously aimed at building a record to justify decisions that the Department made weeks before.[4] In addition, the documents' claim that they merely codified an existing understanding that DOGE affiliates will improve software efficiency is belied by the contemporaneous account of a DOGE affiliate, who wrote on February 4 that he was retained to "perform[] cost reductions" so that "[l]ess dollars will flow from Department of Ed[ucation] to many non-profit and for profit institutions and companies." *Id.* at 22.

### B.    OPM

***Systems of Records Access***:  The record contains an incomplete account of why or how the DOGE affiliates were granted access to OPM's systems of records. The record does not contain *any* report or memorandum describing the decision to grant access to OPM databases. The only hint of the agency's decisionmaking comes from the "Getting DOGE Engineers access" email chain. ECF No. 51-1 ("OPM-AR") at 23–29. On January 27, Acting Director Charles Ezell sent an email stating that OPM was "rapidly ramping up some engineers" who, though OPM did *not* have "immediate plans to change anything," for some reason needed the following for "each computer system" that OPM operates:

---

[4] These documents try to elide this reality by stating that they merely "formalize[] . . . the prior oral agreement." ED-AR at 5, 9.  There is no evidence of any "oral agreement" in the record.

- Code read and write permissions
- Deploy ability Octopus deploy
- Monitoring dashboards (e.g. displaying success rates, volume of traffic)
- Documentation (e.g. test and deploy instructions, system diagrams)
- The on-call rotation for the system
- Names of all engineers deeply familiar with the system
- Names of all product/project managers deeply familiar with the system
- Ability to access the system as a regular user (e.g. hiring manager and onboarding user for USA Staffing)
- Ability to access the system as an admin user
Prioritize USA Staffing, USAJOBS, and EHRI.

*Id.* at 32–33.  But even this email acknowledges that two of the DOGE affiliates "ha[d] already been setup with some access," *id.* at 33, before January 27.  Nothing in the record shows how this occurred.

These deficiencies are only magnified by the incomplete record on the "Account Creation Audit" that OPM performed *after* this lawsuit was filed.  On February 16, 2025, an OPM employee sent Defendant Ezell and others an "Account Creation Audit" Excel file, which included information on user access.  OPM-AR at 27.  But the version of that spreadsheet that was filed on the docket, which spans nearly half the non-public pages in the record, was unintelligible.  *Id.* at 30–52.  Defendants later emailed Plaintiffs an updated copy that cured these errors.  *See* Hu Decl. ¶¶ 7–8.  That corrected spreadsheet confirms that two DOGE affiliates were granted access to numerous OPM databases from January 20–23.  *See id.* Ex. E.

Once more, though, there is no indication of how these two DOGE affiliates obtained access to these databases in mid-January and for what reasons.  That omission is striking given that, on February 18, OPM's Chief Information Officer requested that employees "provide the Cybersecurity Division with evidence of the system account approvals for all internal OPM user accounts created since 1/20/2025 until 2/12/25," including "[e]mail request[s] from user and

approval," "[e]mail request[s] to helpdesk with approval from supervisor," and "Azure access packages approvals." *Id.* at 57. The record does not include any responses to that request.

*Use of Records*: There is similarly nothing in the record that reveals how the DOGE affiliates are using their access to these systems of records. Defendant Ezell's email requesting access offers no insight on this central question because, in his own telling, the DOGE affiliates did *not* need this access because there were no "immediate plans to change anything" or any "immediate plans for new engineers to make direct changes to any of these systems." *Id.* at 33.

The record also does not explain what the DOGE affiliates' responsibilities are. All it reflects is that three of these affiliates were appointed "[t]o provide a high level of expertise relative to issues which have a significant impact on the formulation of agency goals and objectives to the OPM Director." *Id.* at 12, 15, 26. Two affiliates have no description at all.

*Omitted Documents*: The record is missing documents. For example, various DOGE-affiliate personnel forms reference other predicate documents that are not contained in the record. John Hogan's "Notification of Personnel Action" form indicates he was "approved for conversion to permanent incumbency" on February 11, 2025, citing "OPM FORM 1652 DATED 02-11-2025." *See* OPM-AR at 8. That form is absent from the record as are numerous other similarly referenced documents. *See, e.g.*, *id.* at 21 (referencing same form in connection with another DOGE affiliate); *id.* at 17 (referencing non-existent "attach[ment]" that describes DOGE affiliate's "duties" and "qualifications"). The record includes personnel documents for certain DOGE affiliates, *see id.* at 15 (providing form with "position title" and "reason[s] for temporary appointment" for DOGE affiliate "OPM-3"), while failing to provide them for others, *see id.* at 18 (omitting same for "OPM-4").

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR EXTRA-RECORD DISCOVERY

C.    **Treasury**

The Treasury record likewise fails to provide even basic information about Defendants'

decision to grant DOGE affiliates unprecedented access to Treasury systems.  Nearly **two-thirds**

of that record consists of publications from the *Federal Register*.  *See* ECF No. 51-2 ("T-AR") at

75–215.  Numerous pages are blank, *see id.* at 42, 44, 59, 61, 71, and others contain unexplained

redactions, *id.* at 72–74.  As with the other records, this one is plainly incomplete; for example:

- A February 3, 2025 email among DOGE-affiliates Marko Elez and Thomas Kraus and
  several Treasury officials attaches an "updated" spreadsheet summarizing Mr. Elez's
  levels of access to various Treasury data systems.  *Id.* at 67–68.  The email states that
  officials "reviewed" a previous version of the spreadsheet and revised Mr. Elez's "access
  levels . . . based on [their] conversation."  *Id.*  The original version of the spreadsheet is
  absent from the record, as is any information regarding the referenced "conversation" or
  who recommended adjusting Mr. Elez's access and why.  *Id.*

- Although Treasury officials stated that they "need[ed] to better understand [DOGE's]
  objective" to comply with access requests, the record does not reveal what, if anything,
  was communicated to these officials in response.  *Id.*

- The access spreadsheet appears to contradict the sworn testimony of Deputy
  Commissioner Gioeli.  Mr. Gioeli's declaration states that "[o]n February 3,
  2025, . . . Mr. Elez . . . was provided read-only access to the Payment Automation
  Manager (PAM) Database, Payment Automation Manager (PAM) File System, and,
  subsequently on February 5, the Secure Payment System (SPS) Database."  *See* ECF No.
  27-3 ("Gioeli Decl.") ¶ 17.  The spreadsheet shows that Mr. Elez was granted access to
  all of those systems as of *February 1*.  *See* T-AR at 68 (emphasis added).*1*.  *See* T-AR at
  68.

- Nothing in the record sheds light on how Elez used his access to Treasury's systems,
  including how he "automat[ed]" a manual payment review, as the Declaration of Vona S.
  Robinson described.  Robinson Decl. ¶ 11.

- Although the record indicates that "USDS/DOGE" received "'over the shoulder' access
  to monitor Fiscal Service personnel conducting payment processing roles" on January 23,
  *see* T-AR at 65, nothing in the record explains why or to whom such access was granted.
  In fact, the original January 23 request itself is missing from the record.

- The record does not include the email/weekly report that Treasury's threat intelligence
  team sent describing DOGE affiliates' access to Treasury's data systems as "the single
  greatest insider threat risk" the Bureau of Fiscal Service has ever faced.  Hu Decl., Exs. F
  & G.

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR EXTRA-RECORD DISCOVERY

The Treasury record also raises further concerns about the privacy of Plaintiffs' data. Elez was granted access to Treasury's systems without agreeing to the Fiscal Service rules of behavior.  *See* T-AR at 36.  The record also contains no indication that Elez ever completed a background check—only that he received "interim approval . . . contingent on a completed background investigation."  *Id.* at 33 (underlining in original).

## II.    Extra-Record Discovery Is Required

The "record" created by Defendants is so insufficient that it requires extra-record discovery on two independent bases: (1) it prevents meaningful judicial review and (2) it was plainly made in bad faith.

### A.    The Court Should Order Discovery Because the Record Prevents Adequate Judicial Review

Extra-record discovery is appropriate because the administrative record is "so bare that it prevents effective judicial review," *Com. Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998), and fails to explain basic aspects of the challenged action including the who, what, where, when, or why, *see Camp v. Pitts*, 411 U.S. 138, 142–43 (1973) (explaining that discovery is appropriate when there is "such [a] failure to explain administrative action as to frustrate effective judicial review").

Faced with the prospect of a similarly deficient administrative record in another case challenging DOGE affiliates' access to sensitive information, Judge Bates recently ordered expedited discovery to determine "the contours of the agency actions that plaintiffs challenge." *See* Order at 1, *AFL-CIO v. U.S. Dep't of Lab.*, No. 1:25-cv-00339 (D.D.C. Feb. 27, 2025), ECF No. 48.  While recognizing that APA challenges are usually limited to the administrative record, Judge Bates explained that courts "may depart from the default APA no-discovery rule" when extra-record evidence is needed to "ascertain the contours of the precise policy at issue" or "fill[]

the gaps to determine what the agency actually did." *Id.* at 6 (first quoting *Venetian Casino Resort, L.L.C. v. EEOC*, 409 F.3d 359, 367 (D.C. Cir. 2005); and then quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1227 (D.C. Cir. 1993) (alteration omitted)).[5] Discovery was necessary because the administrative record there would not adequately explain what occurred when the agencies granted DOGE affiliates access to their confidential systems of records. *See* Mem. Op. at 6–7.

The same is true here. Without discovery to fill in the gaping holes in the administrative record, there is no way to figure out what Defendants "actually did" when granting access to DOGE affiliates. *See* Order at 6, *AFL-CIO*, No. 1:25-cv-00339, ECF No. 48. Proceeding on this record would morph meaningful judicial review into a guessing game of what access the DOGE affiliates were granted, what reasons justified those authorizations, and whether those unspecified rationales meet the Privacy Act's demanding "need to know" standard. Where, as here, "the record fails adequately to explain the agency's course of conduct or the basis for its decision such that judicial review is frustrated, courts may obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary . . . to determine what the agency actually did." *Green v. Nat'l Archives & Recs. Admin.*, 992 F. Supp. 811, 821 (E.D. Va. 1998) (internal quotations and citations omitted).

## B.    The Court Should Order Extra-Record Discovery Because Defendants Acted in Bad Faith

It is also well-established that courts may order extra-record discovery in an APA action when there has been a "strong preliminary showing" that the federal agency defendant acted in bad faith. *Kravitz v. U.S. Dep't of Com.*, 336 F. Supp. 3d 545, 570 (D. Md. 2018) (citation

---

[5] Judge Bates relied on *Venetian Casino Resort, L.L.C. v. EEOC*, 409 F.3d 359 (D.C. Cir. 2005), the same case that this Court analogized to when finding that the decision to grant DOGE affiliates access to Plaintiffs' personal records was final agency action that can be challenged under the APA. *See* Mem. Op. at 16–18.

omitted); *see also U.S. Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019); *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 458 (D.C. Cir. 1994). That is the case here.

Defendants appear to have "purposefully withheld negative documents" in constructing what purports to be the administrative record. *Maritime Mgmt. v. United States*, 242 F.3d 1326, 1335 (11th Cir. 2001). For example, and as noted above, it has been widely reported in the news that Treasury's threat-intelligence team issued a written recommendation that DOGE members have their access to payment systems suspended due to informational security risks. Mr. Gioeli's declaration similarly acknowledges that granting DOGE affiliates broad access to Treasury's payment systems "presented risks," including "insider threat risk." Gioeli Decl. ¶ 11. His declaration then goes on to say that these identified risks led Treasury to "develop[] mitigation strategies." *Id.* Yet Defendants' administrative record is devoid of any documents—from Treasury or any other agency—analyzing the insider threat risk posed by giving DOGE affiliates access to such sensitive systems. Hu Decl., Exs. F & G. As the reports and Mr. Gioeli's declaration make clear, this information *exists* but Defendants *deliberately chose to omit it* from the administrative record. That is bad faith. *See Maritime*, 242 F.3d at 1335; *see also Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 2017 WL 3189446, at *7 (D. Md. July 27, 2017) ("The whole administrative record includes pertinent but unfavorable information."); *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005) ("The agency may not skew the record in its favor by excluding pertinent but unfavorable information.").

Evidence of Defendants' pretextual decision-making also suggests bad faith. *See, e.g.*, *Kravitz*, 336 F. Supp. 3d at 570–71. When an agency's explanation is "incongruent with what the record reveals about the agency's priorities and decisionmaking process," courts "cannot ignore the disconnect" and must "demand" more. *U.S. Dep't of Com.*, 588 U.S. at 785. That is

-13-

because it would "defeat the purpose" of judicial review if courts simply accepted at face-value "contrived" reasons or records offered by a defendant agency. *Id.*

Defendants' stated reasons for their actions are not aligned with the record. Defendants have represented to this Court that they provided DOGE affiliates unfettered access to Plaintiffs' personally identifiable information because (i) in the Treasury, they "need to . . . assess and modernize payment systems and financial report tools"; (ii) in OPM, they need to "execute their direction to implement workplace reform"; and (iii) in Education, they need to "audit student loan programs for waste, fraud, and abuse." ECF No. 27 at 26. But those justifications "do not match" what limited explanations can be gleaned from the administrative record for Defendants' decisions to grant DOGE affiliates access. *U.S. Dep't of Com.*, 588 U.S. at 785.

There is also evidence that Defendants attempted to construct post hoc a "legally-defensible" reason to justify their decisions to grant access. *Kravitz*, 336 F. Supp. 3d at 571. In Education, for example, the February 5 need-to-know memorandum was both cursory and likely issued *after* some DOGE affiliates had already been granted access, *see supra* p. 7. The record was subsequently expanded to include documents from *February 12*—long after access was granted and two days after Plaintiffs filed their Complaint—purportedly expounding on the reasons DOGE affiliates require access, *see supra* pp. 8–9. Such manipulations of the administrative record entitle Plaintiffs to extra-record discovery. *U.S. Dep't of Com*, 588 U.S. at 785.

**III.    The Necessary Evidence Will Not Be Before the Court by March 17 and Defendants' Gamesmanship Should Not Be Rewarded**

For the reasons set forth above, Defendants should be required to produce extra-record evidence. But given that it took Defendants almost two weeks to produce 64 documents, it is not possible that they can properly supplement the record in time for Plaintiffs to have a chance to

meaningfully review any new information before March 17. And it would have to be before

March 17, because the Government has refused to extend the TRO any further.

But the answer cannot be that *Plaintiffs* must choose between either (1) forging ahead on

a cherry-picked record or (2) allowing the temporary restraining order to lapse in order to obtain

a proper record. Either choice merely rewards Defendants for their gamesmanship. Plaintiffs

therefore ask the Court to (1) convert the current TRO into a preliminary injunction per the

Government's repeated prior requests, while ordering a relatively short timeline for further

discovery and a summary judgment motion and (2) order expedited discovery related to the

Treasury Department so that Plaintiffs may brief a preliminary injunction solely as to Treasury

within three weeks.

## A.    The Court Should Convert the TRO Into a Preliminary Injunction And Set a Discovery And Summary Judgment Schedule

### 1.    The TRO Should Be Converted to a Preliminary Injunction

The Court recognized at the scheduling conference that it would be "unfair" to Plaintiffs

for Defendants to advance on appeal an argument attacking the sufficiency of the evidence

supporting a preliminary injunction if they chose to deny Plaintiffs the opportunity to develop

evidence. Status Conf. Tr. at 8:8–12; *see also* ECF No. 33 (refusing to "forgo

any . . . argument[s]"). It is equally unfair to Plaintiffs for Defendants to produce a deficient

administrative record so close to the hearing date that it forces Plaintiffs to choose between

letting the temporary injunction lapse while awaiting a proper record, or proceeding on a facially

incomplete record.

Defendants squandered twelve days in producing a plainly inadequate record,

representing to the Court that compiling the record was a "substantial undertaking" and that an

earlier deadline was not feasible. Status Conf. Tr. at 10:3. In the interim, Defendants declined to

provide basic information to Plaintiffs that might have sooner revealed the inadequacy of the productions.  Hu Decl. ¶ 3 & Ex. D.  In effect, Defendants have avoided producing evidence about their decisionmaking process by running out the clock—the exact concern that Plaintiffs raised at the status conference.  Status Conf. Tr. at 12:20–13:6

To ensure that Plaintiffs receive the discovery to which they are entitled without sacrificing the protections of an injunction that prevents DOGE affiliates from accessing Plaintiffs' PII, the Court should convert the restraining order into a preliminary injunction and set a schedule for extra-record discovery followed by a motion for summary judgment.  Having repeatedly urged the Court to convert its temporary restraining order into a preliminary injunction, Defendants should not be heard to object to that outcome now, especially because their own machinations have forced Plaintiffs to seek this relief.  *Sheet Metal Workers' Nat. Pension Fund v. Metals and Machining Fabricators, Inc.*, 637 F. Supp. 50, 52 (D.D.C. 1986) ("[T]he Court will not rescue [a party] from [a] problem which is largely of their own making.").

The Court should enter a preliminary injunction based on the findings in the temporary restraining order.[6]  *See Maages Auditorium v. Prince George's County*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014), *aff'd*, 681 F. App'x 256 (4th Cir. 2017) ("The standard for a temporary restraining order is the same as a preliminary injunction.").

## 2. The Court Should Order A Discovery Schedule

The Court should order a relatively short discovery period in order to move this case to summary judgment and permit prompt and effective judicial review of Plaintiffs' claims for

---

[6] Because Defendants produced a plainly deficient administrative record, "[n]othing has occurred to alter the analysis in the Court's original TRO," and the Court has the discretion to convert the restraining order into a preliminary injunction rather than rule on a manifestly incomplete record.  *See ABX Air, Inc. v. Int'l Bhd. of Teamsters*, 2016 WL 7117388, at *5 (S.D. Ohio Dec. 7, 2016).

permanent injunctive relief.  Defendants should not be allowed to continue to evade meaningful

discovery simply because the Court enters a preliminary injunction.

Plaintiffs propose that the Court set a discovery cutoff of three months from now, with

Plaintiffs to file a motion for summary judgment pursuant to a briefing schedule set by the Court

after the Parties have conferred.  Where, as here, the administrative record is insufficient, courts

within the District have ordered all fact and expert discovery to close and motions for summary

judgment to be filed within three months of the order requiring extra-record evidence.  *See*

Scheduling Order, *Kravitz v. U.S. Dep't of Com.*, No. 8:18-CV-01041 (Sept. 6, 2018), ECF No.

56.  Plaintiffs' proposal is similar.

Plaintiffs seek only the narrow discovery necessary to answer basic questions about

Education and OPM's decision to grant unfettered access to DOGE affiliates.  Plaintiffs

accordingly request discovery, including documents and testimony, into the following topics:

1.  Defendants' decisions to grant DOGE affiliates access to their data systems, including recommendations *not* to grant, or to revoke, access;

2.  The DOGE affiliates who have (or have had) access to Defendants' systems of records, including the system(s) each DOGE affiliate has (or had) access to, the date(s) each DOGE affiliate had access to each system, the level of access each DOGE affiliate has (or had) to each system, the official titles and responsibilities of each DOGE affiliate, and the level of security clearance each DOGE affiliate possesses;

3.  The purpose for which each DOGE affiliate was granted access; and

4.  Each DOGE affiliates' use and dissemination of the records contained within Defendants' systems of records, including in connection with AI tools or software.

Given the limited scope of the proposed discovery, Defendants should easily be able to

provide actual meaningful responses within three months.

**B.     The Court Should Set a Preliminary Injunction Hearing Relating to Defendant Treasury and Order Expedited Discovery**

The Court should also set a preliminary injunction hearing to resolve Plaintiffs' claims against DOGE affiliates' data access at Treasury.

The Court declined to enter a TRO against Defendants Treasury and Secretary Bessent because another court in the Southern District of New York already had "granted a preliminary injunction that effectively gives the plaintiffs in this case the relief they seek against Treasury." *See* Mem. Op. at 2 n.1 (citing *New York v. Trump*, No. 25-CV-01144-JAV, 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025)). But that case is meaningfully different from the one at hand. The Southern District of New York did not address Plaintiffs' core argument that Defendants are violating the Privacy Act by disclosing records to DOGE representatives because it held that the States who filed that action were not individuals and therefore could not assert "claims based upon the Privacy Act." *Trump*, 2025 WL 573771, at *16. Its order was instead based on Treasury's inadequate vetting, security, and training procedures. *See id.* at *22–23. The district judge has directed Treasury to submit a report by March 24, 2025, explaining the actions it has taken to address those concerns, after which it will determine "whether the Treasury Department has adequately redressed" these deficiencies "so as to justify the termination or modification of the preliminary injunction." *Id.* at *27. The temporary reprieve at Treasury could therefore evaporate based on factors unrelated to the Privacy Act violations asserted here and without input from Plaintiffs whose personal information is at risk. Plaintiffs therefore ask that the Court expedite discovery and hear Plaintiffs' requests for preliminary injunctive relief against Defendant Treasury. *See, e.g.*, *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 59 (D.D.C. 2020) (noting that courts "routinely grant follow-on

injunctions against the Government, even in instances when an earlier nationwide injunction has

already provided plaintiffs in the later action with their desired relief").

    To make that preliminary injunction hearing meaningful, Defendant Treasury must be

ordered to produce expedited discovery into the categories identified above.  In deciding whether

to order expedited discovery, courts consider whether there is "good cause" under "the totality of

the circumstances," including:

> [1] whether a motion for preliminary injunction is pending; [2] the breadth of the
> requested expedited discovery; [3] the reasons the moving party is requesting
> expedited discovery; [4] the burden on the opponent to comply with the request
> for expedited discovery; [5] whether the information sought expeditiously could
> be obtained more efficiently from some other source; [6] the extent to which the
> discovery process would be expedited; and [7] whether a motion to dismiss for
> failure to state a claim is pending.

*ClearOne Advantage, LLC v. Kersen*, No. CV JKB-23-03446, 2024 WL 278917, at *1 (D. Md.

Jan. 25, 2024); Order at 4, 16, *AFL-CIO*, No. 1:25-cv-00339, ECF No. 48 (concluding those

factors weighed in favor of granting expedited discovery in related Privacy Act litigation).

These factors weigh in favor of ordering expedited discovery in advance of a preliminary

injunction hearing addressing Treasury's decision to grant access to DOGE affiliates.

    First, a motion for preliminary injunction would be pending on Treasury (first factor) and

good reasons exist (third factor) because Plaintiffs' need for expedited discovery stems directly

from Defendants' deficient production and insistence on a compressed timeline.

    Second, the limited scope of the discovery (second factor) and the minimal burden on

Defendants (fourth factor) favor expedited discovery.  The discovery is necessary to facilitate

meaningful judicial review, and Defendants cannot complain about a burden that is only

necessary because of their own deficient administrative record.  *New Medium Techs. LLC v.*

*Barco N.V.*, 242 F.R.D. 460, 469 (N.D. Ill. 2007) ("[C]laims of burden and prejudice are

inevitably rejected when the complaining party is the author of its own dilemma.").

Third, the information cannot be had from other sources (fifth factor). Defendants and DOGE have gone to great length to obscure what exactly is being done with Defendants' data systems from the public (and, frankly, from Plaintiffs and this Court). Only Defendants can answer questions about the extent of, and reason for, DOGE affiliates' access to and use of Defendant Treasury's systems.

Finally, Plaintiffs propose to expedite discovery by a reasonable amount of time (sixth factor) and no motion to dismiss is pending (seventh factor). Plaintiffs propose three weeks for discovery, to be followed by expedited briefing for a preliminary injunction against Defendant Treasury. That is ample time for Treasury to fill in the glaring gaps in the administrative record and provide a sufficient record for this Court to review.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Extra-Record Discovery, convert the temporary restraining order into a preliminary injunction, and order expedited discovery in advance of a motion for summary judgment and request for permanent injunctive relief.

DATED:  March 8, 2025

By:  */s/Xiaonan April Hu*

Xiaonan April Hu (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 220-1123
April.Hu@mto.com

John L. Schwab (*pro hac vice*)
Liam Gennari (*pro hac* forthcoming)
MUNGER, TOLLES & OLSON LLP
350 S Grand Ave 50th Floor
Los Angeles, California 90071
(213) 683-9260
John.Schwab@mto.com

Carson Scott (*pro hac vice*)
Roman Leal (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
(415) 512-4000
Carson.Scott@mto.com
Roman.Leal@mto.com

Mark Hanna (Fed. Bar No. 16031)
David J. Rodwin (Fed. Bar No. 18615)
MURPHY ANDERSON, PLLC
1401 K Street NW, Suite 300
Washington, DC 20005
T: (202) 223-2620 | F: (202) 296-9600
mhanna@murphypllc.com
drodwin@murphypllc.com

Daniel McNeil (*pro hac vice*)
General Counsel
American Federation of Teachers, AFL-CIO
555 New Jersey Ave. NW
Washington, DC 20001
T: (202) 393-6305 | F: (202) 393-6385
dmcneil@aft.org

-21-

Benjamin L. Berwick (*pro hac* forthcoming)
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Jessica A. Marsden (*pro hac vice*)
PROTECT DEMOCRACY PROJECT
510 Meadowmount Village Circle, No. 328
Chapel Hill, NC 27517
(202) 579-4582
jess.marsden@protectdemocracy.org

Kristy Parker (*pro hac vice*)
Jane Bentrott (*pro hac vice*)
Shalini Goel Agarwal (*pro hac vice*)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
202-843-3092
kristy.parker@protectdemocracy.org
jane.bentrott@protectdemocracy.org
shalini.agarwal@protectdemocracy.org

Laurence M. Schwartztol (*pro hac vice*)
DEMOCRACY AND RULE OF LAW CLINIC
Harvard Law School 1525 Massachusetts Avenue
Cambridge, MA 02138 (617) 998-1877
lschwartztol@law.harvard.edu