# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

American Federation of Teachers, *et al.*,

        *Plaintiffs*,

    vs.

SCOTT BESSENT, in his official capacity as
Secretary of the Treasury, *et al.*,

        *Defendants*.

Case No. 8:25-cv-00430-DLB

Date:    March 17, 2025
Time:    10:30 am
Place:   Greenbelt Courthouse
Judge:  Hon. Deborah Boardman

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ...................................................................................................2

I.    The Privacy Act of 1974 ..........................................................................................2

II.    Defendants Grant DOGE Affiliates Unprecedented and Unlawful Access........................2

    A.    Education Systems ..............................................................................................3

    B.    OPM Systems .....................................................................................................5

    C.    Treasury Systems ...............................................................................................7

III.    This Court Enjoins Defendants' Unlawful Disclosures.....................................................9

LEGAL STANDARD...........................................................................................................10

ARGUMENT ........................................................................................................................10

I.    Defendants' Decisions to Grant Access to Plaintiffs' Personal Information Were Final Agency Actions Reviewable Under the APA....................................................11

II.    Plaintiffs Are Likely to Prevail on the Merits...............................................................12

    A.    Defendants' Decisions to Disclose Violated the Privacy Act...............................12

        1.    Defendants' Decisions to Grant Access Constitute Unlawful Disclosures.............................................................................................12

        2.    Defendants' Disclosures Do Not Fall Under the "Need-to-Know" Exception .........................................................................................13

            (a)    Education .........................................................................................16

            (b)    OPM ................................................................................................18

            (c)    Treasury ..........................................................................................20

    B.    Defendants' Decisions to Disclose Were Arbitrary and Capricious.....................21

        1.    Education .........................................................................................22

        2.    OPM ................................................................................................23

        3.    Treasury ..........................................................................................24

III.    Defendants' Disclosures Will Cause Irreparable Harm Absent an Injunction .................25

IV.    The Equities and Public Interest Favor Plaintiffs ............................................................27

V.    The Court Should Order An Evidentiary Hearing ...........................................................29

CONCLUSION......................................................................................................................30

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Advocs. for Highway and Auto Safety v. Fed. Motor Carrier Safety Admin.*,
 429 F.3d 1136 (D.C. Cir. 2005)................................................................25

*Am. Fed. of Gov't Emps., AFL-CIO v. U.S. Off. of Personnel Mgmt.*,
 No. 3:25-cv-01780 (N.D. Cal. Feb. 28, 2025)..........................................5

*Bennett v. Spear*,
 520 U.S. 154 (1997).................................................................................11

*Bigelow v. Dep't of Def.*,
 217 F.3d 875 (D.C. Cir. 2000)...........................................................13, 19

*California v. U.S. Dep't of Health & Hum. Servs.*,
 390 F. Supp. 3d 1061 (N.D. Cal. 2019)...................................................26

*Campbell v. Sims*,
 No. TDC-20-2590, 2021 WL 4342039 (D. Md. Sept. 23, 2021)..............28

*Citizens to Pres. Overton Park, Inc v. Volpe*,
 401 U.S. 402 (1971), abrogated on other grounds by *Califano v. Sanders*, 430
 U.S. 99 (1977).........................................................................................29

*ClearOne Advantage, LLC v. Kersen*,
 710 F. Supp. 3d 425 (D. Md. 2024).........................................................10

*Columbia Gas Transmission Corp. v. FERC*,
 448 F.3d 382 (D.C. Cir. 2006)..................................................................23

*Dick v. Holder*,
 67 F. Supp. 3d 167 (D.D.C. 2014)...........................................................14

*Healthy Teen Network v. Azar*,
 322 F. Supp. 3d 647 (D. Md. 2018)..........................................................18

*Idaho Sporting Congress, Inc. v. Rittenhouse*,
 305 F.3d 957 (9th Cir. 2002)....................................................................25

*Judicial Watch, Inc. v. Department of Energy*,
 412 F.3d 125 (D.C. Cir. 2005)..................................................................18

*League of Women Voters v. Newby*,
 838 F.3d 1 (D.D.C. Cir. 2016)..................................................................28

*Maryland State Dep't of Educ., Div. of Rehab. Serves. v. U.S. Dep't of Veterans Affs.*,
896 F. Supp. 513 (D. Md. 1995) ........................................................................... 29

*Mayor & City Council of Balti. v. Azar*,
392 F. Supp. 3d 602 (D. Md. 2019) ..................................................................... 27

*Michigan v. EPA*,
576 U.S. 743 (2015) ............................................................................................. 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................................... 21

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
915 F.3d 197 (4th Cir. 2019) ......................................................................... 25, 27

*New York v. Trump*,
No. 25-CV-01144 (JAV), 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025) ............... 23, 24, 26, 27

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................................ 10, 27

*Norman-Bloodsaw v. Lawrence Berkeley Lab'y*,
135 F.3d 1260 (9th Cir. 1998) ............................................................................. 26

*Parks v. Internal Revenue Service*,
618 F.2d 677 (10th Cir. 1980) ........................................................................ 14, 15

*Roberts v. Austin*,
632 F.2d 1202 (5th Cir. 1980) ............................................................................. 26

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) ............................................................................. 28

*Roe v. Dep't of Def.*,
947 F.3d 207 (4th Cir. 2020) .......................................................................... 17, 21

*Sanchez v. McAleenan*,
No. GLR-19-1728, 2024 WL 1256264 (D. Md. Mar. 25, 2024) ...................... 11, 28

*Stuller, Inc. v. Steak N Shake Enters.*,
695 F.3d 676 (7th Cir. 2012) ............................................................................... 25

*United Mine Workers of Am., Int'l Union v. Dole*,
870 F.2d 662 (D.C. Cir. 1989) ............................................................................ 23

*United States v. Daniel Chapter One*,
793 F. Supp. 2d 157 (D.D.C. 2011) ..................................................................... 28

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

*Venetian Casino Resort, L.L.C. v. EEOC,*
    530 F.3d 925 (D.C. Cir. 2008) ............................................................11

*Walker v. Gambrell,*
    647 F. Supp. 2d 529 (D. Md. 2009) ................................................14, 17

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.,*
    485 F. Supp. 3d 1 (D.D.C. 2020) ........................................................26

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................10

FEDERAL STATUTES

5 U.S.C. § 552a ................................................................. 2, *passim*

31 U.S.C. § 3325 ......................................................................7

FEDERAL REGULATIONS AND NOTICES

40 Fed. Reg. 28948 (July 8, 1975) ................................................12

79 Fed. Reg. 16834 (Mar. 26, 2014) ..............................................6

Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ...................14, 19

Publication of Notice of Systems of Records, 71 Fed. Reg. 35342, 35347 (June
    19, 2006) ......................................................................6

LEGISLATIVE MATERIALS

120 Cong. Rec. 36,917 (daily ed. Nov. 21, 1974) (statement of Sen. Percy) ................15

U.S. Cong. Senate Comm. on Gov't Operations, 94th Cong., Legislative History
    of the Privacy Act of 1974 (2d Sess. 1976) ............................. 1, passim

OTHER AUTHORITIES

U.S. Off. Personnel Mgmt., USAJOBS Privacy Impact Assessment at 4,
    https://www.opm.gov/information-management/privacy-policy/privacy-
    policy/usajobs.pdf ......................................................................6

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## <u>INTRODUCTION</u>

For decades, the Department of Education, the U.S. Office of Personnel Management, and the Department of the Treasury (collectively, "Defendants") have safeguarded personal data belonging to tens of millions of Americans. They strictly followed the requirements set forth in the Privacy Act of 1974, which was enacted to prevent government agencies from sharing the sensitive information they maintain to other agencies or even employees within their own agencies unless absolutely necessary. In so doing, they honored the trust placed in them by the millions of Americans who share personal data ranging from social security numbers to financial information to facilitate applications for employment, benefits, and other services.

No longer. If the sparse administrative record confirms anything, it is this: Defendants granted DOGE affiliates unfettered access to their data systems (and the data within) with barely a thought for whether these affiliates actually needed the personal information stored inside. Their decisions—haphazardly issued in emails and half-page documents, when they are documented at all—did not grapple with the responsibilities of the DOGE affiliates seeking access, much less the serious informational security and privacy consequences of Defendants' decisions. That is not reasoned decisionmaking. That is a snap judgment made without any deliberation, and it violated the law and Plaintiffs' fundamental right to privacy.

In flippantly granting access to DOGE affiliates, Defendants betrayed their statutory obligations and the confidences of the American people, including individual Plaintiffs and members of Plaintiff organizations. Worse still, Defendants have made clear that they intend to pick up where they left off the moment this Court's temporary restraining order expires. This Court should issue a preliminary injunction to protect Plaintiffs until permanent relief can be granted.

**STATEMENT OF FACTS**

**I.     The Privacy Act of 1974**

The Privacy Act was a "landmark achievement in securing for each citizen of the United States the right of privacy with respect to confidential information held by the Federal Government." U.S. Cong. Senate Comm. on Gov't Operations, 94th Cong., Legislative History of the Privacy Act of 1974, at v (2d Sess. 1976), https://web.archive.org/web/20220401081501/ https://www.justice.gov/opcl/PAOverview_SourceBook ("Privacy Act Legis. Hist."). Recognizing that the government collects "immense amounts of very sensitive information on individuals," Congress sought to place meaningful limits on the collection, dissemination, and access of that information by the government (including within the same agency) to protect the American people's right to privacy. *Id.* at 5–6.

The Act begins with the rule that personal records maintained by a government agency within any such system of records *cannot* be disclosed absent prior written consent by the person whose records are being sought. *See* 5 U.S.C. § 552a(b). Congress carved out several exceptions to this rule, which enable the government to share personal records even without prior written consent. As relevant here, one of these exceptions is "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." *Id.* § 552a(b)(1). The exception is "based on a 'need to know' concept," Privacy Act Legis. Hist. at 1034, and was intended to "strike a balance between the need to know in order to successfully and correctly administer Government programs, and the rights of an individual to be left alone, to control his own personal life." *Id.* at 896.

**II.     Defendants Grant DOGE Affiliates Unprecedented and Unlawful Access**

Defendants collectively maintain more than a hundred data systems containing personally identifiable information ("PII") for tens, if not hundreds, of millions of Americans. Each of

these data systems is the subject of both a System of Record Notice ("SORN") as well as a Privacy Impact Assessment ("PIA"), which carefully set forth the purposes for which that data is collected, the circumstances of its use, and the security guardrails in place to limit unauthorized access to these systems. As discussed *infra*, the types of information maintained in these systems is precisely the sort to which Congress sought to restrict access within the government.

Beginning even before January 20, 2025, persons affiliated with what would later become DOGE began to request wholesale access to Defendants' systems and the PII maintained within. *See* Am. Compl. ¶¶ 51 nn. 28, 29. These requests were denied. *Id.* ¶ 52 nn. 30, 31. Once President Donald J. Trump was inaugurated, however, Defendants swiftly—indeed, unthinkingly—granted DOGE affiliates sweeping access to their systems in clear violation of the Privacy Act.

## A.    Education Systems

The Department of Education ("Education") "promote[s] student achievement and preparation for global competitiveness" by "establishing policies on federal financial aid for education[] and distributing as well as monitoring those funds." Decl. of Xiaonan April Hu ("Hu Decl.") Ex. A (Education webpage). Education oversees funds distributed under Title VI of the Higher Education Act of 1965, which covers grants for postsecondary education, and maintains systems of records to facilitate its various funding initiatives. All told, Education maintains approximately 110 data systems. *See Id.* Decl. Ex. B (Education webpage on SORNs). These systems collectively include PII for millions of Americans, including names, social security numbers, dates of birth, addresses, driver's license numbers, citizenship status, income information, and more. *See, e.g.*, U.S. Dep't of Educ., Privacy Impact Assessment (PIA) for the National Student Loan Data System (NSLDS-New) at 1 (May 19, 2022).

On February 5, 2025, Thomas Flagg, Education's Chief Information Officer, directed Education in a half-page memorandum to provide the "DOGE team" "full and prompt access to *all* unclassified IT systems and data." ECF No. 51-3 at 29 (emphasis added). Although the memorandum purports to "document[] the need to know" supporting the DOGE team's access to Education's systems, it simply parrots President Trump's Executive Order establishing DOGE and DOGE's agenda of "modernizing Federal technology and software." *Id.* The memorandum does not identify the DOGE team members who should be given access, their positions, or their responsibilities, or explain why "modernizing" data systems requires access to social security numbers and other sensitive information for tens of millions of Americans. And it does not address whether DOGE affiliates were given access *before* the memorandum was issued—as the Declaration of Adam Ramada suggests—which would make the memorandum a *post hoc* justification. *See* ECF No. 27-5 ("Ramada Decl.") ¶ 4 ("I have been detailed to the Department of Education since 28 January 2025.").

The remainder of Defendants' threadbare administrative record for Education does not provide this information and also cannot be squared with the Ramada Declaration. For example, the record identifies four DOGE affiliates, but Ramada's declaration states that there are *six* DOGE affiliates, including Ramada, who "require access" to Education's systems. *Id.* ¶ 9. If Ramada was granted access, as his declaration states, the administrative record is devoid of documents cataloguing that access. In fact, the administrative record does not mention Ramada even once. As for the four DOGE affiliates who *are* mentioned in the record, none of the documents explain which systems they gained access to or what they used their access for.

What the record shows instead is that one of these affiliates assumed his position to a "High Risk/Public Trust position" without first undergoing the required "background

investigation." ECF No. 51-3 at 26. This affiliate's stated duties were to "perform[] cost reductions," so "less dollars will flow from Department of ED to many non-profit and for profit institutions and companies." *Id.* at 22. The duties of two other affiliates are described simply as "conduct[ing] research to support [DOGE] efforts," *id.* at 9 (ED-1), and "conducting research and analysis to identify inefficiencies and areas for improvement in ED's administrative programmatic functions and reviewing internal processes . . . to identify areas for improvement," ECF No. 58-1 at 14 (ED-3). The last affiliate's duties are not described at all. ECF No. 51-3 at 13 (ED-2). On February 12, 2025, two days after Plaintiffs filed suit, DOGE entered into an agreement with Education that "supercede[d] the prior oral agreement" and "written interim assignment agreement." *Id.* at 5. The February 12 agreement attempted to retroactively justify DOGE's need to access Education's data systems. *Id.* at 5–6.

### B. OPM Systems

Established in 1978, the U.S. Office of Personnel Management ("OPM") oversees federal workforce management by enforcing the background-check process for federal workers, providing human resources services to other federal agencies to assist them in their hiring and workforce management processes, and developing and administering employee benefits programs. *See* Hu Decl. Ex. C (OPM "About Us" webpage). OPM does not "have the authority to direct the firing of employees, probationary or otherwise, in any other agency." *See* Mem. Op. & Order Amending Temporary Restraining Order at 8, *Am. Fed. of Gov't Emps., AFL-CIO v. U.S. Off. of Personnel Mgmt.*, No. 3:25-cv-01780 (N.D. Cal. Feb. 28, 2025), ECF No. 45. In connection with its responsibilities for the federal workforce, OPM maintains dozens of systems of records, including USAJOBS, USA Performance ("USAP"), and USA Staffing ("USAS"),

each of which is subject to a SORN.[1]  These systems include data such as names, addresses, social security numbers, telephone numbers, email addresses, citizenship information, and more on federal employees and applicants.  *See, e.g.*, U.S. Off. Personnel Mgmt., USAJOBS Privacy Impact Assessment at 4, https://www.opm.gov/information-management/privacy-policy/privacy-policy/usajobs.pdf.

OPM's administrative record does not include any memoranda or reports documenting the agency's decision to provide DOGE affiliates with access.  Instead, it contains only skeletal HR forms,[2] a single email chain with one Excel attachment, and a handful of public SORNs.  The email chain indicates that on January 27, 2025, Defendant Ezell, the Acting Director of OPM, notified an OPM employee that "[w]e are rapidly ramping up some [DOGE] engineers here" and that it was "urgent" to provide them with, among other things, "[c]ode read and write permissions" and "[a]bility to access the system as an admin user."  ECF No. 51-1 at 32–33.  Yet two DOGE affiliates—OPM-5 and OPM-3—had "already been setup with some access" a full week *before* this email was sent out, including access to USAJOBS, USAS, and USAP, which the administrative record does not explain.  *See id.* at 33.

In his January 27 email, Ezell noted that "we don't have any immediate plans for new engineers to make direct changes to any of these systems," but that access should be given to account for "if we need to."  *Id.*  Subsequent emails in the thread from more than a week later indicate that two DOGE affiliates were granted access to OPM's Enterprise Human Resources

_____

[1] OPM has published a SORN for USAJOBS under OPM/GOVT-5.  *See* Privacy Act of 1974: Update and Amend System of Records, 79 Fed. Reg. 16834 (Mar. 26, 2014).  OPM has published a SORN for USAP under OPM/GOVT-2.  Publication of Notice of Systems of Records, 71 Fed. Reg. 35342, 35347 (June 19, 2006).  OPM has published SORNs for USAS under OPM/GOVT-5, OPM/GOVT-6, and OPM/GOVT-7.  Hu Decl. Ex. D at 5.

[2] As discussed in Plaintiff's Motion for Extra-Record Discovery, *see* ECF No. 53-1 at 9, OPM's administrative record does not even include copies of DOGE affiliates' Appointment Request and Certifications that purportedly describe their "duties," "qualifications," and salary, which should have been "attached" to a produced Memorandum of Understanding.

Integration Data Warehouse and Electronic Official Personnel Folder systems even though DOGE affiliates "have never needed access" to them. *Id.* at 27–30. Access to those systems was confirmed to have been revoked on February 16, 2025. *Id.* at 28. Although it is clear that DOGE affiliates continued to have access to USAJOBS, USAS, and USAP, they also appear to have had access to other systems. *See id.* at 42–45. The record does not explain how these affiliates have used their access.

The administrative record also does not describe in any detail what these DOGE affiliates' job duties are. The abbreviated HR forms characterize three of the appointments as needed "[t]o provide a high level of expertise relative to issues which have a significant impact on the formulation of agency goals and objectives to the OPM Director." *Id.* at 12 (OPM-2), 15 (OPM-3), 26 (OPM-6). Two DOGE affiliates' duties are not described at all.

### C. Treasury Systems

The Department of the Treasury ("Treasury") maintains payment and accounting systems to facilitate the disbursement of payments to persons and entities approved by other agencies. By statute, Treasury employees may examine these payments only to confirm that they are "in proper form," have been "certified and approved" by other agencies, and are "computed correctly on the facts certified." 31 U.S.C. § 3325(a)(2). Responsibility for ensuring "the legality of a proposed payment" rests with the agency approving the payment—not with Treasury. *Id.* § 3528(a). Disruptions to Treasury's systems can have "catastrophic consequences," such as "jeopardizing the delivery of lifeline payments to millions of constituents[] and delaying or denying access to thousands of federal agency assets which would all erode public confidence." ECF No. 51-2 at 63.

The administrative record indicates that two DOGE affiliates were granted some form of access to Treasury's systems: Marko Elez and Thomas Krause. On January 21, 2025, Elez was appointed as a special advisor to Treasury. *Id.* at 10. The reason given for his temporary appointment was "administrative need." *Id.* Elez appears to have been appointed to fulfill a position posted on January 15, 2025, for which responsibilities include "strengthen[ing] Treasury's hardware and software" and conducting "special and confidential studies" on Treasury's information technology. *Id.* at 28–29. Elez was granted "<u>interim</u> approval" to enter on duty pending a background investigation and favorable adjudication, the results of which are not in the record. *Id.* at 33 (emphasis in original).

By February 1, 2025, Elez had access to several Treasury systems, including the Secure Payment System ("SPS") and Automated Standard Application for Payments ("ASAP").[3] *Id.* at 68. SPS and ASAP include data such as names and social security numbers—none of which may be used to make adverse benefit determinations.[4] Elez was issued a government laptop without signing the basic rules of behavior regarding use of Treasury's IT systems. *Id.* at 36–38. Elez's request to access at least one other system was placed on hold because of the "need to better understand objective." *Id.* at 68. The record does not explain why Elez needed access to the PII in SPS or ASAP to perform his duties. Instead, a document notes that access to "in scope payment systems *source code*" will be provided to enable the "technical team member"—Elez—to "outlin[e] recommendations for greater efficiencies and potential improvements to the existing payment processes." *Id.* at 63–64 (emphasis added).

---

[3] The record contradicts the Declaration of Joseph Gioeli III, which states that Treasury granted Elez access to "certain BFS systems" on February 3. ECF No. 27-3 ("Gioeli Decl.") ¶ 17.

[4] *See, e.g.*, Hu Decl. Exs. E at 6–8, 22 & F at 7, 11.

On January 23, 2025, Thomas Krause was appointed to be a consultant to Treasury after clearing a background investigation. *Id.* at 21, 30, 45. That same day, DOGE requested "to be granted 'over the shoulder' access to monitor Fiscal Service personnel conducting payment processing roles," which was granted. *Id.* at 65. The record does not explain why such access was granted or who was granted this access.[5] Krause's HR form stated that in his capacity as a consultant, Krause was to "lead[] IT modernization efforts by implementing emerging technologies such as AI, blockchain, and cloud computing" and modernizing "legacy systems." *Id.* at 21. On February 5, 2025, Krause was delegated the duties of the Fiscal Assistant Secretary. *Id.* at 8. The stated rationale was "to meet administration priorities." *Id.*

## III. <u>This Court Enjoins Defendants' Unlawful Disclosures</u>

On February 12, 2025, Plaintiffs filed an Amended Complaint against Defendants asserting three causes of action under the Administrative Procedure Act ("APA") as well as a Motion for Temporary Restraining Order. *See* ECF Nos. 13, 14. On February 19, the Court held a hearing on Plaintiffs' Motion. *See* ECF No. 32. Five days later, the Court partially granted Plaintiffs' Motion for Temporary Restraining Order and enjoined Defendants OPM and Education from providing DOGE affiliates with access to Plaintiffs' PII until March 10, 2025. *See* ECF No. 38 ("Mem. Op.").[6] On March 6, 2025, the Court extended the TRO for good cause shown "until March 17, 2025 at 5:00 p.m., or until such time as the Court rules on the forthcoming preliminary injunction motion—whichever is earlier." ECF No. 50.

---

[5] Gioeli's declaration states that Krause had "over the shoulder" access, Gioeli Decl. ¶ 4, which the record cannot confirm because it does not identify which DOGE people received "over the shoulder" access.

[6] The Court noted that it would deny the TRO with respect to Defendants Treasury and Secretary Bessent on the ground that they were already subject to a preliminary injunction providing the same protections that a TRO in this case would afford. Mem. Op. at 2 n.1.

## LEGAL STANDARD

"The standards for granting a TRO and granting a preliminary injunction are the same." *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 431 (D. Md. 2024).  A preliminary injunction is a matter of the Court's equitable discretion, and may be awarded upon a showing by the plaintiff "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  The third and fourth requirements "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

This Court correctly determined that Plaintiffs are likely to succeed in demonstrating that Defendants OPM and Education violated the APA.  The administrative record produced by Defendants—as threadbare as it is—only bolsters the Court's prior conclusions that Defendants' disclosures are reviewable agency actions and that Plaintiffs are likely to succeed in proving that Defendants' actions violated the Privacy Act.  The administrative record also confirms what has long been apparent from public reporting and from the declarations submitted by Defendants: that Defendants' rushed, haphazard decisions to disclose Plaintiffs' PII were arbitrary and capricious.  Accordingly, this Court should preliminarily enjoin all Defendants from making further disclosures of Plaintiffs' sensitive personal information to DOGE affiliates in violation of the Privacy Act and the APA.[7]

---

[7] As noted in Plaintiffs' March 8 discovery motion, Plaintiffs request that the Court convert its Temporary Restraining Order into a Preliminary Injunction without a hearing.  *See* ECF 53-1 at 5–6 & n.3.  In the event the Court denies that request, Plaintiffs request the opportunity to call the witnesses listed in this Motion at the March 17 hearing, in light of the serious deficiencies in the administrative record produced by Defendants.  *See infra* p. 29.

## I. Defendants' Decisions to Grant Access to Plaintiffs' Personal Information Were Final Agency Actions Reviewable Under the APA

The Court has already concluded that the decisions by Education and OPM "to grant DOGE affiliates access to the plaintiffs' personal information are final agency actions." Mem. Op. at 18. Nothing in the administrative records calls into question that conclusion.[8]

To the contrary, the administrative records confirm that Defendants' decisions, however arbitrary, clearly meet the two conditions for final agency action, and that this Court's holding applies equally to Treasury's grant of access. The administrative records for all three agencies include writings purportedly justifying Defendants' decisions to grant DOGE affiliates access to protected systems of records containing Plaintiffs' data without Plaintiffs' consent.[9] These decisions, which were "neither tentative nor interlocutory in nature," *id.* at 17, marked the "consummation of the agenc[ies'] decisionmaking process[es]," *id.* at 18 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). And they necessarily involved "determinations about the plaintiffs' rights to protect their personal information and the agencies' legal obligations under the Privacy Act." *Id.*; *see Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 930–31 (D.C. Cir. 2008). This Court therefore has jurisdiction to review and enjoin all three agencies' decisions to disclose pursuant to the APA.

---

[8] In addition to determining that these decisions to disclose constitute final agency action, this Court has also already determined that Plaintiffs have standing to sue and that the APA allows Plaintiffs to sue for injunctive relief for Privacy Act violations. Mem. Op. at 10–19. Those determinations are binding here. *See Sanchez v. McAleenan*, No. GLR-19-1728, 2024 WL 1256264, at *6 (D. Md. Mar. 25, 2024) ("[T]he Court's prior decisions regarding subject matter jurisdiction in this matter have become law of the case and "must be followed unless '(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.'" (citation omitted)). None of the narrow exceptions identified in *Sanchez* apply.

[9] *See* ECF No. 51-3 at 29 (Education memorandum granting DOGE affiliates "full and prompt access to all unclassified IT systems and data"); ECF No. 51-1 at 32–33 (OPM email granting DOGE affiliates access to "each computer system" that OPM "operates and manages," including "[c]ode read and write permissions" and "admin user" access); ECF 51-2 at 63–65 (Treasury engagement plan confirming that DOGE affiliates were to be provided "access to Fiscal Service systems and data").

## II.  Plaintiffs Are Likely to Prevail on the Merits

### A.  Defendants' Decisions to Disclose Violated the Privacy Act

The Privacy Act places strict limits on an agency's ability to disclose records containing individuals' PII.  Specifically, it bars agencies from "disclos[ing] any record which is contained in a system of records . . . to any person, or to another agency" without the authorization of the individual to whom the record pertains.  5 U.S.C. § 552a(b).  Defendants' decisions to grant DOGE affiliates sweeping access to Plaintiffs' PII violated the Privacy Act and were therefore contrary to law and in excess of statutory authority.  Accordingly, they must be "h[eld] unlawful and set aside" under the APA.  *Id.* § 706(2).

#### 1.  Defendants' Decisions to Grant Access Constitute Unlawful Disclosures

Defendants from each agency have made "disclosures" of "records" under the Privacy Act.  As this court has already recognized, courts and agencies alike have defined "disclosure" under the Act "liberally," to include not just a record's dissemination, but also the granting of access to a record.  Mem. Op. at 21 n.8; *see, e.g.*, Hu Decl., Ex. K at 8 (Privacy Act Implementation, Guidelines and Responsibilities, 40 Fed. Reg. 28948 (July 8, 1975)) ("A disclosure [under the Privacy Act] may be either the transfer of a record or the granting of access to a record.").  Defendants do not dispute that their systems include records protected by the Privacy Act.  OPM, Treasury, and Education have each granted DOGE affiliates sweeping access to systems of records containing millions of records with sensitive information about Plaintiffs, including their social security numbers, addresses, dates of birth, and citizenship status, *see supra* p. 3–8.  No individual Plaintiff or member of a Plaintiff organization consented to these disclosures, s*ee, e.g.*, ECF 14-7 ("Martinez Decl.") ¶ 10; ECF 14-9 ("Tammelleo Decl.")

¶ 8.  Defendants' decisions to disclose are therefore unlawful under the Privacy Act unless they fall within one of the Act's specifically enumerated exceptions.

Of the thirteen exceptions set forth in the Privacy Act, Defendants rely on just one: disclosure of records "to those officers and employees of the agency . . . who have a need for the record in the performance of their duties" under 5 U.S.C. § 552a(b)(1).[10]  That exception does not apply.

## 2. Defendants' Disclosures Do Not Fall Under the "Need-to-Know" Exception

The "need-to-know" exception applies in the limited circumstances where an agency employee has "a need for the record in the performance of their duties."  5 U.S.C. § 552a(b)(1). The government's attempt to use this narrow exception to justify DOGE affiliates' access to Plaintiffs' social security numbers, dates of birth, and other PII for purposes defined only at the highest levels of generality defies the caselaw, the record, and common sense.

An agency employee may access a record pursuant to this exception only where that employee "*ha[s] to do so*" in order to perform his official duties.  *Bigelow v. Dep't of Def.*, 217 F.3d 875, 877 (D.C. Cir. 2000) (emphasis added).  As this Court explained, the exception "applies when there is an explanation for why the employee needed access to the protected information to perform their job duties."  Mem. Op. at 24 n.11.  Specifically, the government

---

[10] Defendants previously suggested they might rely on the "routine use" exception, 5 U.S.C. § 552a(b)(3), but subsequently disclaimed that position.  *See* Hu Decl. Ex. G ("TRO Hearing Tr.") at 84:16-17 ("[W]e don't believe that the routine use exception applies here.").  Defendants cannot revive those arguments on this record.  None of the administrative records produced by Defendants contain the required documentation that disclosure was made pursuant to a routine use.  *See* 5 U.S.C. § 552a(c)(1) (requiring that each agency retain an accurate accounting of "the date, nature, and purpose of each disclosure of a record to any person or to another agency" as well as the "name and address of the person or agency to whom the disclosure is made," and excepting certain disclosures, but not those made pursuant to the "routine use" exception).  The absence of this required documentation disproves any claim that disclosure was made pursuant to a routine use.  In any event, for the reasons described in Plaintiffs' memorandum of law in support of their motion for temporary restraining order, Defendants have failed to identify applicable routine uses and to show compatibility with the purposes for which the data was collected.  *See* ECF No. 28 at 9–13.

must explain "*how* knowledge of such information would affect the ability of . . . the[]

employee[] to perform their specific duties." *Walker v. Gambrell*, 647 F. Supp. 2d 529, 538 n.4

(D. Md. 2009) (emphasis added). Permitting the large-scale distribution of protected records

"without any showing of why each employee needed to receive the information would allow the

exception to swallow the rule." Mem. Op. at 24 (quoting *Dick v. Holder*, 67 F. Supp. 3d 167,

178 (D.D.C. 2014)).

An employee's need to know cannot be established by the government's say-so. Rather,

to prevent this limited exception from circumventing the fundamental purpose of the Privacy

Act, *Dick*, 67 F. Supp. 3d at 178, courts carefully scrutinize the government's explanations for

disclosure, including to determine whether each employee receiving the protected information

required it at the level of specificity disclosed. In *Walker*, for instance, the court rejected the

government's contention that a large group of Treasury staffers "needed to know" that the

plaintiff had experienced a miscarriage in order to "reduce[] distraction" among those employees

who had witnessed the plaintiff's "alleged 'hysterical crying.'" 647 F. Supp. 2d at 538 n.4. It

concluded that the government had "failed to describe how knowledge of such information

would affect the ability of any of these employees to perform their specific duties" and it was

"difficult to see how knowledge with such specificity was necessary." *Id.*

Nor is an executive order charging an agency with a vague mission like pursuing

"workplace reform" or "systems modernization" sufficient to establish that specific agency

employees have a need to know every single piece of sensitive personal information contained

within a system of records. *Cf.* Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025)

("Workforce Executive Order"). In *Parks v. Internal Revenue Service*, IRS officials were

granted access to Privacy Act-protected records showing whether Treasury employees had

purchased savings bonds, and used that information to call employees and encourage them to purchase bonds. 618 F.2d 677, 679 (10th Cir. 1980). The IRS argued that an executive order creating a committee aimed at the "promotion of the savings bond program" generated the requisite need to know for agency employees to access the protected records. *Id.* at 681. The Tenth Circuit rejected this argument, holding that the executive order could not "license the defendants to violate the Privacy Act." *Id.* The same principle applies here. The President's executive order creating DOGE could not and did not provide blanket authorization for access to sensitive records in violation of the Privacy Act.

Defendants try to distinguish this case from the authority requiring close scrutiny of the need-to-know exception by claiming that the disclosure here was so massive that such scrutiny is effectively impossible.[11] But the scale of Defendants' unauthorized disclosure only underscores that the need-to-know exception does not, and cannot, apply here. Defendants chose to disclose *all* of the information maintained in their systems to about a dozen DOGE affiliates, without consideration for the specifics of each employee's responsibilities or even knowing what these affiliates would use their access for. That sweeping decision is precisely the sort of disclosure Congress sought to prevent by enacting the Privacy Act. *See* 120 Cong. Rec. 36,917 (daily ed. Nov. 21, 1974) (statement of Sen. Percy) (describing the Privacy Act's aim to "never see the day when a bureaucrat in Washington . . . can use his organization's computer facilities to assemble a complete dossier of all known information about an individual"); *see also* Privacy Act Legis. Hist. at vii ("The Privacy Act . . . places certain curbs on the random distribution of personal

---

[11] Indeed, Defendants' own declarations and statements by former officials confirm that those with experience managing access to these systems of records have never heard of disclosure of PII at the scale and speed that exist here. *See* Hu Decl. Ex. H at 16−17 (former Treasury officials describing the unprecedented nature of the access granted by Treasury); Gioeli Decl. ¶ 13 ("[P]roviding a single individual with access to multiple systems and data records accessed here was broader in scope than what has occurred in the past."). It should be no surprise, then, that "[t]here appears to be no precedent with similar facts." Mem. Op. at 23.

information."), 834 (Privacy Act "seeks to reduce, if not eliminate, the peril to personal privacy and individual rights presented by governmental data banks," including "dubious uses" of "Internal Revenue Service" files and other data systems).

Defendants cannot justify their actions by cursorily invoking the need-to-know exception for *all* of the data in their possession. That would render the Privacy Act's protections meaningless.[12] Defendants certainly cannot justify their decisions by offering *less* information and authority than those advanced by agencies in other cases defending the disclosure of a single record. Yet that is precisely the position Defendants take here.

The Court should reject Defendants' invitation to turn the Privacy Act upside down. A careful examination of each administrative record shows that there is no basis to conclude that any of Defendants' disclosures to DOGE affiliates satisfied the need-to-know exception.

### (a)    Education

This Court correctly determined that the DOGE affiliates working at Education do not need to know Plaintiffs' PII. Mem. Op. at 23–24. Through the Ramada declaration, Defendants suggested that six DOGE affiliates need all information contained in the systems of records "related to student loans in order to audit those programs for waste, fraud, and abuse." Ramada Decl. ¶ 9. But this statement in the Ramada declaration finds no support in the administrative

---

[12] It would also be contrary to the construction of the Act articulated by its implementing regulations and by Defendants' privacy impact assessments. The Privacy Act's implementing regulations make clear that the need-to-know exception should apply to disclosures made for purposes "generally related to the purpose for which the record is maintained," and that the exception aims to avoid "delay[ing] services performed *in the interests of the individual*." Hu Decl., Ex. K at 9 (emphasis added). This focus on alignment with the purpose for which the data was collected is also borne out by the agencies' PIAs, which indicate that access to the covered systems is limited to agency personnel charged with administering the covered programs. *See, e.g.*, Hu Decl., Ex. L (Department of Education PIA) at 21 ("Access to the system is limited to authorized COD personnel and contractors responsible for administering COD."). Nothing in the sparse administrative records Defendants produced connects their decisions to grant DOGE affiliates access to their systems with the purposes for which the data in those systems was collected. If anything, the records show the opposite is true: Defendants' sweeping commandments to provide access plainly did not consider the characteristics of each system, much less the purpose of the data residing within those systems.

record, which does not discuss student loan programs at all, let alone the auditing of those programs for fraud, waste, and abuse—and must therefore be disregarded. *See Roe v. Dep't of Def.*, 947 F.3d 207, 228 (4th Cir. 2020) ("[P]ost-hoc rationalizations . . . have traditionally been found to be an inadequate basis for review."). In any event, "neither Ramada nor the government explain *why* he and the DOGE affiliates at Education *need* such comprehensive, sweeping access to the plaintiffs' records" in order to accomplish these goals. Mem. Op. at 23.

The paltry administrative record produced by Defendants only confirms the Court's conclusion that the DOGE affiliates at Education lack the requisite "need to know." The half-page memorandum granting "full and prompt access to all unclassified IT systems and data" to members of the "Education DOGE team" purported to "document[] the need to know," but in fact did nothing of the sort. ECF No. 51-3 at 29. The memorandum did not identify any relevant duties or even the specific systems themselves. The only "need" articulated was to "improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." *Id.* But the memorandum does not explain how access to the PII contained in these databases, such as Plaintiffs' social security numbers, "would affect the ability of any of these employees to perform their specific duties." *Walker*, 647 F. Supp. 2d at 538 n.4.

The remainder of the administrative record does nothing to answer these questions and in fact shows additional inconsistencies. For example, the appointment request for ED-4 describes entirely different—but no less vague—duties: "[a]dvising the department on change management" and "performing cost reductions." ECF No. 51-3 at 22. Nothing in the administrative record connects these duties to access of any record in any system of record, let alone every record in every system in the Department. And a February 12 agreement between DOGE and Education that *postdates* the agency's decision to grant access by a week or more

cannot, as a matter of logic, have provided the requisite need-to-know. *See Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 660 (D. Md. 2018) ("[A]n agency may not justify an action through *post hoc* rationalization.").

Finally, even if Defendants had shown that the DOGE affiliates had a need to know this information (they have not), they cannot establish that all of the DOGE affiliates receiving this information are employees of Education. The need-to-know exception applies only to disclosures made to "employees of the agency which maintains the record." 5 U.S.C. § 552a(b)(1). The administrative record contains no information about the employment status of Ramada or the unidentified Education DOGE member, and therefore provides no basis to assess whether either individual is an Education employee under the factors described in *Judicial Watch, Inc. v. Department of Energy*, 412 F.3d 125 (D.C. Cir. 2005).[13] What little information the administrative record does include about DOGE detailees to Education suggests that Ramada and the unidentified Education DOGE team member are likely *not* employees of Education. That is because the record suggests that DOGE will "continue to be the supervisor of record for the USDS detailees," ECF 51-3 at 6, which cuts against a finding of employment by Education. *See Jud. Watch, Inc.*, 412 F.3d at 131.

> *(b)    OPM*

This Court correctly determined that the government has failed to explain why all DOGE affiliates working at OPM need to know Plaintiffs' personally identifiable information to carry out their stated mission of "workforce reform."[14] Mem. Op. at 27–29. The government, through

---

[13] These factors include whether detailees worked exclusively on an agency's matters, whether they were supervised by that agency, and whether they had an office at that agency. *Judicial Watch*, 412 F.3d at 131.

[14] This Court determined that it was likely that the government could show that one OPM employee—OPM Chief Information Officer Greg Hogan—likely does have a "need to know" under the Privacy Act. Mem. Op. at 28. Hogan's duties, which are codified by statute and by agency privacy impact assessments, stand in stark contrast to

the Hogan declaration, has leaned heavily on the President's February 11 Executive Order to justify the broad grants of access to OPM employees.  *See* Workforce Executive Order.  But neither Hogan's declaration, nor the executive order itself explains "why those OPM employees who *do* have access to these systems of record for the principal purpose of implementing the Workforce Executive Order *need* to access these records to perform their jobs."  Mem. Op. at 28–29.  Nor, as this Court has pointed out, does Hogan so much as "identify which OPM employees working on the DOGE workplace reform measures have been granted access to the OPM records systems with sensitive information" or "explain the criteria for determining who needs access to this information to fulfill their job duties."  *Id.* at 29.

The administrative record produced by Defendants not only supports the Court's conclusion that the government has failed to establish the requisite "need to know," but also confirms that the DOGE affiliates at OPM affirmatively did *not* need to access these systems to perform their jobs.  The administrative record is devoid of any substantive description of the DOGE affiliates' duties at OPM or any explanation as to why the DOGE affiliates required access to OPM's systems.  Perhaps this is unsurprising, given that the record makes clear that at least some members of the DOGE team "have never needed access" to OPM systems of records, ECF No. 51-1 at 27-30, and that others were being granted access as a mere contingency plan, *see id.* at 33  (noting that "we don't have any immediate plans" to change the systems, but that access should be given to account for "if we need to").  Far from explaining why these employees "had to" access Plaintiffs' sensitive personal information to do their jobs, *Bigelow*, 217 F.3d at 877, the administrative record confirms the opposite was true.

those of the other OPM DOGE affiliates with access to Plaintiffs' sensitive personal information, which remain a mystery even after production of the administrative record.

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Defendants have likewise failed to explain why Treasury officials need to know

Plaintiffs' personal information to "modernize" payment systems.  The government has

represented that only two DOGE affiliates have worked at Treasury: Marko Elez and Thomas

Krause.[15]  ECF 27-1 ("Krause Decl.") ¶ 3.  As discussed *supra* p. 8–9, the record indicates that

Elez's responsibilities included studying and strengthening Treasury's hardware and software,

and Krause's duties were to incorporate AI, blockchain, and cloud computing technologies

within Treasury.

Nothing in the administrative record explains why these duties required access to the full

range of information contained in Treasury's systems of records.  The record does offer some

justification for Elez's access to system "source code," which was purportedly necessary to

"outlin[e] recommendations for greater efficiencies and potential improvements to the existing

payment processes."  ECF 51-2 at 63–64 (emphasis added).  But the very existence of such an

explanation throws into sharp relief the complete lack of any similar justification for access to

the PII actually contained in the systems.  And the record contains no information at all about

Krause's supposed need to know.

Outside of the record, Krause has submitted a declaration that offers a *post hoc*

explanation that the DOGE affiliates' work "required review of the source code for BFS's

payment systems and databases across multiple BFS payment systems as well as the ability to

review sensitive payment data" in order "to understand the full end-to-end payment process,

across multiple payment systems."  Krause Decl. ¶ 15.  But this perfunctory extra-record

---

[15] Elez resigned on February 6, 2025.  Krause Decl. ¶ 3.  Public news reports, however, state that Elez's email has since reappeared in a DOGE employee directory.  *See, e.g.*, Hu Decl. Ex. I at 4.

statement fails to explain *why* Krause and Elez needed to see "sensitive payment data" in order to "understand the full end-to-end payment process" and why—even if they did need to see certain aspects of that data—the specific personally identifiable information associated with those systems could not be redacted or otherwise obscured. It is clear that Treasury *can* redact or otherwise obscure PII. The Privacy and Civil Liberties Impact Assessment for SPS—one of the systems accessed by the Treasury DOGE team—states that Treasury is "committed to . . . redacting, truncating, and anonymizing [social security numbers] in systems and documents to limit their accessibility to individuals who do not have a need to access the full SSN in order to perform their official duties." Hu Decl. Ex. F at 7. Yet Defendants have offered no explanation for their decision to forgo this "commitment" in lieu of providing unfettered access to Plaintiffs' full social security numbers and other PII. In short, nothing in the administrative record comes close to satisfying the "need to know" exception.

### B. Defendants' Decisions to Disclose Were Arbitrary and Capricious

The sparse administrative records make plain that Defendants' rushed decisions to grant access to inexperienced and undertrained DOGE affiliates were arbitrary and capricious.

Agency actions are arbitrary where an agency fails to "consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or otherwise engage in "reasoned decisionmaking," *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citation omitted). That includes "fail[ing] to reasonably reflect upon the information contained in the record and grapple with contrary evidence." *Roe*, 947 F.3d at 228 (citation omitted). As Defendants have conceded, if "the administrative records produced do not support Defendants' actions, then the Court may grant Plaintiffs' request for a preliminary injunction." ECF No.54 at 10; *see also* Hu Decl. Ex. J ("Status Conf. Tr.") at 14:15–17

(Defendants' counsel explaining that if the administrative record provides "insufficient basis for the agency action, that would be a reason to grant the preliminary injunction and enjoin the agency action.").

Defendants have represented that the produced administrative record is "complete."[16] *See* ECF 51-1 at 2; ECF 51-2 at 2; ECF 51-3 at 2. Taking this contention at face value, the "complete" record is devoid of evidence of reasoned decisionmaking. Instead, records contemporaneous with the decision to grant DOGE affiliates sweeping access to Plaintiffs' sensitive PII either (1) do not exist; or (2) show that Defendants failed to properly vet and train DOGE affiliates receiving the records or install security precautions commensurate with the sensitivity of the information at issue across all three agencies. Because the administrative record provides an insufficient basis for each agency's action, this Court should find that all three Defendant agencies acted arbitrarily and capriciously by granting DOGE affiliates unfettered access to Plaintiffs' PII.

### 1. Education

The administrative record reveals that Education acted hastily and without proper consideration of security risks in granting DOGE affiliates access to Plaintiffs PII. Remarkably, Education authorized "the Department of Education DOGE team *full and prompt* access to *all* unclassified IT systems and data" in a half-page memorandum. ECF No. 51-3 at 29 (emphasis added). Setting aside that this document appears to have been issued *after* some DOGE affiliates were already granted access, *see* Ramada Decl. ¶ 3, which means that there is no explanation for

---

[16] For the reasons detailed in Plaintiffs' Motion for Extra-Record Discovery, *see* ECF Nos. 53, 53-1, Plaintiffs reserve their argument that the administrative record is woefully deficient and that conversion of the temporary restraining order to a preliminary injunction or, at minimum, an evidentiary hearing prior to a decision on Plaintiffs' instant motion, is necessary for meaningful judicial review.

those affiliates' access, the memorandum's reasoning is deficient on its face. Besides "support[ing] the implementation of the EO 'Establishing and Implementing the President's "Department of Government Efficiency,"'" ECF No. 51-3 at 29, no other rationale was provided to justify granting DOGE affiliates "prompt" access to *all* of Education's systems. *Id.*

The agency appears not to have considered, among other issues, the risks associated with disclosing PII, whether the specific DOGE affiliates actually had a need for the data, and whether the DOGE affiliates had fulfilled the requisite level of ethics, security, or information-technology training prior to the grant of access. In fact, the record reflects that Education *waived* a required background investigation for one of the Education DOGE affiliates one day before the grant of access. *Id*. at 26. "[T]he complete absence of any discussion" of the specific affiliates' need to know this information—a statutory requirement for access—is textbook arbitrary and capricious decisionmaking. *See United Mine Workers of Am., Int'l Union v. Dole*, 870 F.2d 662, 673 (D.C. Cir. 1989). And the lack of consideration of informational security risks associated with Education's decision to grant access only underscores that point. *See New York v. Trump*, No. 1:25-CV-01144 (JAV), 2025 WL 573771, at *21 (S.D.N.Y. Feb. 21, 2025).

## 2.    OPM

The OPM administrative record likewise evinces an arbitrary decisionmaking process. Here, too, the administrative record contains no explanation for OPM's decision to grant at least two DOGE affiliates access to its systems on January 20, 2025, *see supra* p. 6. The lack of an explanation in the record is, by definition, arbitrary and capricious. *See, e.g.*, *Columbia Gas Transmission Corp. v. FERC.*, 448 F.3d 382, 388 (D.C. Cir. 2006). And while the record reflects that OPM granted additional DOGE affiliates access on January 27, 2025, in an email requesting "urgent" compliance, that email does not reflect any reasoned decisionmaking. ECF No. 51-1 at

32–33. Despite requesting extraordinary levels of access, including "[c]ode read and write permissions" and "[a]bility to access the system as an admin user," *id.*, the email does not address or even acknowledge the serious informational security concerns associated with providing that access. What is more, when an OPM staff member suggested connecting the DOGE affiliates with "folks that can give them the deep dive/documentation on the Apps," *id.* at 28, Defendant Ezell responded that the DOGE affiliates "won't have a lot of time to go through a lot of presentations on what the systems are," *id.* at 31. OPM's decision to grant DOGE affiliates sweeping access to its systems without first educating these affiliates on what these systems are only highlights the arbitrary and capricious nature of OPM's decision to grant access.

### 3. Treasury

As another court already found in determining that Treasury's processes for permitting the Treasury DOGE team access was likely arbitrary and capricious, the "launch of the Treasury DOGE Team" was "chaotic and haphazard" and a "flawed process." *Trump*, 2025 WL 573771, at *21. The serious shortcomings of Treasury's decisionmaking process are underscored by the administrative record. The *Trump* court found that Treasury had "full knowledge" of the "serious risks" posed by their decisions to grant Elez sweeping access to virtually all Treasury systems, *id.*, yet the record lacks any indication that Elez underwent even a *complete background check* before he was given administrator level privileges on these systems. *See* ECF No. 51-2 at 68; *cf. id.* at 33 (granting Elez only "interim approval . . . contingent on a completed background investigation").

Underscoring Defendants' arbitrary decision making is the fact that Treasury ignored an internal report designating DOGE as an "insider threat" and characterizing DOGE's access to Treasury's payment systems as "the single greatest insider threat risk the Bureau of the Fiscal

Service has ever faced." *See* Am. Compl. ¶ 135 & n.118. The report recommended *immediately* suspending DOGE's access. *Id.* Yet Treasury apparently failed to consider that report, which is absent from its administrative record. *See Advocs. for Highway and Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1146–47 (D.C. Cir. 2005) (ignoring evidence and recommendations contained in relevant agency report "without reasonable explanation" was arbitrary and capricious); *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002) (agency action that "ignored the detailed and well-supported conclusions of its own scientists" was arbitrary and capricious).

## III.  Defendants' Disclosures Will Cause Irreparable Harm Absent an Injunction

The Court already has held that Plaintiffs "are likely to suffer irreparable harm without injunctive relief." Mem. Op. at 30. That is for good reason: the continued unauthorized disclosure of troves of sensitive, personally identifiable information to DOGE representatives will gravely and irreversibly harm Plaintiffs absent emergency relief.

"To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (citation omitted). "Additionally, the harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)). The sweeping disclosures of Plaintiffs' private data more than meet this mark, as the Court has already determined.

"DOGE affiliates have been granted access to systems of record that contain some of the plaintiffs' most sensitive data—Social Security numbers, dates of birth, home addresses, income and assets, citizenship status, and disability status—and . . . [t]here is no reason to believe their

access to this information will end anytime soon" without immediate judicial relief. Mem. Op. at 30; *see, e.g.*, Martinez Decl. ¶ 8. The Court rightly has recognized that this "continuing, unauthorized disclosure of the plaintiffs' sensitive personal information to DOGE affiliates is irreparable harm that money damages cannot rectify." Mem. Op. at 30. That is true regardless of whether the DOGE representatives, who lack lawful access to Plaintiffs' records, further disseminate this sensitive information to other unauthorized individuals. *See, e.g.*, *Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d 1260, 1275 (9th Cir. 1998) (finding "the retention of undisputedly intimate medical information" that was illegally obtained constitutes a "continuing 'irreparable injury' for purposes of equitable relief"); *Roberts v. Austin*, 632 F.2d 1202, 1214 (5th Cir. 1980) (finding irreparable harm from unauthorized release of food-stamp recipients' files to state's attorney where state law gave "recipients statutory protection from disclosure of confidential information" and recipients had a "legitimate expectation that the information [would] be kept confidential").

These harms have not been ameliorated by the preliminary injunction issued by a district court in the Southern District of New York blocking Treasury from granting DOGE access to data systems containing confidential information. *See Trump*, 2025 WL 573771, at *27. "The existence of another injunction—particularly one in a different circuit that could be overturned or limited at any time—does not negate [plaintiffs'] claimed irreparable harm." *California v. U.S. Dep't of Health & Hum. Servs.*, 390 F. Supp. 3d 1061, 1065–66 (N.D. Cal. 2019). Courts therefore "routinely grant follow-on injunctions against the Government, even in instances when an earlier nationwide injunction has already provided plaintiffs in the later action with their desired relief," *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 59 (D.D.C. 2020), and reject government claims that "there is no imminent threat of

irreparable harm because a nationwide injunction has already been issued" when the government intends to appeal and the plaintiff is "not a party to the other cases" and thus "remains at risk," *Mayor & City Council of Balti. v. Azar*, 392 F. Supp. 3d 602, 618 (D. Md. 2019).

The Court should do the same here. Plaintiffs are not parties in the Southern District of New York lawsuit and remain at risk that the preliminary injunction there could soon be lifted either on appeal or by the district court. That risk is "actual and imminent.'" *Mountain Valley Pipeline*, 915 F.3d at 216. As Plaintiffs explained in their March 8 brief addressing the deficiencies in the administrative record, ECF No. 53-1 at 22–23, the Southern District of New York court's ruling was limited to a finding that Treasury's decision was arbitrary and capricious, and plans to hold a hearing sometime after March 24, 2025 to determine "whether the Treasury Department has adequately redressed" these deficiencies "so as to justify the termination or modification of the preliminary injunction." *Trump*, 2025 WL 573771, at *27. The temporary reprieve at Treasury could therefore evaporate based on factors unrelated to the Privacy Act violations asserted here and without input from Plaintiffs whose personal information is at risk. This Court can and should provide greater assurance by issuing a preliminary injunction covering all three agencies to prevent future violations of Plaintiffs' privacy rights.

## IV.    The Equities and Public Interest Favor Plaintiffs

Where the government is the opposing party, the balance of the equities and the public interest merge into a single factor. *See Nken*, 556 U.S. at 435. This factor weighs heavily in favor of enjoining Defendants from providing DOGE affiliates with access to Plaintiffs' PII.

As discussed *supra* p. 25–27, Plaintiffs will continue to suffer irreparable harm from the unauthorized and unlawful disclosure of their sensitive information to DOGE affiliates absent

preliminary injunctive relief.  Defendants, on the other hand, "cannot suffer harm from an injunction that merely ends an unlawful practice."  *Sanchez v. McAleenan*, No. GLR-19-1728, 2024 WL 1256264, at *14 (D. Md. Mar. 25, 2024) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).  That is especially the case here, where the violation concerns Defendants' decision to provide access to DOGE affiliates who have no need for this information in the course of their employment responsibilities, as even President Trump has conceded in his public remarks.  *See* White House, *President Trump Holds a Press Conference with Prime Minister Shigeru Ishiba of Japan*, YouTube, at 15:42–16:31 (Feb. 7, 2025), https://www. youtube.com/live/jMiAE9XWig?si=S0NkrDwEwLbrvTYM&t=942.  Under these circumstances, an injunction—by definition—cannot and will not affect these affiliates' ability to perform their duties or Defendants' abilities to carry out their agency responsibilities.  All an injunction would require is that Defendants follow the Congressionally established requirements set forth in the Privacy Act—requirements that Defendants have adhered to for decades. Comporting with preexisting legal obligations is not a cognizable hardship.  *See, e.g.*, *United States v. Daniel Chapter One*, 793 F. Supp. 2d 157, 163 (D.D.C. 2011) ("[T]here is no hardship to defendants in requiring them merely to follow the law.").

In addition, "[t]here is generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.D.C. Cir. 2016).  If anything, "the public has an abiding interest in the 'deterrence of unlawful conduct' on the part of government officials."  *Campbell v. Sims*, No. TDC-20-2590, 2021 WL 4342039, at *4 (D. Md. Sept. 23, 2021) (citation omitted).  That conclusion applies with full force here.

## V.    The Court Should Order An Evidentiary Hearing

For the reasons discussed in Plaintiffs' Motion for Extra-Record Discovery, *see* ECF No. 53-1 at 15–20, the Court should convert the restraining order against Education and OPM into a preliminary injunction without a hearing, and schedule a separate preliminary injunction hearing following discovery with respect to Defendants Treasury and Bessent.  To the extent the Court denies that request, Plaintiffs request that the Court conduct an evidentiary hearing as part of the preliminary injunction hearing currently scheduled on March 17, 2025, during which Defendants should make the following witnesses available for questioning by Plaintiffs and the Court: (1) Joseph Gioeli III, from Treasury; (2) Adam Ramada, from DOGE and Education; (3) Thomas Flagg, from Education; (4) Defendant Ezell, from OPM; and (5) Greg Hogan, from OPM.

Four of these five individuals have already submitted extra-record declarations in this case in support of Defendants, and Plaintiffs are entitled to cross-examine them as to the substance of those declarations.  The fifth, Ezell, is a defendant in this case and sent an email ordering access be granted to DOGE affiliates.  His testimony is important to understand how Defendant OPM made its decision, particularly given the deficient administrative record Defendants compiled.  *See Citizens to Pres. Overton Park, Inc v. Volpe*, 401 U.S. 402, 420 (1971) ("The court may require the administrative officials who participated in the decision to give testimony explaining their action," particularly when the administrative record lacks "formal findings"), abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977); *see also Maryland State Dep't of Educ., Div. of Rehab. Servs. v. U.S. Dep't of Veterans Affs.*, 896 F. Supp. 513, 515 (D. Md. 1995) (observing district courts "possess[] discretionary authority to hold a hearing under the standards of *Overton Park*" where administrative record lacks necessary "factual and/or legal development . . . with regard to the requirements of" applicable law).

## <u>CONCLUSION</u>

Defendants have made no secret of their intentions to continue providing DOGE affiliates, including three new DOGE affiliates embedded within Treasury and potentially others yet to be assigned, with access to their systems and Plaintiffs' PII at the first available opportunity. *See* ECF No. 35-1 at 2–3. Absent judicial intervention, they will continue to do so without having considered the Privacy Act's requirements or the informational security risks such sweeping grants of access will create. Neither the Administrative Procedure Act nor the Privacy Act countenance such an outcome. Indeed, they forbid it. The Court should grant Plaintiffs' Motion for Preliminary Injunction and order Defendants to make the individuals identified in this Motion available for questioning during the preliminary injunction hearing.

DATED:  March 10, 2025

By:  _/s/Xiaonan April Hu_

Xiaonan April Hu (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 220-1123
April.Hu@mto.com

John L. Schwab (*pro hac vice*)
Wendy Q. Xiao (*pro hac* forthcoming)
Liam Gennari (*pro hac* forthcoming)
MUNGER, TOLLES & OLSON LLP
350 S Grand Ave 50th Floor
Los Angeles, California 90071
(213) 683-9260
John.Schwab@mto.com

Carson Scott (*pro hac vice*)
Roman Leal (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
(415) 512-4000
Carson.Scott@mto.com
Roman.Leal@mto.com

Mark Hanna (Fed. Bar No. 16031)
David J. Rodwin (Fed. Bar No. 18615)
MURPHY ANDERSON, PLLC
1401 K Street NW, Suite 300
Washington, DC 20005
T: (202) 223-2620 | F: (202) 296-9600
mhanna@murphypllc.com
drodwin@murphypllc.com

Daniel McNeil (*pro hac vice*)
General Counsel
American Federation of Teachers, AFL-CIO
555 New Jersey Ave. NW
Washington, DC 20001
T: (202) 393-6305 | F: (202) 393-6385
dmcneil@aft.org

Benjamin L. Berwick (*pro hac* forthcoming)
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Jessica A. Marsden (*pro hac vice*)
PROTECT DEMOCRACY PROJECT
510 Meadowmount Village Circle, No. 328
Chapel Hill, NC 27517
(202) 579-4582
jess.marsden@protectdemocracy.org

Kristy Parker (*pro hac vice*)
Jane Bentrott (*pro hac vice*)
Shalini Goel Agarwal (*pro hac vice*)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
202-843-3092
kristy.parker@protectdemocracy.org
jane.bentrott@protectdemocracy.org
shalini.agarwal@protectdemocracy.org

Laurence M. Schwartztol (*pro hac vice*)
DEMOCRACY AND RULE OF LAW CLINIC
Harvard Law School 1525 Massachusetts Avenue
Cambridge, MA 02138 (617) 998-1877
lschwartztol@law.harvard.edu

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION