# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### SOUTHERN DIVISION

AMERICAN FEDERATION OF
TEACHERS, et al.,

             Plaintiffs,

    v.

SCOTT BESSENT, et al.,

             Defendants.

Case No. 8:25-cv-430-DLB

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 1

I.    The United States Department of Governmental Efficiency Service ................................. 1

II.   The Department of the Treasury ..................................................................................... 3

III.  The Department of Education ......................................................................................... 5

IV.   The Office of Personnel Management ............................................................................. 6

V.    This Litigation .............................................................................................................. 7

STANDARD OF REVIEW ................................................................................................... 9

ARGUMENT ....................................................................................................................... 9

I.    The Court Lacks Jurisdiction over Plaintiffs' Claims...................................................... 9

      A.   Plaintiffs Lack Standing. ........................................................................................ 9

      B.   Plaintiffs Fail to Establish Reviewable Final Agency Action. ................................. 14

           1.   Access Decisions Are Not Reviewable "Agency Action"................................. 15

           2.   Plaintiffs Have Failed to Identify "Final" Agency Action................................ 17

II.   Even If There Were Jurisdiction, Plaintiffs Are Not Likely to Succeed on the Merits of
      their Claims ................................................................................................................. 20

      A.   Plaintiffs Cannot Use the APA to Avoid the Privacy Act's Narrow Cause of
           Action. ............................................................................................................... 20

      B.   There Is No Privacy act Violation. ........................................................................ 21

      C.   Defendants' Conduct Is Not Arbitrary and Capricious. ........................................... 26

II.   Plaintiffs Have Not Established Irreparable Harm. ......................................................... 28

III.  The Public Interest and Balance of the Equities Weigh Against an Injunction................ 29

CONCLUSION.................................................................................................................... 30

Defendants the U.S. Department of the Treasury; Scott Bessent, in his official capacity as Secretary of the Treasury; U.S. Office of Personnel Management; Charles Ezell, in his official capacity as Acting Director of the U.S. Office of Personnel Management; the U.S. Department of Education; and Denise Carter, in her official capacity as Acting Secretary of Education submit this Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction. (ECF No. 59).

## INTRODUCTION

This Court should deny Plaintiffs' request for a preliminary injunction because none of the injunctive-relief factors weighs in favor of relief. First, Plaintiffs are unlikely to succeed on the merits—their claims fail both at the threshold and in substance. Plaintiffs lack standing because they have not suffered any cognizable Article III injury; their claims are not cognizable under the APA; and they have not alleged a Privacy Act violation because only authorized federal employees with a need to access the relevant data systems have been provided access. Second, Plaintiffs' speculation has not shown that they likely face imminent irreparable harm. And finally, both the equities and the public interest support permitting the government to exercise its lawful authority to hire employees and give those employees access to systems as required for their job duties. In sum, the entirety of Plaintiffs' motion relies on one claim: that it is unlawful for one employee of a federal agency to share information with another authorized federal employee specifically for the purpose of carrying out an Executive Order of the President. That claim cannot be correct, so their motion fails.

## BACKGROUND

## I.    The United States Department of Governmental Efficiency Service

On January 20, 2025, President Trump signed Executive Order 14,158, which directs changes to the previously established United States Digital Service, an agency that was designed

to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." 90 Fed. Reg. 8441, § 4 ("USDS EO"). The USDS EO redesignated the United States Digital Service as the U.S. DOGE Service. *Id.* § 3(a). And it established a "U.S. DOGE Service Temporary Organization" within the Executive Office of the President pursuant to 5 U.S.C. § 3161, which will terminate on July 4, 2026. USDS EO § 3(b). Agency heads are required under the USDS EO to establish within their respective agencies a "DOGE Team" of at least four employees, which may include Special Government Employees. *Id.* § 3(c).

The USDS EO directs the USDS Administrator to collaborate with agency heads to modernize the technology and software infrastructure of the federal government to increase efficiency and productivity as well as ensure data integrity. USDS EO § 4. As to the Department of the Treasury, the need to modernize and ensure data integrity is uniquely critical: the Government Accountability Office ("GAO") has identified "problems in accounting for transactions between federal agencies," resulting in potentially improper payments totaling approximately 2.7 trillion dollars. *See* GAO Report, "Financial Statement Audit: Bureau of the Fiscal Service's FY22 Schedules of the General Fund" (March 30, 2023), *available at* https://www.gao.gov/products/gao-23-104786 (last visited Feb. 17, 2025). And as to OPM, GAO has identified sixteen "priority recommendations" involving "preventing improper payments," "improving payroll data," and "strengthening IT security and management." *See* GAO Report, "Priority Open Recommendations: Office of Personnel Management" (May 28, 2024) at 1-2, *available at* https://www.gao.gov/assets/gao-24-107323.pdf (last visited Feb. 13, 2025) (capitalization and bold removed). GAO stated that, "[f]ully implementing these open

recommendations could significantly improve both OPM's operations and its efforts to assist federal agencies in addressing various human capital management issues." *Id*. at 1.

To accomplish its objectives, the USDS EO directs the USDS Administrator to work with relevant agency heads, and vice versa, to ensure that USDS has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with law." USDS EO § 4(b). At all times, the USDS EO instructs, USDS must "adhere to rigorous data protection standards." *Id.*

## II.    The Department of the Treasury

Only two individuals associated with USDS have ever been granted access to Treasury systems, Mr. Thomas Krause and Mr. Marko Elez. *See* Declaration of Thomas Krause ¶ 3, ECF No. 27-1 ("Krause Decl."); Declaration of Joseph Gioeli III ¶ 4; ECF No. 27-3 ("Gioeli Decl."), Declaration of Michael J. Wenzler ¶¶ 3-5, ECF No. 27-4 ("Wenzler Decl."); Declaration of Vona Robinson, ¶ 6, ECF No. 27-2. Mr. Krause is an employee of the Treasury Department and is the DOGE Team lead at the agency. Krause Decl. ¶ 2; ECF No. 51-2 at 7-27. His position at Treasury as Senior Advisor for Technology and Modernization was created to effectuate the mission of DOGE by reducing and eliminating improper and fraudulent payments, addressing the problems of waste, fraud, and abuse, and improving the accuracy of financial reporting. Krause Decl. ¶ 2; ECF No. 51-2 at 21, 27. Although Mr. Krause sometimes coordinates with officials at USDS, he is not an employee of USDS. *Id*. ¶ 4. Instead, he is an employee of Treasury with an ethics designation of Special Government Employee. *See* Wenzler Decl. ¶¶ 3-4; ECF No. 51-2 at 20-27. As of February 13, 2025, Mr. Krause has been delegated the duties of the Fiscal Assistant Secretary, in a Temporary Transition Schedule C position. Wenzler Decl. ¶ 7; ECF No. 51-2 at 7-8.

Mr. Krause's role at Treasury is to find ways to use technology to make the Treasury Department more effective, more efficient, and more responsive to the policy goals of the current Administration. Krause Decl. ¶ 2; ECF No. 51-2 at 2 7. As part of the President's DOGE efforts, Mr. Krause's mandate is to understand how BFS's end-to-end payment systems and financial reporting tools work, recommend ways to update and modernize those systems to better identify improper and fraudulent payments, and better allow federal agencies to quickly adapt to changing conditions. Krause Decl. ¶ 11; *see* ECF No. 51-2 at 27. Mr. Krause has never had any direct access to any BFS payment system. His only access to those systems was so-called "over the shoulder" access to review activity others performed in the system or data others accessed from the system. Krause Decl. ¶ 16. However, under the terms of the temporary restraining order in place due to litigation in the Southern District of New York, Mr. Krause does not currently have any access to any payee data in BFS systems. *Id*.

Mr. Elez began working at the Treasury Department on January 21, 2025, *see* ECF No. 51-2 at 10, but resigned from his role on February 6, 2025. Krause Decl. ¶ 3. Treasury had hired Mr. Elez as a Special Advisor for Information Technology and Modernization. *Id*.; ECF No. 51-2 at 28-29. In this role, Mr. Elez was a Treasury employee tasked with working closely with engineers at BFS on information technology matters in service of BFS's mission to promote financial integrity and operational efficiency of the federal government through accounting, financing, collection, payment, and other relevant BFS services. Krause Decl. ¶ 3; Wenzler Decl. ¶ 9; ECF No. 51-2 at 28-29. On February 6, 2025, Mr. Elez submitted his resignation from this role. Krause Decl. ¶ 23; Wenzler Decl. ¶ 11. Treasury has since filled the position previously held by Mr. Elez with another Treasury employee, Mr. Ryan Wunderly. However, given the restrictions of the preliminary injunction entered in the U.S. District Court for the Southern District of New York,

currently no member of the Treasury DOGE Team has access to BFS systems.  *See* Mem. Op. & Order, ECF No. 76, *State of New York, et al. v. Treasury, et al,* Civil Action No. 25-1144 (S.D.N.Y. Feb. 21, 2025).

## III.    The Department of Education

There are six employees at the Department of Education whose principal role is to help advance the goals of Executive Order 14,158.  *See* Declaration of Adam Ramada, ECF No. 27-5 ("Ramada Decl."); Supplemental Ramada Declaration ¶¶ 4-6, ECF No. 27-6 ("Suppl. Ramada Decl."); *see* ED-000001-000004, 000005-000007, 000008, 000009, 000010-000012, 000013-000016, 000017-000019, 000021.  All six work to audit contract, grant and related programs for waste, fraud and abuse.  Supp. Ramada Decl. ¶ 5; *see* ED-000001-000004, 000005-000007, 000008, 000009, 000010-000012, 000013-000016, 000017-000019, 000021.  In addition, these employees help senior leadership to obtain access to accurate data and data analytics to inform policy decisions at the Department.  Supp. Ramada Decl. ¶ 5; *see* ED-000001-000004, 000005-000007, 000008, 000009, 000010-000012, 000013-000016, 000017-000019, 000021.

Of the six employees at the Department of Education working to implement Executive Order 14,158, two were detailed to the Department from the USDS.  *See* ED-000001-000004.  Two others were detailed from other federal agencies, and two were directly onboarded as employees in the Department of Education.  Supp. Ramada Decl. ¶ 3; *see* ED-000005-000007, 000008, 000009, 000010-000012, 000013-000016, 000017-000019, 000021.  Based on a March 7, 2025 audit of the Department of Education's National Student Loan Data System (NSLDS), Common Organization and Disbursement (COD) system, FUTURE Act System (FAS), and Financial Management System (FMS), only one individual associated with USDS, Mr. Ramada, has had access to any of the four systems.  *See* Declaration of Steven Matteson ¶¶ 2-4, attached as Ex. 1

("Matteson Decl."). Specifically, the Department of Education granted Mr. Ramada access to FMS, and no other systems, and his account is no longer active. *Id.* ¶ 5. Based on the Department of Education's audit, no other Department of Education DOGE Team member has ever accessed any of the four systems. *Id.* ¶ 6. Further, no one at the Department of Education working to implement Executive Order 14,158 has disclosed any protected information from these systems to individuals not employed by the Department of Education in connection with the implementation of Executive Order 14,158. Declaration of Thomas Flagg ¶ 4, ECF No. 27-7 ("Flagg Decl.").

## IV.    The Office of Personnel Management

OPM plays a critical role in overseeing and managing the federal workforce. *See* Declaration of Greg Hogan ¶ 8, ECF No. 27-8 ("Hogan Decl."). Given that central role, numerous OPM employees, both political and career, have contributed to facilitating the President's initiatives related to workforce reform, including the deferred resignation program that closed on February 12, 2025. *Id.* ¶ 9. All individuals with access to OPM records systems who are working to implement Executive Order 14,158 are employees of OPM. They were all hired directly by OPM as employees or detailed to OPM by another agency. *Id.* ¶¶ 12, 13; *see* OPM-00001-22. All such OPM employees who have participated in workforce reform, like all OPM employees, are subject to applicable privacy, ethics, and other requirements. Many OPM employees involved in these efforts hold policymaking, legal, or similar positions that do not require access to sensitive data systems. Hogan Decl. ¶¶ 9-10. For systems engineers who require access to sensitive systems, such as eOPF and EHRI, the Chief Information Office ("CIO") will periodically review access permissions to ensure that they are limited to those with a need to know. For example, in early February, the CIO removed access to eOPF and EHRI for three engineers whose job duties do not require prospective access. *Id.* ¶ 11; OPM-000025-26.

6

Defendants note that, in OPM's administrative record, certified as complete on March 7, 2025, OPM included records for six individuals working to implement Executive Order 14,158: Mr. Gregory Hogan and five others who OPM anonymized with the monikers OPM-2 through OPM-6 consistent with the Protective Order entered by the Court. It has since come to OPM's attention that additional OPM employees who would likely be considered "DOGE affiliates," as defined by the Court, *see* ECF No. 38 at 5 n.2, were also granted access to relevant OPM data systems. Of those additional employees, only three people—OPM Chief of Staff Amanda Scales, and two employees who Defendants will identify as OPM-7 and OPM-8—in fact, logged into any of these OPM systems, as of March 6, 2025. Defendants intend to supplement the administrative record as early as possible before the hearing this upcoming Monday, March 17, with a revised version of the "Account Creation Audit" spreadsheet (OPM-000075-88) reflecting these additional employees, together with other relevant documents.

## V.     This Litigation

Plaintiffs are several labor organizations, a nonprofit organization, and six individuals. Am. Compl ¶¶ 19-27 (ECF No. 13). Defendants are three federal government agencies—the Department of the Treasury, the Office of Personnel Management, and the Department of Education—and the head (or acting head) of each agency. *Id.* ¶¶ 28-33. Plaintiffs filed an amended complaint on February 12, 2025. *Id.* The Complaint states three causes of action. In Count One, Plaintiffs allege that Treasury, OPM, and Education have violated the Privacy Act of 1974 by "disclos[ing]" Plaintiffs' personal data in violation of 5 U.S.C. § 552a(b), and that those disclosures must therefore be "set aside" under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Am. Compl. ¶¶ 145-51. In Count Two, Plaintiffs allege that Defendants' conduct is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law under the APA, 5 U.S.C. § 706(2)(A), because they have "failed to consider the consent requirements of the

Privacy Act," "their duty to protect the sensitive data on their systems," "the risks that their disclosures would result in corrupted data," and "the security threats that are likely to result from their action."  Am. Compl. ¶¶ 152-56; *see* 5 U.S.C. §§ 552a(b), 552a(e)(1).  And in Count Three, Plaintiffs allege that Defendants acted "in excess of statutory authority" under the APA, 5 U.S.C. § 706(2)(C), by violating their "non-discretionary duty to protect records on individuals from unauthorized disclosure."  Am. Compl. ¶¶ 157-59.

Plaintiffs filed a motion for temporary restraining order on February 12. Mot. (ECF No. 14); TRO Mem. (ECF 14-1).  On February 24, the Court granted that motion in part, enjoining the Department of Education and OPM from disclosing the personally identifiable information of the plaintiffs and the members of the plaintiff organizations to "any DOGE affiliates," until March 10, 2025 at 8:00 a.m.  Mem. Op. & TRO 32-33, ECF No. 38 ("Mem. Op. & TRO").

Following a status conference held on February 26, the Court ordered Defendants to produce the administrative records by 5 p.m. on March 7 and for Plaintiffs to notify the Court by midnight on March 8 if Plaintiffs seek limited discovery.  ECF No. 46.  The Court also entered a schedule for briefing on Plaintiffs' motion for preliminary injunction and set a hearing on that motion for 10:30 a.m. on March 17.  *Id.*  Further, on March 6, the Court extended the temporary restraining order until March 17 at 5 p.m.  ECF No. 50.

Defendants have produced the administrative records for all three agencies.  *See* ECF No. 51.  Plaintiffs now ask that the Court convert the Court's order entering a temporary restraining order as to the Department of Education and OPM, and to enter a preliminary injunction as to Treasury.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'" *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008)). "A party 'seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), as amended (Jan. 14, 2020) (quoting *Winter*, 555 U.S. at 20). If a plaintiff fails to succeed on any one of these requirements, the motion for a preliminary injunction must be denied. *Mountain Valley Pipeline*, 918 F.3d at 366 ("Each of these four requirements must be satisfied.") (citing *Winter*, 555 U.S. at 20).

## ARGUMENT

Plaintiffs' motion for a preliminary injunction should be denied. They are not likely to succeed on the merits because they lack standing; they do not challenge a "final agency action" under the APA; and Defendants have not violated the Privacy Act or the APA. They are not likely to suffer irreparable harm. And the equities and the public interest do not favor injunctive relief. Plaintiffs' motion should be denied.

## I.     The Court Lacks Jurisdiction over Plaintiffs' Claims.

### A.     Plaintiffs Lack Standing.

The Court should deny Plaintiffs' motion for a preliminary injunction because Plaintiffs lack standing. "One 'essential aspect' of the limitations that Article III of the Constitution imposes on federal courts is the requirement 'that any person invoking the power of a federal court must demonstrate standing to do so.'" *Coreas v. Bounds*, 451 F. Supp. 3d 407, 417 (D. Md. 2020),

quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013).  To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief."  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citations omitted).  "Those specific standing requirements constitute an essential and unchanging part of the case-or-controversy requirement of Article III."  *Id.* (internal quotation marks and citations omitted).  Facts demonstrating each of these elements "must affirmatively appear in the record" and "cannot be inferred argumentatively from averments in the [plaintiff's] pleadings." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (citation omitted).  And "[t]he party seeking to establish standing carries the burden of demonstrating these elements." *Chambers Med. Techs. of S.C., Inc. v. Bryant*, 52 F.3d 1252, 1265 (4th Cir. 1995).

To establish standing, Plaintiffs must show that they—or their members—have suffered injury-in-fact—"actual or imminent, not speculative" harm, "meaning that the injury must have already occurred or be likely to occur soon."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).  For injury to be imminent, it must be "certainly impending"; mere "allegations of possible future injury are not sufficient."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  In other words, injury cannot be established through "a 'highly attenuated chain of possibilities' predicated on 'guesswork as to how independent decisionmakers will exercise their judgment.'" *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1163 (D.C. Cir. 2025) (quoting *Clapper*, 568 U.S. at 410).

An injury-in-fact must have a "close relationship" to a "harm traditionally recognized as providing a basis for a lawsuit in American courts[.]"  *TransUnion*, 594 U.S. at 417, 424 (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-341 (2016)).  While Congress "may elevate harms that

exist in the real world before Congress recognized them to actionable legal status," at the same time, Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Id.* at 426 (citations and quotations omitted). Congress may create "a statutory prohibition or obligation and a cause of action," but it may not override Article III's injury requirement. *Id.*; *see also Doe v. OPM*, 25-cv-234 (RDM), 2025 WL 513268, at *5 (D.D.C. Feb. 17, 2025) ("[N]ot every statutory violation results in the type of concrete injury-in-fact sufficient to support Article III standing.").

That need for an independent Article III injury is particularly important when considering intangible forms of injury, like the ones Plaintiffs assert in this case. Long before *TransUnion*, courts cautioned about according standing to those raising "only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large." *Lujan*, 504 U.S. at 573–74. *TransUnion* recognizes that "[v]arious intangible harms can . . . be concrete," but limits cognizable intangible injuries to those "with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," including when the plaintiff alleges harm related to the handling of her personal information. *TransUnion*, 594 U.S. at 425 (surveying common-law privacy torts and looking to "whether plaintiffs have identified a close historical or common-law analogue for their asserted injury").

Here, the Court previously found that the individual plaintiffs and the organizational plaintiffs (based on a theory of representation[1]) have standing based on an alleged invasion of the

---

[1] An organization establishes "representational standing" by demonstrating that: "'(1) its own members would have standing to sue in their own right; (2) the interests the organization

individual plaintiffs' and members' privacy.  Mem. Op. at 10-15.  Defendants respectfully disagree.  The Court concluded—at the temporary restraining order stage—that Plaintiffs' alleged injury "resembles the common law tort of intrusion upon seclusion, a type of invasion of privacy." Mem. Op. at 12.  In *O'Leary v. TrustedID, Inc.*, 60 F.4th 240 (4th Cir. 2003), however, the Fourth Circuit rejected the plaintiffs' attempt to analogize the disclosure of their partial social security numbers to the tort of intrusion into seclusion, explaining that there was no "unwanted intrusion into the home" and therefore no intrusion into seclusion.  *Id.* at 246 ("It's the unwanted intrusion into the home that marks intrusion upon seclusion, and O'Leary hasn't pleaded anything that closely relates to that.").  Moreover, as the Fourth Circuit pointed out, the case that the Supreme Court in *TransUnion* cited for the proposition that the tort of intrusion upon seclusion could serve as a basis for standing, *Gadelhak*, dealt with the receipt of unwanted text messages on the plaintiffs' cell phones—*i.e.*, an actual intrusion into the peace and tranquility of the plaintiffs' personal lives.  *See O'Leary*, 60 F.4th at 245; *see also Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (describing the tort of intrusion upon seclusion as the "inva[sion]" into the "private solitude of another"); *TransUnion*, 594 U.S. at 425 (citing *Gadelhak*).  But that is nothing like the facts of this case.  Mere access to data housed by a government agency by government employees—even if the *quantity* of data is potentially large— does not bear the "close relationship to [the] traditional harm" of intrusion upon seclusion, and, respectfully, the Court's prior conclusion to the contrary cannot be squared with *O'Leary*.  The information at issue is entirely housed within government systems, and is being accessed only by government employees.  That is nothing like an "unwarranted intrusion into the home," and

---

seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit.'"  *Id.* at 184 (quoting *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)).

therefore the tort of intrusion upon seclusion does not provide a traditional analogue for Plaintiffs' alleged harms.

Notably, also, the tort of intrusion upon seclusion requires "*interference* with the plaintiff's seclusion" that is "*substantial*." Restatement (Second) of Torts § 652B cmt. d (emphasis added). The Restatement provides examples of the necessary "intrusion" such as *opening* private mail, *searching* safes or wallets, *examining* bank accounts, or compelling an *inspection* of private documents as illustrative of injuries considered an intrusion upon seclusion. Restatement (Second) of Torts § 652B cmt. b (emphasis added).  All of these examples involve more than mere access to records—they involve an actual "intrusion," such as examination or review of sensitive material. Nothing like that is present in Plaintiffs' allegations.

Further, although the Court previously concluded otherwise, to establish an injury-in-fact, Plaintiffs would be required to show not just that there has been intra-agency *access* but also some third party or unauthorized disclosures by the defendant agencies, which they have not.  *Cf. Wrocklage v. DHS*, 769 F.3d 1363, 1368-69 (Fed. Cir. 2014) (concluding no "disclosure" occurred under the Privacy Act where specific information about the plaintiff was not actually viewed). Access alone, without any indication that any of the relevant agency officials have ever even viewed Plaintiffs' data, does not give rise to an actual, concrete harm sufficient to establish standing.  *See Hunstein v. Preferred Coll. & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240, 1245-50 (11th Cir. 2022) (en banc) (no cognizable injury from disclosure of private information where plaintiff's information was sent from hospital to collection agency because disclosure was not public); *id.* at 1246 (citing cases); *see also TransUnion*, 594 U.S. at 434 n.6 ("Many American courts did not traditionally recognize intra-company disclosures as actionable publications for purposes of the tort of defamation.") (citations omitted).

13

The Tenth Circuit's decision in *Parks v. Internal Revenue Service*, 618 F.2d 677 (10th Cir. 1980), cited by the Court, does not support Plaintiffs' theory of standing in this case. There, agency officials used the plaintiffs' personal information to call their homes to pressure them to purchase U.S. Savings Bonds—a use of information that Congress expressly prohibited under the Privacy Act. *Id.* at 679, 681 & n.1. And based on that "personal invasion," the court had no difficulty concluding that the plaintiffs had standing. *Id.* at 683. Plaintiffs here cannot point to any similar conduct as a basis for injury in fact.

Finally, although the Court looked to the purpose and legislative history of the Privacy Act in previously concluding that Plaintiffs had established injury, Mem. Op. at 13-14, *TransUnion* instructs that a statutory violation is not, by itself, a cognizable Article III injury, *id.* at 426-27—even assuming there were one. Rather, "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that . . . defendant over that violation in federal court." *Id.* at 427 (emphasis in original). Here, without any plausible allegation of concrete herm, Plaintiffs cannot pursue their claims.

**B.    Plaintiffs Fail to Establish Reviewable Final Agency Action.**

This Court lacks authority to resolve Plaintiffs' claims for an additional reason: Only "final agency action" is reviewable under the APA. 5 U.S.C. § 704. In the Fourth Circuit, the inquiry is jurisdictional. *See Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024); *City of New York v. DoD*, 913 F.3d 423, 430 (4th Cir. 2019).

The "final agency action" requirement has two distinct parts. First, the challenged act must be an "agency action" recognized by the APA, which defines the term to include a specific "rule, order, license, sanction, relief, or the equivalent." 5 U.S.C. § 551(13). Such an action must be a "discrete" act, as plaintiffs are prohibited from leveling a "broad programmatic attack," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("*SUWA*"), against programs for which they are

14

seeking "wholesale improvement . . . by court decree, rather than in the offices of the Department or the halls of Congress," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).  As the Court explained in *Lujan*, moreover, the APA is not intended to permit "general judicial review of the [an agency's] day-to-day operations."  *Id.* at 899.

Second, agency action must be "final."  There is a two-part test for finality, including that: (1) "the action must mark the consummation of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature"; and (2) the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  The APA expressly excludes "preliminary, procedural, or intermediate agency action[s] or ruling[s]."  5 U.S.C. § 704.

### 1.    Access Decisions Are Not Reviewable "Agency Action."

The APA provides a list of five actions which it considers to be agency action: rules, orders, licenses, sanctions, and relief. 5 U.S.C. § 551(13).  The Act further defines each of these terms. *Id.* §§ 551(4) ("rule"), (6) ("order"), (8) ("license"), (10) ("sanction"), (11) ("relief").  While construed expansively, these terms do not permit judicial review of the day-to-day operations of agencies.  Courts have long recognized that this definition of agency action "is not so all-encompassing as to authorize us to exercise 'judicial review [over] everything done by an administrative agency.'" *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)). For example, courts do not oversee agency training programs, *see Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4, 17 (D.D.C. 2023), or "the common business of managing government programs," *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006).  Put another way, judicial review does not reach to the agency's "workaday" dealings. *Indep. Equip. Dealers Ass'n*, 372 F.3d at 427.

The avoidance of such review implicates separation of powers concerns, but it is also targeted at circumventing the "broad programmatic attacks" disfavored in agency review. *SUWA*, 542 U.S. at 64; *see also New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (internal quotations and citations omitted) ("When challenging agency action . . . the plaintiff must . . . identify specific and discrete governmental conduct, rather than launch a broad programmatic attack on the government's operations."). By limiting review to only certain things agencies do, the APA "'protect[s] agencies from undue judicial interference with their lawful discretion, and . . . avoid[s] judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Jones*, 701 F. Supp. 3d at 17 (quoting *SUWA*, 542 U.S. at 66).

Plaintiffs' motion exemplifies this very concern. Plaintiffs' alleged agency action is made up of decisions to grant individual employees access to their systems. These are precisely the day-to-day operations the Supreme Court in *Lujan* advised not to sweep into the APA's ambit. *See Lujan*, 497 U.S. at 899. As the Fourth Circuit has recognized, "[w]e are woefully ill-suited . . . to adjudicate generalized grievances asking us to improve an agency's performance or operations. In such a case, courts would be forced either to enter a disfavored 'obey the law' injunction . . . or to engage in day-to-day oversight of the executive's administrative practices. Both alternatives are foreclosed by the APA, and rightly so." *New York*, 913 F.3d at 431 (quotations omitted).

Agencies make thousands of such decisions every day, whenever they decide to open an e-mail account for an employee, to staff an employee on a particular matter, or that an employee has the relevant training to access systems or participate in certain programs. A court could not review such decisions without bringing within the scope of the APA virtually every aspect of an

agency's relationship with its employees, a result the "final agency action" limitation of the APA is designed to prevent.

      2.    <u>Plaintiffs Have Failed to Identify "Final" Agency Action</u>.

Plaintiffs' claims fail the *Bennett* test because they do not identify an action that marks the "consummation" of the agencies' decision-making process, by which "rights or obligations have been determined" or from which "legal consequences will flow." *Bennett*, 520 U.S. at 177-78. Therefore, there is no "final" agency action for the Court to review.

The Amended Complaint fails to demonstrate how providing a new employee with system access necessary to his or her function "consummat[es]" the agency's decision-making process in such a way that legal consequences flow to Plaintiffs. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). This prong of the *Bennett* test is measured by the "actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014); *see also Mashni v. U.S. Army Corps of Eng'rs*, 535 F. Supp. 3d 475, 482 (D.S.C. 2021) (quoting *Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 925 (E.D. Va. 2013), *aff'd sub nom. Versata Dev. Grp., Inc. v. Lee*, 793 F.3d 1352 (Fed. Cir. 2015)) ("for a decision to constitute a final agency decision, it 'must have a direct and immediate effect on the party's legal rights.'").

For example, the D.C. Circuit has found no final agency action where the challenged act "impose[d] no obligations, prohibitions or restrictions on regulated entities," and "[did] not subject them to new penalties or enforcement risks." *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020). In this case, Plaintiffs are not regulated, or even affected by, the alleged provision of access to certain government employees at issue in this case. The fact that such a decision could potentially have practical consequences for the regulated public does not change the analysis. Adverse effects "accompany many forms of indisputably nonfinal government action. Initiating

an enforcement proceeding against a company, for example, may have a devastating effect on the company's business, but that does not make the agency's action final." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004).

The data access decision alleged has no "direct and appreciable legal consequences" for any of the Plaintiffs. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019). Indeed, as explained above, such decisions do not even give rise to an Article III injury, much less the sort of "legal consequences" that could ground an APA action. Plaintiffs would have to demonstrate that employees implementing Executive Order 14,158 not only do not have a right to access their members' information, but that steps were taken with the information that had legal consequences for Plaintiffs and their members. By analogy, an agency's decision to give an employee access to its systems is not itself final agency action, even if the employee might conceivably use the computer to effect final agency action (*e.g.*, in approving or denying benefits) at some later date. Plaintiffs' claim that they are potentially harmed by the mere provision of access does not undermine this analysis; many unreviewable government actions have a significant effect on the public.

*Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), which this Court previously found persuasive, Mem. Op. at 16-17, does not support the conclusion that Plaintiffs challenge final agency action. There, the EEOC was held to have a concrete (albeit informal) *policy* of disclosing confidential information, including trade secrets, without providing notice to the submitter. *Id.* at 929-30. The D.C. Circuit concluded that a decision "to disclose [a regulated party's] confidential information without notice" satisfied the requirements for reviewable final agency action. *Id.* at 931 ("Adopting a policy of permitting employees to disclose confidential information without notice is surely a 'consummation of the agency's decisionmaking process,

and one by which [the submitter's] rights [and the agency's] obligations have been determined.'" (citation omitted)).  Here, Plaintiffs do not even allege that Defendants adopted a broad policy of allowing employees unfettered access to its data systems—instead, they challenge decisions to allow access to specific individuals.  Such access decisions as to those working on agency business, with the agency's consent and approval, do not have legal consequences for Plaintiffs in the way that *third-party* disclosure of confidential commercial information would.

Rendering data access decisions "final agency action" would sweep swathes of routine agency business within the APA's ambit, even though such decisions have no legal consequences for Plaintiffs or their members without some further step by the agency—transforming federal judges into government agencies' Human Resources and Chief Information Officers.  As such, the Court should conclude that Plaintiffs are not likely to prevail on their APA claims.[2]

---

[2] Plaintiffs contend that the Court's conclusions with respect to standing and final agency action decided in connection with their motion for a TRO are now "binding" upon the Court as the law of the case.  However, the authority Plaintiffs cite for that proposition, *Sanchez v. McAleenan*, No. GLR-19-1728, 2024 WL 1256264, at *6 (D. Md. Mar. 25, 2024), runs counter to established law in this Circuit.  *See Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) ("[W]hen a court is presented with a different record at a new stage of the case, the law-of-the-case doctrine will no longer constrain the court's review." (citation omitted)).  "In general, a court's decisions at the preliminary injunction phase do not constitute law of the case in further proceedings and do not limit or preclude the parties from litigating the merits."  *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 948 F. Supp. 2d 538, 551 (D. Md. 2013) (collecting cases).  "For similar reasons, courts have been loath to apply the doctrine where the prior holdings in the case were based on an undeveloped factual record, or where the prior holdings were made on a different standard of review." *Id.* (collecting cases).  That is the case here.  The facts before the Court are that there was no actual "intrusion" into any of the plaintiffs' sensitive data—just mere access to such systems, which is insufficient to establish standing.  Moreover, the law of the case doctrine is discretionary, and "[t]he ultimate responsibility of the federal courts . . . is to reach the correct judgment under law," *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003), and Defendants respectfully submit that the Court's prior rulings as to standing and final agency action, necessarily made on an undeveloped factual record, are no longer valid.

II.    **Even If There Were Jurisdiction, Plaintiffs Are Not Likely To Succeed on the Merits of Their Claims.**

A.    **Plaintiffs Cannot Use the APA to Avoid the Privacy Act's Narrow Cause of Action.**

Plaintiffs cannot use the APA to circumvent the Privacy Act's carefully drawn limitations on the types of relief they can seek.  For this reason, Plaintiffs are unlikely to succeed on their APA claims.

The APA provides a vehicle for review only in circumstances where "there is no other adequate remedy."  5 U.S.C. § 704; *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (Section 704 "also makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action.").  By contrast, the Privacy Act provides a "comprehensive remedial scheme" for injuries arising out of the inappropriate dissemination of private information about individuals.  *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008) (citing *Chung v. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003)).

Section 552a(g) of the Privacy Act establishes the narrow causes of action for which an "individual may bring a civil action against the agency."  *See* 5 U.S.C. § 552a(g)(1).  It is reasonable, based on the nature of their claims, to assume that Plaintiffs advance a theory based on an agency's failure to comply with any other provision.  5 U.S.C. § 552a(g)(1)(D).  The Privacy Act, however, only provides for monetary damages for such actions, and then only for individuals, as compared to associations.  *See* 5 U.S.C. § 552a(g)(4); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007).  Prospective relief, such as that sought by Plaintiffs, is reserved for Amendment or Access Actions.  5 U.S.C. § 552a(g)(2), (3).  Quite simply, the Privacy Act does not permit organizations to sue for injunctive relief over a decision to provide access to particular government employees.

Plaintiffs should not be permitted to circumvent the Privacy Act's carefully drawn constraints by raising purported Privacy Act violations through the APA. Defendants recognize, that, in dicta, the Fourth Circuit has suggested that prospective injunctive relief may be available under the APA for alleged Privacy Act violations. *See Doe v. Chao*, 435 F.3d 492, 504 n.17 (4th Cir. 2006). That dicta is not binding, but even if it were, Defendants disagree and raise the argument here to preserve it for any further review.

### B.     There is No Privacy Act Violation.

Plaintiffs are not likely to succeed on their claims that Defendants' actions violated the Privacy Act. That statute establishes a general ban absent consent on disclosure of covered personal information but excludes "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." *Id.* § 552a(b)(1).

The Privacy Act uses the term "employee" (in addition to "officer"). 5 U.S.C. § 552a(b)(1). "[F]or purposes of" Title 5 of the U.S. Code, "employee" "means an officer and an individual who is" first "appointed in the civil service by one of the following acting in an official capacity"; as relevant here, the ensuing list of potential appointers includes "the President" and "an individual who is an employee under this section." *Id.* § 2105(a)(1)(A), (D). An employee must also be "engaged in the performance of a Federal function under authority of law or an Executive act; and . . . subject to the supervision of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position." *Id.* § 2105(a)(2). Because the Privacy Act is part of Title 5, § 2105's definition of employee directly applies to its use of the term "employee." *See* 5 U.S.C. § 552a(b)(1).

The relevant employees at the Department of the Treasury, OPM, and the Department of Education satisfy § 2105(a)'s definition of "employee." All have been appointed to their positions under federal law, including the detailees. Krause Decl. ¶¶ 1-3; ECF 51-2 at 10, 13; Hogan Decl.

¶ 12; OPM-000001, 000006, 000010, 000014, 000016, 000021; Ramada Decl. ¶¶ 4-7; ED-000001, 000006, 000008, 000009, 000010, 000014, 000017, 000019, 000021. All are "engaged in the performance of a Federal Function under authority of . . . an Executive act," *i.e.*, Executive Order 14,158. Krause Decl. ¶ 17; Hogan Decl. ¶ 8; Ramada Decl. ¶¶ 3-4. And all are ultimately subject to the supervision of the senior leadership of their respective agencies, whether because they have been appointed as agency employees under agency-specific statutes directly or because they are detailed to those agencies. *See, e.g.*, Ramada Decl. ¶ 13; Hogan Decl. ¶ 9; Krause Decl. ¶ 17.

The relevant employees also satisfy the requirement that they be employees "of" the Department of the Treasury, OPM, and the Department of Education. *See* 5 U.S.C. § 552a(b)(1). At each agency, some of the employees were hired directly by the Department, clearly resolving their status. Wenzler Decl. ¶¶ 3-4, 7-10; Krause Decl. ¶¶ 1, 3; Hogan Decl. ¶ 12; Ramada Decl. ¶ 6. The detailees from other components of the Executive Branch qualify, too. While courts in the Fourth Circuit do not appear to have considered the question, the D.C. Circuit in evaluating the employment status of detailees has adopted a functional approach, looking to the subject matter and purpose of the individual's work, their supervision, and their physical worksite as illustrative (but not conclusive) factors. *Judicial Watch v. Dep't of Energy*, 412 F.3d 125, 131-32 (D.C. Cir. 2005). Here, those factors clearly cut in favor of the detailees' status as employees of their respective agencies. At OPM, employees are responsible for facilitating the President's initiatives related to workplace reform, including the deferred resignation program that closed on February 12. Hogan Decl. ¶ 8. At Education, their responsibilities include identifying "waste, fraud, and abuse" in the Department's student loan portfolio. Ramada Decl. ¶¶ 4-6; *see, e.g.*, ED-000001-000002. They are subject to the supervision of senior Department leadership. Ramada Decl. ¶ 10. They have physical access to the Department of Education building, where they have physical

workspace at the Department.  Supp. Ramada Decl. ¶ 4.  At Treasury, there is currently one DOGE Team detailee who is assigned to the Internal Revenue Service.  His function is to support "the President's DOGE mission at the IRS," and he reports to the Assistant Secretary for Management at Treasury.  *See* Decl. of Michael J. Wenzler, attached as Ex. 2 (filed in *State of New York v. Treasury*, Civil Action No. 25-1144, (S.D.N.Y.)).

These facts lead to the inescapable conclusion that all of the involved individuals are employed by their respective agencies, whether or not they have been detailed to the agency, a fact that Plaintiffs largely concede.  *See* Pls.' Mem. at 21.[3]  *See also Judicial Watch*, 412 F.3d at 131-32; *Freeman v. EPA*, No. 02-0387, 2004 WL 2451409, at \*4-5 (D.D.C. Oct. 25, 2004) (finding that disclosure of plaintiffs' drug testing schedules and results by EPA OIG to an EPA-hired DOD investigator did not violate Privacy Act because "according to the OMB 1975 Guidelines, an agency that hires a member of another agency to serve in a temporary task force or similar, cross-designated function can share otherwise protected information with that hired person and still satisfy exception (b)(1)"); *cf. Ciralsky v. CIA*, 689 F. Supp. 2d 141, 155 (D.D.C. 2010) (permitting disclosure to "a group of Agency contractors engaged specifically to conduct an official CIA investigation into allegations of anti-Semitism at the Agency"); *Mount v. United States Postal Serv.*, 79 F.3d 531, 532, 533 (6th Cir. 1996) (describing "physician under contract with [United

---

[3] Plaintiffs do contend that two Department of Education employees whose employment documentation is not contained in the agency's administrative record may not, in fact, work for the Department of Education.  *See* Pls.' Mem. at 18.  For certain detailees, like Mr. Ramada, the Department of Education does not have contemporaneous formal documentation establishing the detail arrangement.  However, the Court may rely both on the subsequent interagency agreement and Mr. Ramada's sworn declaration, in which he testified that he was detailed to the agency and that the remaining individuals working there to implement Executive Order 14,158 were either hired by or detailed to the Department of Education.  *See* ED-000001-04 (memorializing the prior oral agreement for federal government employees detailed to the agency); Ramada Decl. ¶¶ 4-7, ECF No. 27-5.

States Postal Service]" as an employee or agent of Postal Service under § 552a(b)(1)); *Liable v. Lanter*, 91 F.4th 438, 442 (6th Cir. 2024) (local employee detailed to federal task force was a federal employee for purposes of the Westfall Act).

Nevertheless, Plaintiffs argue Defendants have violated that statute, relying on an overly cramped conception of the "need to know" requirement in 5 U.S.C. § 552a(b)(1). *See* Pls.' Mem. at 13-16. Yet, all of the relevant employees have a need for the records to which they have access in the performance of their duties. The DOGE teams at Treasury, OPM, and the Department of Education exist under Executive Order 14,158 to modernize technology and to "maximize efficiency and productivity." Exec. Order 14,158 § 4. To that end, the Order instructs agency heads "to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems," and in turn requires USDS to "adhere to rigorous data protection standards." *Id.* § 4(b). Given the purpose of the order—to modernize technology—it necessarily follows that agency personnel seeking to improve agency systems would need access to them to conduct that modernization. Put another way, it would be impossible for the DOGE team members to modernize these data systems without access to the systems themselves. Defendants respectfully submit, despite the Court's prior ruling, that the Executive Order provides the requisite "explanation for why the employee needed access to the protected information to perform their job duties." Mem. Op. at 24 n.11.

The underlying purpose of the agencies' DOGE teams' mission, moreover, distinguishes this case from the decisions on which Plaintiffs rely. For example, in *Parks v. Internal Revenue Service*, the Court noted that the government defendants could not rely on the executive order promoting savings bond programs to show that disclosure of employees' nonparticipation in savings bond programs contained in personnel files "was necessary to the performance of their

duties," in light of the fact that "Congress expressly held out nonparticipation in savings bond programs as an example of information not needed in the performance of federal employees' regular duties."  618 F.2d at 681 & n.1.  In contrast, there is no congressional pronouncement that employees' access to agency data systems for purposes of their modernization is not necessary to the performance of their duties.  And, as in *Bigelow v. Department of Defense*, 217 F.3d 875, (D.C. Cir. 2000), the employees at the three agencies "ha[ve] to" have access to the relevant systems "in order to perform [their] duties properly," *id.* at 877; indeed, the Executive Order itself directs agencies to provide "full and prompt access to all unclassified agency records, software systems, and IT systems," subject to "rigorous data protection standards," Exec. Order 14,158 § 4(b), so that the agencies' DOGE Teams can carry out their duties.

Moreover, beyond the Executive Order itself, Defendants have provided information specific to the three agencies establishing their need to know.  The relevant personnel at the Department of the Treasury have a need to access Privacy Act-protected records to assess and modernize payment systems and financial report tools, Krause Decl. ¶¶ 2, 5; Ex. 2 ¶ 13, the OPM personnel need to access such records to execute their direction to implement technology modernization and workplace reform, Hogan Decl. ¶¶ 6, 8, and the Department of Education personnel need to access such records in order to audit student loan programs for waste, fraud, and abuse, Ramada Decl. ¶ 9.  *Cf.* Feb. 14, 2025 Order, *Am. Fed. of Labor of Indus. Orgs. v. Dep't of Labor*, No. 1:25-cv-339, at 3-4, 8 (D.D.C. Feb. 14, 2025) (Bates, J.).

In the alternative, Defendants' actions are permissible under the Privacy Act's exception for "routine use."  *See* 5 U.S.C. § 552a(b)(3) (permitting disclosure absent consent for certain "Routine Uses" that are defined in a published Systems of Record Notice ("SORN")).  Treasury's published Routine Use 17 permits disclosure to a federal agency "for the purpose of identifying,

preventing, or recouping improper payments to an applicant for, or recipient of, federal funds." *Privacy Act of 1974: System of Records*, 85 Fed. Reg. 11,776, 11,780 (2020). Treasury's DOGE Team is tasked with doing just that. Krause Decl. ¶¶ 2-4. Education's SORNs likewise cover the DOGE Team's ambit. For example, they allow for disclosure "to support the investigation of possible fraud and abuse and to detect and prevent fraud and abuse" in program funds. *See* 88 Fed. Reg. 41,942, 41,949 (2023); 88 Fed. Reg. 42,200, 42,222 (2023); 73 Fed. Reg. 117 (2008); *see also* 84 Fed. Reg. 47,265, 47,269 (2019) (permitting disclosure to "support governmental researchers and policy analysts"). So too with OPM's SORNs, which permit disclosure in certain circumstances "to help eliminate waste, fraud, and abuse in Governmental programs." 77 Fed. Reg. 73,694, 73,697 (2012).

These purposes, moreover, are compatible with the purpose for the collection of the records. *Ames v. United States Dep't of Homeland Sec.,* 153 F. Supp. 3d 342, 347-48 (D.D.C. 2016), *aff'd*, 861 F.3d 238 (D.C. Cir. 2017) ("To assess compatibility, a court must conduct a 'dual inquiry into the purpose for the collection of the record in the specific case and the purpose of the disclosure.'"), citing *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548-49 (3rd Cir. 1989). Where a "concrete relationship or similarity, some meaningful degree of convergence" exists "between the disclosing agency's purpose in gathering the information and in its disclosure," compatibility is satisfied. *Britt*, 886 F.2d at 549-50. There is little question that collection of information submitted for purposes of gaining a government benefit "converges" with disclosure intended to identify fraud abuse in the same benefit programs. However, as Defendants have indicated previously, the Court need not reach this issue, because the relevant access is covered by 5 U.S.C. § 552a(b)(1).

C.    **Defendants' Conduct Is Not Arbitrary and Capricious.**

Plaintiffs also claim that Defendants acted arbitrarily and capriciously, based almost exclusively on what Plaintiffs perceive as deficiencies in the administrative records of the agencies.  *See* Pls.' Mem. at 21-25.  Plaintiffs complain loudly that the administrative record should include additional materials, but it should come as no surprise that they are not voluminous given Defendants' position that the decision to grant agency employees access to internal agency databases is not a final agency action.  Unlike in a rulemaking, for example, the agencies did not create a voluminous "record" underlying their decisions—and they were under no obligation to do so.  As noted above, agencies decide who gains access to systems routinely—for example, whenever a new employee is hired or staffed to work on a new matter—and it is unrealistic to assume agencies would document those decisions with the type of detail that Plaintiffs suggest is necessary.

Plaintiffs contend, moreover, that Defendants did not adequately consider security risks associated with granting access to their data systems.  *See* Pls.' Mem. at 22.  But the facts before the Court show that the agencies in fact *did* consider security risks and take action to ensure that data protected by the Privacy Act were properly protected.  *See* Gioeli Decl. ¶ 15; Hogan Decl. ¶ 11; Ramada Decl. ¶¶ 7-8.  For example, the Department of the Treasury took particular risk-mitigation efforts with respect to its DOGE Team members, such as limiting access to Treasury payment systems to a laptop connected with those systems and providing "read-only" access to payment data.[4]  Gioeli Decl. ¶¶ 12-13; Ex. 2 ¶¶ 10-11, 18-19; ECF No. 41-4 at 68 (adopting recommended access restrictions).  OPM provides only certain of its DOGE Team members with

_____

[4] Mr. Elez was briefly provided with read/write access in error.  That access was revoked and there is no indication that Mr. Elez ever knew that he had such access or used that functionality. *See* Gioeli Decl. ¶¶ 18-20.

access to sensitive systems, and the agency's Chief Information Officer reviews access permissions to ensure that only employees with a need to know are granted access. Hogan Decl. ¶¶ 10-11; OPM-000023-29. The Department of Education has likewise required all of its DOGE Team members to complete information security training, sign agreements designated for privileged users, and familiarize themselves with the rules governing access to the agency's data systems. Ramada Decl. ¶¶ 7-8. In short, Plaintiffs' arbitrary and capricious claim is unfounded. The agencies did grapple with the risks of granting new employees access to their data, and they took appropriate steps to mitigate those (routine) risks. That is no basis to set aside agency action.

## III.    Plaintiffs Have Not Established Irreparable Harm.

"[F]or a preliminary injunction to issue, Plaintiffs must show they are 'likely to suffer irreparable harm in the absence of preliminary relief.'" *Roe*, 947 F.3d at 228 (quoting *Winter*, 555 U.S. at 20). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. And, "[t]o establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir.) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991), *cert. denied sub nom. Givens v. Mountain Valley Pipeline, LLC*, 140 S. Ct. 300 (2019).

For all of the reasons Plaintiffs have failed to show cognizable injury for the purposes of Article III standing, they have necessarily failed to show any irreparable harm, which is fatal to Plaintiffs' motion. *See Mountain Valley Pipeline*, 918 F.3d at 366 ("Each of these four requirements must be satisfied."). But even if they had shown a cognizable injury for the purposes of standing—the analysis of which assumes that the merits of a dispute will be resolved in favor

of the party invoking jurisdiction, *see* Mem. Op. at 11 n.5—Plaintiffs nonetheless fail to make a clear showing of actual and imminent harm.  Indeed, three other courts addressing similar claims have denied motions for emergency relief based on the plaintiffs' failure to establish irreparable harm.  *See Electronic Privacy Information Center v. U.S. Office of Personnel Management*, No. 1:25-cv-255 (RDA/WBP), 2025 WL 580596, at *6-7 (E.D. Va. Feb. 21, 2025) (denying TRO in analogous case against OPM, Treasury, and agency heads because plaintiffs did not establish irreparable harm); *Univ. of Cal. Student Ass'n v. Carter*, --- F. Supp. 3d ----, 2025 WL 542586, at *5 (D.D.C. Feb. 17, 2025) (denying analogous TRO against Education and Acting Secretary of Education because plaintiffs did not establish irreparable harm; observing that, "courts have declined to find irreparable injury where the challenged disclosure is not 'public,' but [rather] involves individuals obligated to keep it confidential"); *id.* at *6 (possibility of future misuse of data by bad actors is "entirely conjectural"); *Alliance for Retired Americans v. Bessent*, --- F. Supp. 3d ----, 2025 WL 740401, at *20–24 (D.D.C. Mar. 7, 2025) (denying requested preliminary injunction as to Treasury for lack of irreparable harm).  The Court should do so here, despite its prior ruling on Plaintiffs' motion for a temporary restraining order as to the Department of Education and OPM.

## IV.   THE PUBLIC INTEREST AND BALANCE OF THE EQUITIES WEIGH AGAINST AN INJUNCTION.

The last two factors—balance of equities and the public interest—"merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs' argument for why the equities and the public interest fall in their favor largely collapse into the merits.  They say that the "government cannot suffer harm from an injunction that merely ends an unlawful practice."  Pls.' Mem. at 28.  To be clear, Plaintiffs have not shown

that Defendants' practice is unlawful, for the reasons stated above.  Regardless, considering only likelihood of success is insufficient to justify injunctive relief.  *Winter*, 555 U.S. at 376–77.

The proposed injunction would harm the public interest.  At its core, it would harm the public interest by limiting the President's ability to effectuate the policy choices the American people elected him to pursue by limiting his advisors and other employees' ability to access information necessary to inform that policy.  It would also frustrate the President's ability to identify fraud, waste, and abuse throughout the federal government.  And it would draw false distinctions between different types of employees, unsupported in the statutory text, frustrating the flexibility that Congress itself provided in allowing multiple avenues to federal employment.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated:  March 13, 2025          Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division, Federal Programs Branch

EMILY HALL
Counsel to the Assistant Attorney General
Civil Division

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
Senior Trial Counsel
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street NW. Washington, DC 20005
Telephone: (202) 305-0878
Bradley.Humphreys@usdoj.gov

Kelly O. Hayes
Interim United States Attorney

ARIANA WRIGHT ARNOLD
USDC Md Bar No. 23000
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
Tel: (410) 209-4813 Ph
Fax: (410) 962-2310 Fax
Ariana.Arnold@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on March 13, 2025, I electronically filed the foregoing and the accompanying exhibits with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ Bradley P. Humphreys
BRADLEY P. HUMPHREYS