**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

|  |  |
|---|---|
| AMERICAN FEDERATION OF TEACHERS, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>SCOTT BESSENT, Secretary, U.S. Department of Treasury, *et al.*,<br><br>    Defendants. | Case No. 8:25-cv-00430-DLB |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

i

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

I.      USDS and the DOGE Agenda ............................................................................. 2

II.     The Agency Defendants' Actions ....................................................................... 3

        A.    Education ................................................................................................... 3

        B.    OPM .......................................................................................................... 4

        C.    Treasury .................................................................................................... 4

III.    This Litigation ...................................................................................................... 5

LEGAL STANDARDS ..................................................................................................... 6

ARGUMENT ..................................................................................................................... 7

I.      Plaintiffs Lack Standing ...................................................................................... 7

II.     Plaintiffs Fail to Establish Reviewable Final Agency Action ............................. 12

III.    The Privacy Act Precludes Plaintiffs' APA Causes of Action ............................ 16

IV.     Plaintiffs' APA Claims Fail on the Merits ........................................................... 20

        A.    Count I (No Privacy Act Violation) ........................................................... 21

        B.    Count II (No Arbitrary or Capricious Action) ........................................... 27

        C.    Count III (No Action in Excess of Statutory Authority) ............................ 29

CONCLUSION ................................................................................................................. 30

ii

## TABLE OF AUTHORITIES

### Cases

*All. for Retired Americans v. Bessent*, 2026 WL 622235, at *6 (D.D.C. Mar. 5, 2026) ........ 14, 15

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
771 F.Supp.3d 717 (D. Md. Mar. 20, 2025) ................................................................................... 5

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
778 F.Supp.3d 685 (D. Md. Apr. 17, 2025) ................................................................................... 5

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
172 F.4th 361 (4th Cir. 2026) ................................................................................................... 5, 11

*American Federation of Teachers v. Bessent*, 152 F.4th 162 (4th Cir. 2025) .............. 5, 10, 11, 19

*Ames v. United States Dep't of Homeland Sec.,* 153 F. Supp. 3d 342 (D.D.C. 2016), *aff'd*, 861
F.3d 238 (D.C. Cir. 2017) ............................................................................................................ 26

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32 (1991) ......................... 30

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................................... 13, 15

*Berardi v. U.S. Dep't of the Air Force*, 2006 WL 8448631 (D.D.C. Sep. 29, 2006) ................... 19

*Bierly v. Dep't of Def.*, 2024 WL 4227154 (D.D.C. Sep. 18, 2024) ............................................. 18

*Bigelow v. Dep't of Def.*, 217 F.3d 875, (D.C. Cir. 2000) ..................................................... 21, 25

*Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984) .................................................................... 16

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ........................................................................... 16

*Britt v. Naval Investigative Serv.*, 886 F.2d 544 (3rd Cir. 1989) ................................................. 26

*Cell Assocs., Inc. v. NIH*, 579 F.2d 1155 (9th Cir. 1978) ....................................................... 18, 19

*Chambers Med. Techs. of S.C., Inc. v. Bryant*, 52 F.3d 1252 (4th Cir. 1995) ............................... 6

*Ciralsky v. CIA*, 689 F. Supp. 2d 141 (D.D.C. 2010) ................................................................... 24

*City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019) ............................ 6, 14

*Coal. to Pres. McIntire Park v. Mendez*, 862 F. Supp. 2d 499 (W.D. Va. 2012) ........................... 7

*Demo v. Kirksey*, 2018 WL 5994995 (D. Md. Nov. 15, 2018) ...................................................... 8

*Dew v. U.S.*, 192 F.3d 366 (2d Cir. 1999) ................................................................................... 17

*Doe v. Chao*, 435 F.3d 492 (4th Cir. 2006) ................................................................. 19

*Doe v. Chao*, 540 U.S. 614 (2004) ............................................................................... 19

*Doe v. Hosp. of Univ. of Pennsylvania*, 546 F. Supp. 3d 336 (E.D. Pa. 2021) ............................... 9

*Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988) .......................................................... 18

*El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*, 396 F.3d 1265 (D.C. Cir. 2005) ............. 16

*Fed. Aviation Admin. v. Cooper*, 566 U.S. 284 (2012) ............................................. 17, 19

*Fletcher v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d 871 (8th Cir. 2000) .................. 9, 10

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ....................................... 7

*Freeman v. EPA*, 2004 WL 2451409 (D.D.C. Oct. 25, 2004) ......................................................... 24

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13 (D.C. Cir. 2006) ........... 12, 14

*Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458 (7th Cir. 2020) (Barrett, J.) ..................................... 8

*Gamble v. Fradkin & Weber, P.A.*, 846 F.Supp.2d 377 (D. Md. 2012) ........................................ 8

*Garcia v. Vilsack*, 563 F.3d 519 (D.C. Cir. 2009) ......................................................... 16

*Garey v. James S. Farrin, P.C*, 35 F.4th 917 (4th Cir. 2022) ......................................................... 10

*Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487 (D.C. Cir. 1988) ...................................... 29

*Haleem v. Dep't of Def.*, 2024 WL 230289 (D.D.C. Jan. 22, 2024) ........................................... 18

*Harrison v. Fed. Bureau of Prisons*, 248 F. Supp. 3d 172 (D.D.C. 2017) .................................... 18

*Hinck v. U.S.*, 550 U.S. 501 (2007) ............................................................................... 19

*Hyatt v. U.S. Patent & Trademark Office*, 146 F. Supp. 3d 771 (E.D. Va. 2015) ........................... 6

*Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420 (D.C. Cir. 2004) ........................................... 12

*Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627 (4th Cir. 2024) .. 12

*Jones v. U.S. Dep't of Hous. & Urban Dev.*, 2012 WL 1940845 (E.D.N.Y. May 29, 2012) ....... 17

*Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4 (D.D.C. 2023) ....................................................... 12

*Judicial Watch v. Dep't of Energy*, 412 F.3d 125 (D.C. Cir. 2005) ...................................... 22, 24

*Kan. by and through Kan. Dep't for Children and Families v. Source Am.*, 826 F. App'x 272 (4th Cir. 2020) ....................................................................................................................... 7

iv

*Krakauer v. Dish Network, LLC*, 925 F.3d 643 (4th Cir. 2019) ................................................... 10

*Krichbaum v. Kelley*, 844 F.Supp. 1107 (W.D. Va. 1994) ........................................................... 7

*Lepre v. Dep't of Labor*, 275 F.3d 5 (D.C. Cir. 2001) ................................................................. 30

*Liable v. Lanter*, 91 F.4th 438 (6th Cir. 2024) .......................................................................... 23

*Lowy v. Daniel Def., LLC*, 167 F.4th 175 (4th Cir. 2026) ............................................................ 6

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) .................................................................... 12

*Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167 (2d Cir. 2008) ........................................... 6

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ... 27

*Mount v. U.S. Postal Serv.*, 79 F.3d 531, 532 (6th Cir. 1996) ..................................................... 22

*Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445 (D.C. Cir. 2009) ...................... 29, 30

*O'Donnell v. United States*, 891 F.2d 1079 (3d Cir. 1989) ........................................................... 9

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009) ............................ 7

*Parks v. IRS*, 618 F.2d 677 (10th Cir. 1980) ......................................................................... 19, 25

*Poss v. Kern*, 2024 WL 4286088 (D.D.C. Sep. 25, 2024) ........................................................... 18

*Rimmer v. Holder*, 700 F.3d 246 (6th Cir. 2012) ....................................................................... 17

*Savidge v. Pharm-Save, Inc.*, 2023 WL 2755305 (W.D. Ky. Mar. 31, 2023) ............................... 9

*Schroer v. Billington*, 525 F. Supp. 2d 58 (D.D.C. 2007) ........................................................... 29

*Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006) ........................................................ 6

*Soc. Sec. Admin. v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 145 S. Ct. 1626, 222 L. Ed. 2d
    1068 (2025) ............................................................................................................................ 5

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .............................................................................. 6

*Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106 (D.C. Cir. 2007) .............................................. 18

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ...................................................................... 8

*Tripp v. DOD*, 193 F. Supp. 2d 229 (D.D.C. 2002) ..................................................................... 19

*Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008) ..................................... 13

*Village of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186 (4th Cir. 2013) .... 12

*Westcott v. McHugh*, 39 F. Supp. 3d 21 (D.D.C. 2014) ................................................................ 18

*Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. Ct. App. 1989)........................................................ 8

*Wolfson v. Lewis*, 924 F. Supp. 1413 (E.D. Pa. 1996)..................................................................... 8

*Yates v. Commercial Index Bureau, Inc.*, 861 F. Supp. 2d 546 (E.D. Pa. 2012) ........................... 10

## Statutes

5 U.S.C. § 2105............................................................................................................... 21, 22

5 U.S.C. § 551.................................................................................................................. 12, 13

5 U.S.C. § 552a ............................................................................................................... passim

5 U.S.C. § 553....................................................................................................................... 20

5 U.S.C. § 702....................................................................................................................... 16

5 U.S.C. § 704......................................................................................................... 6, 12, 13, 16

5 U.S.C. § 706........................................................................................................... 7, 20, 29

## Other Authorities

Exec. Order No. 14,158, §§ 3(a), 4, 90 Fed. Reg. 8441 ............................................... 3, 13, 23, 25

## Treatises

Restatement (Second) of Torts § 652B .................................................................................. 8, 9, 10

**INTRODUCTION**

Plaintiffs—several labor organizations, a nonprofit organization, and six individuals—brought this action under the Administrative Procedure Act to seek sweeping declaratory and injunctive relief that would bar any employees of the Department of the Treasury ("Treasury"), the Department of Education ("Education"), and the Office of Personnel Management ("OPM") who assist with implementing the President's Department of Government Efficiency ("DOGE") Agenda from accessing intra-agency data systems to carry out their jobs. Because Plaintiffs fail to establish that this Court has jurisdiction over the claims presented, and fail to state a claim as a matter of law, the Court should dismiss the Amended Complaint under Rules 12(b)(1) or 12(b)(6) of the Federal Rule of Civil Procedure or grant summary judgment for Defendants under Rule 56.

At the outset, Plaintiffs fail to properly allege standing as they cannot demonstrate that providing access to government data to government employees creates an injury-in-fact under Article III of the Constitution. Although this Court and the *en banc* Fourth Circuit have previously held that Plaintiffs' alleged harms are sufficiently analogous to the common law harms of intrusion on seclusion, Defendants respectfully disagree that Plaintiffs' alleged harms satisfy this standard or otherwise demonstrate standing at this stage of the case. Plaintiffs allege no tangible harm, and their vague assertions of intangible harm arising from access to certain data by government employees has no common-law analogue that would demonstrate an injury-in-fact.

The Court also lacks subject-matter jurisdiction on another important ground, as Plaintiffs do not challenge a "final agency action" subject to review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*. Providing government employees with access to internal databases is not an "agency action" as defined by the

1

APA, let alone a "final" agency action. Rather, providing individual employees access to internal data systems is the sort of routine decision that characterizes any workplace.

Plaintiffs also cannot use the APA to state a claim where another statutory scheme provides relief. Here, Privacy Act includes a precisely defined remedial scheme and exhaustion requirement prior to filing suit and does not lend itself to the sort of broad, programmatic injunctive relief sought here.

Finally, even if the Court were to determine it has subject matter jurisdiction over the claims asserted, Defendants have fully complied with the Privacy Act and the APA. The defendant Agencies engaged in a lawful exercise of discretion in granting government employees access to internal data systems, and that lawful and discretionary decision should not be disturbed.

## BACKGROUND

### I.       USDS and the DOGE Agenda

The U.S. DOGE Service was originally founded as the U.S. Digital Service ("USDS") in 2014 under President Barack Obama with the goal of, among other things, improving the federal government's information technology and data organization systems. *See* Delivering a Customer-Focused Government Through Smarter IT, WhiteHouse.gov (Aug. 11, 2014).[1] On January 20, 2025, President Trump signed Executive Order 14,158 ("Executive Order"), which redesignated the USDS as the United States DOGE Service and directed executive agencies to establish internal DOGE teams to advance the President's efforts to modernize government technology, improve efficiency,

---

[1]     *Available    at*    https://obamawhitehouse.archives.gov/blog/2014/08/11/delivering-customer-focusedgovernment- through-smarter-it.

and identify waste, fraud, and abuse. Exec. Order No. 14,158, §§ 3(a), 4, 90 Fed. Reg. 8441. The Order also established a temporary organization within USDS dedicated to advancing the President's DOGE agenda through July 4, 2026, at which time it will expire of its own accord. *Id.* Consistent with that directive, Education, OPM, and Treasury assigned employees to support DOGE-related initiatives and granted those employees access to agency systems necessary to perform their duties.

## II.    The Agency Defendants' Actions

### A.    Education

At the time of Plaintiffs' complaint, Education had several employees assigned to support implementation of the DOGE agenda, including both direct appointees and detailees. *See* ECF 51-3, ED-1–22.[2] On February 5, 2025, Education's Chief Information Officer authorized IT system access to "USDS personnel onboarded to the Department of Education DOGE team." *Id.*; ED-25. The authorization explained that Executive Order 14,158 required implementation of the President's DOGE agenda through technology modernization and improvements to government information systems and stated that DOGE team members required access to Education's systems and data in order to perform those responsibilities. *Id.*

Education's detail agreement with USDS provided that detailees would support information-technology modernization efforts, assess existing projects, implement

---

[2] Defendants produced three separate administrative records—one for each agency. They were filed at ECF 51, and are each bates numbered with a prefix indicating the agency initials (e.g., Education ("ED"); U.S. Office of Personnel Management ("OPM"), and U.S. Department of Treasury ("TR"). Defendants also produced supplemental administrative records for OPM and Treasury, filed at ECF 64 and bates numbered with a prefix "Supp_" before the agency initials (e.g., "Supp_OPM" and "Supp_TR"). Where a bates number does not appear, ECF PageID numbers are used to identify the record citation (e.g., "ECF 64-2, Supp_TR, PageID 25–29").

safeguards against fraud, and promote data interoperability. ED-1–3. The agreement further provided that detailees would be treated as Education employees for purposes of data access, would work under Education supervision, and would access Education systems only for authorized government purposes. *Id.*

### B.    OPM

When the challenged access decisions were made, the individuals working on DOGE-related initiatives at OPM were OPM employees, either hired directly by OPM as employees or detailed to OPM by another agency, and serving in positions within the agency, including positions in the Office of the Director. *See* ECF 51-1, OPM-1–22, 103, 110. Certain of those employees were granted access to OPM systems, including USAJOBS, USA Staffing, eOPF and EHRI. OPM-28–29, 103, 108–09. OPM's Chief Information Office periodically reviewed access permissions to ensure that access remained tied to employees' duties and removed access when it determined that certain employees no longer required access. *See id.*, OPM-24–27, 53–54. For example, on February 6, 2025, the CIO removed access to eOPF and EHRI for three engineers whose job duties did not require prospective access. OPM-25–26. These actions reflected OPM's application of ordinary access-control and least-privilege principles rather than any blanket grant of unrestricted access.

### C.    Treasury

When the challenged access decisions were made, Treasury had assigned two employees to support technology modernization and payment-integrity initiatives associated with the President's DOGE agenda. *See* ECF 51-2, TR-2–4, 7, 15, 24, 26–27. Those employees underwent security clearances and trainings that are required of Treasury employees. *See* ECF 51-2, TR-26, 30–32, 39, 58; *see also* ECF 64-2, Supp_TR, PageID

25–29. On January 24, 2025, Treasury developed an engagement plan describing a short-term effort to review payment processes and identify opportunities to improve efficiency. *Id.*, TR-56–60. Consistent with that effort, Treasury provided system access necessary for assigned personnel to perform those duties. *See id.* TR-61–62; *see also* ECF 64-2, Supp_TR-2–13.

### III.    This Litigation

Defendants respectfully refer the Court to its recitation of the prior procedural history in its Memorandum Opinion and Order Granting Plaintiffs' Motion for Preliminary Injunction ("PI Op."), ECF 68, at p. 13–14. Plaintiffs—several labor organizations, a nonprofit organization, and six individuals—filed the operative amended complaint on February 12, 2025. ECF 13, Am. Compl ¶¶ 19-27. The Complaint asserts three APA causes of action premised on alleged violations of the Privacy Act. *Id.* ¶¶ 145–59. On March 24, 2025, this Court granted Plaintiffs' motion for a preliminary injunction. ECF 68.[3]

Defendants appealed. The Fourth Circuit vacated the preliminary injunction and remanded the case for further proceedings. *American Federation of Teachers v. Bessent* ("*AFT*"), 152 F.4th 162 (4th Cir. 2025). While Plaintiff petitioned for rehearing and that

---

[3] On March 20, 2025, another judge in the District of Maryland granted different plaintiffs a temporary restraining order ("TRO") against the Social Security Administration ("SSA") and certain related defendants. That court's lengthy TRO decision relied heavily on the analysis in the decision granting a TRO in this case. *See* ECF 49, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.* ("*AFSCME v. SSA*"), 771 F.Supp.3d 717 (D. Md. Mar. 20, 2025). Ultimately, the judge granted a preliminary injunction in the SSA case on April 17, 2025. *AFSCME v. SSA*, 778 F.Supp.3d 685 (D. Md. Apr. 17, 2025). SSA appealed to the Fourth Circuit, which agreed to hear the appeal *en banc*. *See* Order, *AFSCME v. SSA*, No. 25-1411, Doc. 27 (4th Cir. May 6, 2025). While that appeal was pending, the Supreme Court granted a stay of the injunction pending the disposition of the appeal in the Fourth Circuit and disposition of any petition for a writ of certiorari on June 6, 2025. *Soc. Sec. Admin. v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 145 S. Ct. 1626, 222 L. Ed. 2d 1068 (2025). On April 10, 2026, the *en banc* Fourth Circuit dissolved the injunction, in large part based on the Supreme Court's stay. *See AFSCME v. SSA*, 172 F.4th 361 (4th Cir. 2026).

petition remained pending, the en banc Fourth Circuit decided *AFSCME v. SSA*, 172 F.4th 361 (4th Cir. 2026), which abrogated portions of the *AFT* panel's reasoning concerning standing and preliminary-injunction methodology but left undisturbed the panel's vacatur of the injunction. The Fourth Circuit in *AFT* thereafter denied rehearing and remanded this case to the district court. ECF 91.

Following the submission of a joint status report in which the parties expressed differing views as to how further briefing on the merits in this case should proceed, *see* ECF 95, this Court ordered the parties to brief their respective dispositive motions, with the government's motion to dismiss or, in the alternative, for summary judgment due first on June 18, 2026. ECF 102. Defendants' motion timely follows.

**LEGAL STANDARDS**

"Determining the existence of subject matter jurisdiction is a threshold inquiry[.]" *Lowy v. Daniel Def., LLC*, 167 F.4th 175, 202 (4th Cir. 2026) (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)). "[W]hen a federal court has ruled that it lacks subject-matter jurisdiction, it must dismiss the case." *Id.* at 201. It is the plaintiff's burden to establish subject matter jurisdiction, including Article III standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Chambers Med. Techs. of S.C., Inc. v. Bryant*, 52 F.3d 1252, 1265 (4th Cir. 1995). It is also the plaintiff's burden in an APA case to establish that they are seeking review of a "final agency action," 5 U.S.C. § 704, and in the Fourth Circuit, this requirement is jurisdictional. *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430, 432 (4th Cir. 2019).

On the merits of an APA claim, "summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA." *Hyatt v. U.S. Patent & Trademark Office*,

146 F. Supp. 3d 771, 780 (E.D. Va. 2015) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). When a court reviews at the summary judgment stage the decision of an administrative agency under the APA, the administrative record provides "the complete factual predicate for the court's review." *Coal. to Pres. McIntire Park v. Mendez*, 862 F. Supp. 2d 499, 508 (W.D. Va. 2012) (quoting *Krichbaum v. Kelley*, 844 F.Supp. 1107, 1110 (W.D. Va. 1994)); *see Kan. by and through Kan. Dep't for Children and Families v. Source Am.*, 826 F. App'x 272, 282 (4th Cir. 2020) (explaining that in APA actions, "the focal point for judicial review should be the administrative record already in existence"). The APA allows a federal court to overturn an agency's decision only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole. 5 U.S.C. § 706. "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).

## ARGUMENT

### I.    Plaintiffs Lack Standing

This Court should dismiss Plaintiffs' claims for lack of subject-matter jurisdiction because Plaintiffs have not established a concrete injury sufficient to satisfy Article III. To establish standing, Plaintiffs must demonstrate that they have suffered an injury in fact that is concrete, particularized, and actual or imminent; that the injury is fairly traceable to Defendants' conduct; and that it is likely to be redressed by the requested relief. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). Here, Plaintiffs have not demonstrated this first requirement.

Plaintiffs contend that they suffered an injury when Defendants granted certain agency employees access to agency databases containing their information and information

7

of their members and that the access alone constituted a violation of the Privacy Act. But Article III requires more than a statutory violation. "Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021) (emphasis in original). To show a concrete injury, Plaintiffs must allege an injury that bears a sufficiently close relationship "in kind, not degree" to a common-law analogue. *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462–63 (7th Cir. 2020) (Barrett, J.). Each element that is "essential to liability" for that analogue must be shown. *TransUnion*, 594 U.S. at 434.

Under American common law, "an intentional intrusion upon another person's solitude, seclusion, private affairs, or concerns in a manner that would be highly offensive to a reasonable person" causes injury and subjects the intruder to liability. *Gamble v. Fradkin & Weber, P.A.*, 846 F.Supp.2d 377, 383 (D. Md. 2012); *see* Restatement (Second) of Torts § 652B, cmt a. An actionable "intrusion" includes physical invasions into private spaces, eavesdropping, spying, or "some other form of investigation or examination into [a person's] private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents." Restatement (Second) of Torts § 652B cmt b. And for this claim, "[i]ntent is required." *Gamble*, 846 F.Supp.2d at 383. Indeed, "the acquisition of information" does not fix liability—"[r]ather, it is the nature of the intrusion" that must be examined. *Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. Ct. App. 1989). As such, this is "a heavily fact-dependent claim" that requires consideration of at least "the context, conduct, and circumstances surrounding the intrusion, as well as the intruder's motives and objectives, the setting into which he intrudes, and the

expectations of those whose privacy is invaded.'" *Demo v. Kirksey*, 2018 WL 5994995, at
\*6 (D. Md. Nov. 15, 2018) (quoting *Wolfson v. Lewis*, 924 F. Supp. 1413 (E.D. Pa. 1996)).

In cases involving unauthorized access or disclosure of records, courts assessing
common-law claims for intrusion upon seclusion have emphasized that intent is essential
to liability. Based on the Restatement, such courts have consistently held that "an actor
commits an *intentional* intrusion only if he believes, or is substantially certain, that he lacks
the necessary legal or personal permission to commit the intrusive act." *O'Donnell v.
United States*, 891 F.2d 1079, 1083 (3d Cir. 1989) (emphasis in original); *see, e.g.*, *Fletcher
v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d 871, 876 (8th Cir. 2000); *Doe v. Hosp.
of Univ. of Pennsylvania*, 546 F. Supp. 3d 336, 352 (E.D. Pa. 2021); *Savidge v. Pharm-
Save, Inc.*, 2023 WL 2755305, at \*13 (W.D. Ky. Mar. 31, 2023). Relatedly, the
Restatement reflects that in circumstances not involving physical invasions, spying, or
eavesdropping, an "intrusive act" must be an "*investigation* or *examination into*" private
material—a standard that also implies the need for an actor to have the intent to gather
private information or learn more about the individual whose private information is
accessed. *See* Restatement (Second) Torts § 652B cmt b (emphasis added).

Plaintiffs in this case have not established the essential element of an *intentional*
intrusion—*i.e.*, that Defendants "believe[d], or [were] substantially certain, that [their
personnel] lack[] the necessary legal . . . permission to commit the intrusive act."
*O'Donnell*, 891 F.2d at 1083. Indeed, Defendants have maintained throughout this case
that they acted lawfully in granting database access to their personnel.

Furthermore, Plaintiffs do not allege that anyone on Defendants' DOGE teams
*viewed* any particular plaintiff's personal data, let alone *investigated* or *examined* such data.

9

Rather, as the *AFT* Fourth Circuit panel observed in this case, "[e]ach Plaintiff's information is one row in various databases that are millions upon millions of rows long." *AFT*, 152 F.4th at 172. "Plaintiffs do not allege in their complaint that any particular row of information belonging to any particular Plaintiff has been examined at all." *Id.* Nor do Plaintiffs allege that any employee searched for, used, disclosed, gathered for future use, or otherwise directed any specific action toward any Plaintiff based on any personal information of theirs that might have been available for viewing. *Cf. Fletcher*, 220 F.3d at 876 (affirming liability where the defendant "used a medical authorization from a workers' compensation form to gain information about Fletcher's staph infection"); *Yates v. Commercial Index Bureau, Inc.*, 861 F. Supp. 2d 546, 552 (E.D. Pa. 2012) (involving an investigation into the plaintiff's hospital records to gain potentially useful information for a pending lawsuit); *Krakauer v. Dish Network, LLC*, 925 F.3d 643 (4th Cir. 2019) (involving intrusive contact attempts using the plaintiffs' personal data); *Garey v. James S. Farrin, P.C*, 35 F.4th 917 (4th Cir. 2022) (same).

Plaintiffs' theory is that certain agency employees should not have been granted access to agency databases in the first place. But a dispute over which government employees may access information within their own agencies is fundamentally different from a claimed injury arising from a government employee's use of such access to "investigate or examine" a particular plaintiff's private information for a wrongful purpose. The latter may create an actionable injury—the former does not. Accordingly, the *AFT* Fourth Circuit panel correctly held that Plaintiffs had not been "the subjects of targeted 'investigation[s] or examination[s] into [their] private concerns,'" 152 F.4th at 172 (quoting Restatement § 652B cmt. b), and thus could not establish an injury under the

10

common-law analogue. The *AFSCME* Fourth Circuit en banc panel majority disagreed, noting that the Restatement's text did not "say the snooping must be 'targeted' in the sense that *AFT* used that term," and that "*AFT* never explains why invading the privacy of millions of people is 'different in kind' from invading the privacy of just one—much less in a way that *helps the defendant*." *AFSCME*, 172 F.4th at 361 (emphasis in original) (citing *AFT*, 152 F.4th at 172). But respectfully, the en banc majority poses a question that assumes the central issue in dispute—namely, that the challenged actions "invad[ed] the privacy of millions of people." *Id.* Defendants are not arguing—and the *AFT* Fourth Circuit panel did not hold—that "invading the privacy of millions of people" is not actionable. *AFSCME*, 172 F.4th at 371. Rather, the *AFT* panel reasonably concluded that scrolling through a database with lines of data "millions and millions of rows long"—without carrying out an investigation or examination into any individual lines of data, or taking any further action to identify the individuals whose data is depicted—is not itself an "intrusion" that creates an injury under American common law. *AFT*, 152 F.4th at 172.

Indeed, there is a difference *in kind*—not merely in degree—between accessing a database in order to investigate or discover information about a particular person (or millions of particular people), and accessing a database for purposes unrelated to prying or spying, scrolling through millions of rows of data where the identity of the persons to whom the data is related is unknown and inconsequential to the user, and perhaps glancing upon a particular row containing a particular plaintiff's data through the course of that user's work. The proposition that the latter action constitutes an intrusion upon seclusion stretches the common-law analogy beyond recognition.

Because Plaintiffs have not demonstrated a concrete injury in fact, they lack

11

standing, and the Court should dismiss the complaint for lack of subject-matter jurisdiction.

## II.    Plaintiffs Fail to Establish Reviewable Final Agency Action

As another dispositive issue meriting dismissal of this case, the agency action challenged by Plaintiffs here—granting database access to certain employees—does not constitute a "final agency action," as required for APA review. 5 U.S.C. § 704. Plaintiffs bear the burden of identifying a "final agency action," and their failure to do so here deprives this Court of subject-matter jurisdiction over their APA claims. *See Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024).

It is well settled that not all agency conduct is subject to review under the APA. As used in the APA, an "agency action" is not an "'action' in its broadest sense" but "a determination—*i.e.*, a 'rule, order, license, sanction, relief, or the equivalent[.]'" *Village of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186, 194 (4th Cir. 2013) (quoting 5 U.S.C. § 551(13)). Thus, the Supreme Court has emphasized, the APA does not permit "general judicial review of [an agency's] day-to-day operations." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990). Nor does the APA authorize agencies to oversee "the common business of managing government programs." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). For example, courts will not engage in APA review of claims seeking to improve or mandate agency training programs, *see Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4, 17 (D.D.C. 2023), or oversee activity done "in anticipation of agency action," such as the "conduct [of] studies," *Fund for Animals*, 460 U.S. at 20, or otherwise review an agency's "workaday" dealings, *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004).

Plaintiffs seek review of quintessential day-to-day operations. The "agency action" they identify is a loosely defined series of personnel decisions related to granting individual

12

employees access to internal information systems, which Plaintiffs contend were done too quickly and without adequate vetting. *See* Am. Compl. ¶ 137. Such actions do not resemble a "rule, order, license, sanction, relief, or the equivalent," 5 U.S.C. § 551(13), nor a "policy" adopted by the agencies. *Cf. Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008) (holding that the agency's adoption of a policy and practice that was long-running, agency-wide, conceded to exist by agency counsel, and expressly written down in the agency's formal Compliance Manual was final agency action). Indeed, none of the four features supporting the D.C. Circuit's finding of an official "policy" in *Venetian Casino* are present here. Plaintiffs filed this lawsuit three weeks after the start of a new Presidential term, when government agencies characteristically carry out their busiest day-to-day operations, including personnel onboarding and IT access. The fact that these agencies also onboarded and granted IT access to employees tasked with executing DOGE-related priorities at the start of the new Presidential term does not turn those operational actions into a policy.[4]

Moreover, even if the challenged actions could be characterized as "agency action" under the APA, they are not "final" agency action. To satisfy § 704, an action must mark the consummation of the agency's decision-making process and be one from which rights or obligations have been determined or legal consequences flow. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Plaintiffs satisfy neither requirement.

Granting an employee access to an agency IT system does not determine any rights or obligations of Plaintiffs. Rather, it is in the nature of decisions regarding staffing,

---

[4] The Executive Order, signed on January 20, 2025, also places a time limit on the President's "DOGE agenda" at 18 months, and it terminates the U.S. DOGE Service Temporary Organization in 16 days, on July 4, 2026. Exec. Order 14,158 § 3(b).

13

supervision, training, or work assignments. Those decisions may facilitate future agency conduct, but they do not themselves create legal consequences for members of the public such as Plaintiffs. For example, OPM's subsequent modification and revocation of permissions for certain employees underscores that these access determinations were ongoing operational judgments rather than consummated agency actions carrying legal consequences. An agency's decision to give an employee access to its systems is not itself final agency action, even if the employee might conceivably use the computer to effect final agency action (*e.g.*, in approving or denying benefits) at some later date. "[I]nternal sharing of data with employees within an agency is a routine decision that should have few, if any, direct practical or legal consequences for individuals." *All. for Retired Americans v. Bessent*, 2026 WL 622235, at *6 (D.D.C. Mar. 5, 2026). At most, such access allows agency personnel to perform assigned responsibilities within the agency. But it does not impose duties on Plaintiffs, alter their legal status, or subject them to any legal consequences. Any effect on Plaintiffs would arise, if at all, only from some future use of information contained within those systems, not from the access decision itself, a distinction that is critical here, as the APA's "final agency action" requirement exists precisely to prevent courts from becoming entangled in such preliminary and occupational matters. *See Fund for Animals*, 460 U.S. at 20.

Plaintiffs ask the Court to second-guess the agencies' decisions regarding which employees may access agency systems and perform agency work. But as the Fourth Circuit has recognized, courts "are woefully ill-suited . . . to adjudicate generalized grievances asking us to improve an agency's performance or operations." *New York*, 913 F.3d at 431. In that kind of case, "courts would be forced either to enter a disfavored 'obey the law'

injunction . . . or to engage in day-to-day oversight of the executive's administrative practices. Both alternatives are foreclosed by the APA, and rightly so." *New York*, 913 F.3d at 431 (citation omitted). In fact, Plaintiffs' prayer for relief demonstrates that precisely those kinds of unsuitable outcomes are the objective of this suit, which seeks an injunction to limit Defendants' discretion in managing certain personnel and information systems, and seeks an impermissible "obey the law" injunction. *See* ECF 13, Am. Compl. at 39 ¶ b (requesting to "[e]njoin Defendants from continuing to permit such access" of data systems to certain agency employees; *id.* ¶ e (requesting to "[e]njoin Defendants to ensure that future disclosure of individual records will occur only in accordance with the Privacy Act and the SORNs applicable to the system of records at issue.").

As such, there are "strong reasons" not to treat "an agency's decisions about sharing data with its own employees" as "a final, judicially reviewable action" under the APA. *All. for Retired Americans*, 2026 WL 622235, at *6 (quoting *Bennett*, 520 U.S. at 178). Agencies make thousands of human resource, information technology, and system access decisions every day, whenever they decide to open an e-mail account for an employee, to staff an employee on a particular matter, to grant an employee security credentials, or to assign relevant training to employees who access certain systems or participate in certain programs. To review such decisions would be to bring within the scope of the APA virtually every aspect of an agency's day-to-day business and relationship with its employees. Judicial review of "internal data-sharing within an agency" under the APA would therefore risk "far-reaching consequences, potentially inviting judicial review of a vast array of operational choices that agencies must make in carrying out their duties." *Id.* This is precisely the result that the "final agency action" limitation of the APA is designed

to prevent.

Based on the internal and operational nature of the access here and the absence of any agency decision establishing a policy regarding such access, Plaintiffs have failed to identify a final agency action subject to APA review, and their claims must be dismissed.

### III.    The Privacy Act Precludes Plaintiffs' APA Causes of Action

Even if the decisions providing government employees with access to agency data were a "final agency action," Plaintiffs have failed to establish that "there is no other adequate remedy" in a court which provides a means for judicial review. 5 U.S.C. § 704. The APA's "central purpose" is to "provid[e] a broad spectrum of judicial review of agency action," but Section 704 "makes it clear that Congress did not intend the general grant of review under the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Accordingly, a plaintiff has adequate relief—and thus cannot rely on the cause of action in 5 U.S.C. § 704—"'where a statute affords an opportunity for *de novo* district court review' of the agency action." *Garcia v. Vilsack*, 563 F.3d 519, 522–23 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005)). The APA likewise does not "confer[] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," 5 U.S.C. § 702. Stated differently, where an agency action is subject to review in some manner under a separate statutory review scheme that prescribes certain forms of review and certain forms of relief, then the general rule is that action must be reviewed within the confines of that scheme. The mode of review and remedies established by the statutory review scheme are presumed exclusive.

This is true even where a statutory review scheme provides relief only to particular parties; other parties are presumptively precluded from obtaining review of those issues

16

under the APA. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."); *see also Dew v. U.S.*, 192 F.3d 366, 372 (2d Cir. 1999). It is also true even where the plaintiff may not prevail on the merits of her claim if she brings it under the alternative statute; the existence of that alternative suffices. *See Rimmer v. Holder*, 700 F.3d 246, 261–62 (6th Cir. 2012); *Jones v. U.S. Dep't of Hous. & Urban Dev.*, 2012 WL 1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate "whether or not relief is ultimately granted").

Under these principles, Plaintiffs may not challenge the purported violations of the Privacy Act under the APA, because the Privacy Act already provides an adequate alternative remedy for persons entitled to sue under that statute. The Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information, *Fed. Aviation Admin. v. Cooper*, 566 U.S. 284, 287 (2012), and authorizes individuals to sue agencies that violate those requirements, 5 U.S.C. § 552a(g)(1)(D). But Congress carefully limited the civil remedies under the Privacy Act to four circumstances: (1) injunctive relief in the form of an order requiring that an agency amend inaccurate, incomplete, irrelevant, or untimely records, 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A); (2) injunctive relief in an order requiring an agency to allow a person access to certain records, *id.* § 552a(g)(1)(B); (3) damages for any intentional failure to maintain a necessary record for a benefits determination if the erroneous record results in an adverse determination, *id.* § 552a(g)(1)(C), (g)(4); and (4) the greater of actual damages or damages in the amount of

17

$1000 for any other "intentional or willful" violation of the Act that has caused proven harm to the plaintiff, *id.* § 552a(g)(1)(D), (g)(4). This detailed remedial structure reflects Congress's judgment regarding both who may sue, what kinds of Privacy Act violations merit remedial measures, and which remedial measures are available.

Plaintiffs' APA claims are, in substance, Privacy Act claims. *See* Am. Compl. ¶¶ 145–59. Yet Plaintiffs seek relief that the Privacy Act does not authorize. The Privacy Act does not allow organizations to obtain sweeping injunctions regulating agencies' future decisions regarding employee access to agency records systems. In fact, organizations have no remedies whatsoever under the Privacy Act, which is expressly limited to individual relief. *See* 5 U.S.C. § 552a(g)(1). Even for the individual plaintiffs here, injunctive relief is unavailable for any other situation arising out of the Privacy Act except for orders to amend or allow a person access to his records. *See id.*; *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs" (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)); *see also Cell Assocs., Inc. v. NIH*, 579 F.2d 1155, 1161–62 (9th Cir. 1978) ("We think it unlikely that Congress would have gone to the trouble [in the Privacy Act] of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board.").

Because of the Privacy Act's comprehensive remedial scheme, courts have long recognized that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also, e.g.*, *Poss v. Kern*, 2024 WL 4286088, at *6 (D.D.C. Sep. 25, 2024); *Haleem v. Dep't of*

18

*Def.*, 2024 WL 230289, at \*13-14 (D.D.C. Jan. 22, 2024); *Bierly v. Dep't of Def.*, 2024 WL 4227154, at \*8–9 (D.D.C. Sep. 18, 2024); *Harrison v. Fed. Bureau of Prisons*, 248 F. Supp. 3d 172, 182 (D.D.C. 2017); *Berardi v. U.S. Dep't of the Air Force*, 2006 WL 8448631, at \*6 (D.D.C. Sep. 29, 2006); *Tripp v. DOD*, 193 F. Supp. 2d 229, 238 (D.D.C. 2002).[5] That result is consistent with the principle that, "[w]here, as here, [a] statute provides for certain special types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief." *Parks v. IRS*, 618 F.2d 677, 684 (10th Cir. 1980) (citing *Cell Assocs.*, 579 F.2d at 1161–62). Under the Privacy Act, Congress concluded that suits for money damages provide an adequate remedy for violations of § 552a(b) and limited relief to suits for such damages. That congressional determination forecloses all of Plaintiff's APA claims that are predicated on violations of the Privacy Act. *See Hinck v. U.S.*, 550 U.S. 501, 506 (2007) (applying the "the well-established principle that, in most contexts, a precisely drawn, detailed statute pre-empts more general remedies").

This result is especially sensible with respect to the Privacy Act, because Congress "link[ed] particular violations of the Act to particular remedies in a specific and detailed manner[,]" which "points to a conclusion that Congress did not intend to authorize the issuance of [other] injunctions." *Cell Assocs.*, 579 F.2d at 1158–59. Indeed, were injunctive relief freely available for violations of the Privacy Act generally—such as through the sort of generic APA claims that Plaintiff brings here—"the detailed remedial scheme adopted by Congress would make little sense." *Id.* at 1160. It is "unlikely that Congress would have

---

[5] Defendants recognize that the Supreme Court and the Fourth Circuit have suggested in dicta that prospective relief under the APA may be available in certain limited circumstances alleging Privacy Act violations. *See Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004); *Doe v. Chao*, 435 F.3d 492, 504 n.17 (4th Cir. 2006). But the Supreme Court has recently expressly reserved direct consideration of that question. *See Fed. Aviation Admin. v. Cooper*, 566 U.S. 284, 303 n.12 (2012).

gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board." *Id.*; *see also AFT*, 152 F.4th at 175 ("With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy Act at least plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here.")[6]

In short, Congress specified the procedural requirements for agencies to follow when issuing rules under the APA, *see* 5 U.S.C. § 553, and also separately specified the remedies that are available for APA violations, *see id.* § 706. Congress likewise specified the procedural requirements for agencies to follow when making significant changes to a "system of records" under the Privacy Act, *see id.* § 552a(e)(4), (e)(11), and likewise separately specified the remedies that are available to individuals for Privacy Act violations, *see id.* § 552a(g). Both the substantive arguments advanced and the relief requested in this suit make a mess of those choices by mixing and matching from different parts of different statutes. Congress's decision to provide narrow, targeted causes of action for damages and only particular kinds of injunctive relief under the Privacy Act strongly suggests that it did not intend to allow plaintiffs to end-run that carefully constructed scheme via APA claims. This Court should respect that congressional choice.

IV.     **Plaintiffs' APA Claims Fail on the Merits**

Even if the Court determines that APA review is not precluded, the Court should

---

[6] By contrast, the Supreme Court has held that the Privacy Act's remedial scheme does not displace the remedial scheme in the Fair Credit Reporting Act ("FCRA") precisely because those parallel substantive statutes "are merely complementary" and "can coexist harmoniously" without the FCRA nullifying the Privacy Act's limitations. *See Dep't of Agric. Dev. Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024). Enjoining Privacy Act violations through the APA, however, would have precisely that nullifying effect, rendering meaningless the limitations on remedies that Congress set forth in the Privacy Act.

20

dismiss APA challenges for failure to state a claim or grant summary judgment in Defendants' favor.  Defendants' decisions to grant their employees access to internal data systems was not contrary to law, arbitrary or capricious, or in excess of statutory authority.

### A.      Count I (No Privacy Act Violation)

Count I alleges that Defendants violated the Privacy Act by permitting certain agency personnel to access agency records systems containing Plaintiffs' information. *See* ECF 13, Am. Compl. ¶¶ 147–149, 151. This is incorrect; the Privacy Act expressly authorizes this kind of access. The Privacy Act generally prohibits the disclosure of covered personal information without the consent of the individual to whom those records pertain. 5 U.S.C. § 552a(b). But Congress created an express exception for intra-agency access. An agency may disclose records without consent to "those officers and employees of the agency . . . who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). The Privacy Act does not prohibit sharing information with those whose jobs give them good reason to access the information to perform assigned functions. *See Bigelow v. Dep't of Def.*, 217 F.3d 875, 877 (D.C. Cir. 2000).

The administrative record establishes both elements of the § 552a(b)(1) exception: the individuals provided access to the data at issue were agency employees, and they required access to agency systems in order to carry out their assigned responsibilities.

The Privacy Act uses the term "employee" (in addition to "officer"). 5 U.S.C. § 552a(b)(1). "[F]or purposes of" the Privacy Act, "employee" is defined as an officer or individual "appointed in the civil service by one of the following acting in an official capacity" including "the President" or "an individual who is an employee under this section." *Id.* § 2105(a)(1)(A), (D). An employee must also be "engaged in the performance of a federal function under authority of law or an Executive act" and must

be "subject to the supervision of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position." *Id.* § 2105(a)(2). Because the Privacy Act is part of Title 5, § 2105's definition of employee directly applies to its use of the term "employee." *See* 5 U.S.C. § 552a(b)(1). The challenged personnel were employees of the agencies whose systems they accessed.

At Education, the relevant individuals were either detailed or appointed directly to positions within the agency pursuant to formal agreements providing that they would perform work for Education under Education supervision.[7] ECF 51-3, ED-1–3, 5–7, 13–16. Those agreements expressly provided that the detailees would be treated as Education employees for purposes of data access and would perform work on Education's behalf. ED-3. Similarly, the individuals at OPM were OPM employees serving in positions within the agency, including positions in the Office of the Director. ECF 51-1, OPM-1–22, 103, 110. And at Treasury, the relevant personnel were appointed to positions within Treasury and assigned responsibilities relating to technology modernization and payment-integrity initiatives in order to carry out the Executive Order; those employees underwent security clearances and trainings that are required of Treasury employees. ECF 51-2, TR-1–6, 13, 21–23, 24–27, 30–32, 39, 58; *see also* ECF 64-2, Supp_TR, PageID 25–29. In sum, all of the involved individuals were employed by their respective agencies, whether or not they were detailed or formally hired by the agency. *See Mount v. U.S. Postal Serv.*, 79 F.3d 531, 532, 533 (6th Cir. 1996) (describing "physician under contract with [United States Postal

---

[7] While courts in the Fourth Circuit do not appear to have considered the question, the D.C. Circuit has adopted a functional approach, looking to the subject matter and purpose of the individual's work, their supervision, and their physical worksite as illustrative (but not conclusive) factors. *Judicial Watch v. Dep't of Energy*, 412 F.3d 125, 131–32 (D.C. Cir. 2005). Here, those factors clearly weigh in favor of the detailees' status as employees of their respective agencies.

22

Service]" as an employee or agent of Postal Service under § 552a(b)(1)); *Liable v. Lanter*, 91 F.4th 438, 442 (6th Cir. 2024) (local employee detailed to federal task force was a federal employee for purposes of the Westfall Act).

Second, the record establishes that the challenged agency employees needed access to the data in order to perform duties. The Executive Order tasked these employees to modernize technology and to "maximize efficiency and productivity." Exec. Order 14,158 § 4. To that end, the Executive Order instructed agency heads "to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems," and in turn requires USDS to "adhere to rigorous data protection standards." *Id.* § 4(b). Given the purpose of the Order—to modernize technology—it necessarily follows that agency personnel assigned to improve agency systems would need access to them to conduct that modernization. Defendants determined that these employees were responsible for implementing initiatives relating to technology modernization, interoperability, payment integrity, operational review, and related government functions. *See* ECF 51-3, ED-1–3, 25; ECF 51-1, OPM-24–27, 53–54, 57–62; ECF 51-2, TR-56–60. It would be impossible for these employees to modernize these data systems without access to the systems. Plaintiffs repeatedly characterize the access as if it were granted for the purpose of examining particular individuals' records. But the record reflects that the access was granted so employees could perform assigned agency functions relating to the systems and processes themselves.

Agency officials reasonably authorized access to the systems necessary for the employees to perform those responsibilities. For example, Education's Chief Information Officer expressly documented the need for access and authorized DOGE team members to

23

access Education's systems and data in order to carry out assigned responsibilities relating to implementation of Executive Order 14,158 and technology modernization efforts. ECF 51-3, ED-25. Education's agreements with detailees similarly provided that access would be authorized to the extent necessary to perform assigned work and that agency data would be accessed only for legitimate governmental purposes. *Id.*, ED-2–3.

The record at OPM likewise reflects that access permissions were tied to employees' job responsibilities and were periodically reviewed and adjusted based on operational need. ECF 51-1, OPM-24–27, 53–54. Indeed, OPM removed access when it determined that particular employees no longer required prospective access to certain systems. OPM-25–26. That process confirms that access decisions were based on assessments of need rather than a blanket decision to grant indiscriminate access. Treasury's records similarly establish that access was granted in connection with assigned responsibilities relating to payment systems, technology modernization, and payment integrity. ECF 51-2, TR-56–64; *see also* ECF 64-2, Supp_TR-2–13.

Defendants respectfully submit, despite the Court's prior rulings, that the Executive Order provides the requisite explanation for why the employees needed access to the protected data and data systems in order to perform their job duties. *See, e.g.*, *Judicial Watch*, 412 F.3d at 131–32; *Freeman v. EPA*, 2004 WL 2451409, at *4–5 (D.D.C. Oct. 25, 2004) (disclosure of plaintiffs' drug testing schedules and results by to an EPA-hired DOD investigator did not violate Privacy Act because "according to the OMB 1975 Guidelines, an agency that hires a member of another agency to serve in a temporary task force or similar, cross-designated function can share otherwise protected information with that hired person and still satisfy exception (b)(1)"); *Ciralsky v. CIA*,

24

689 F. Supp. 2d 141, 155 (D.D.C. 2010) (permitting disclosure to "Agency contractors engaged specifically to conduct an official CIA investigation into allegations of anti-Semitism at the Agency"). The Executive Order directs agencies to provide "full and prompt access to all unclassified agency records, software systems, and IT systems" to these employees subject to "rigorous data protection standards," Exec. Order 14,158 § 4(b), so that the agencies' DOGE Teams can carry out their duties.

The purpose of the agencies' DOGE teams' mission, moreover, distinguishes this case from the decisions on which Plaintiffs rely. For example, in *Parks*, the government defendants could not rely on the executive order promoting savings bond programs to show that disclosure of employees' nonparticipation in savings bond programs contained in personnel files "was necessary to the performance of their duties," where "Congress expressly held out nonparticipation in savings bond programs as an example of information not needed in the performance of federal employees' regular duties." 618 F.2d at 681 & n.1. In contrast, there is no congressional pronouncement that employees' access to agency data systems for modernizing those systems is not necessary to the performance of their duties. And, as in *Bigelow*, the employees at the three agencies "ha[d] to" have access to the relevant systems "in order to perform [their] duties properly." 217 F.3d at 877.

At bottom, Plaintiffs ask the Court to substitute its judgment for the agencies' judgment regarding which employees required access to agency data and systems in order to perform their assigned duties. But § 552a(b)(1) does not require agencies to prove that more limited access could have sufficed, nor does it authorize courts to second-guess an agency's discretionary internal staffing and data access decisions. The question is whether the employees had a need to access the data in order to perform their duties. The

administrative record demonstrates that they did.

Additionally, Defendants' actions are permissible under the "routine use" exception under the Privacy Act. *See* 5 U.S.C. § 552a(b)(3). Treasury's published Routine Use 17 permits disclosure to a federal agency "for the purpose of identifying, preventing, or recouping improper payments to an applicant for, or recipient of, federal funds." ECF 51-2, TR-85; *Privacy Act of 1974: System of Records*, 85 Fed. Reg. 11,776, 11,780 (2020). Education's SORNs likewise cover the DOGE Team's assigned responsibilities. For example, they allow for disclosure "to support the investigation of possible fraud and abuse and to detect and prevent fraud and abuse" in program funds. *See* 88 Fed. Reg. 41,942, 41,949 (2023); 88 Fed. Reg. 42,200, 42,222 (2023); 73 Fed. Reg. 117 (2008); *see also* 84 Fed. Reg. 47,265, 47,269 (2019) (permitting disclosure to "support governmental researchers and policy analysts"). The same is true of OPM's SORNs, which permit disclosure in certain circumstances "to help eliminate waste, fraud, and abuse in Governmental programs." 77 Fed. Reg. 73,694, 73,697 (2012).

These purposes are entirely compatible with the purpose of the data collection. *Ames v. United States Dep't of Homeland Sec.,* 153 F. Supp. 3d 342, 347–48 (D.D.C. 2016), *aff'd*, 861 F.3d 238 (D.C. Cir. 2017) ("To assess compatibility, a court must conduct a 'dual inquiry into the purpose for the collection of the record in the specific case and the purpose of the disclosure.'") (citing *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548–49 (3rd Cir. 1989)). Where a "concrete relationship or similarity, some meaningful degree of convergence" exists "between the disclosing agency's purpose in gathering the information and in its disclosure," compatibility is satisfied. *Britt*, 886 F.2d at 549–50. There is little question that collection of information submitted for purposes of gaining

26

a government benefit "converges" with disclosure intended to identify fraud abuse in the same benefit programs. Here, as Defendants have indicated previously, the Court need not reach this issue, because the relevant access is covered by 5 U.S.C. § 552a(b)(1).

Because the challenged access fails squarely within § 552a(b)(1)'s need-to-know exception, or the routine use exception, Plaintiffs cannot establish a Privacy Act violation. Defendants are therefore entitled to summary judgment on Count I.

### B.    Count II (No Arbitrary or Capricious Action)

Plaintiffs also cannot prevail on their claim that Defendants decision to provide access to the data was arbitrary or capricious under the APA. Plaintiffs allege that Defendants' decision to provide access to certain data was arbitrary and capricious because they "failed to consider the consent requirements of the Privacy Act," "their duty to protect the sensitive data on their systems," "the risks that their disclosures would result in corrupted data," and the possibility that "security threats that are likely to result from their action." ECF 13, Am. Compl. ¶¶ 152-156; *see* 5 U.S.C. §§ 552a(b), 552a(e)(1).

In large part, Plaintiffs' claim that the decision to provide access was arbitrary and capricious is simply a restatement of Plaintiffs' claim that decision was contrary to law. As such, it fails for the same reason; it was entirely lawful for government employees assigned to DOGE teams to be provided with access to agency data and systems in order to perform their duties. Plaintiffs' contention that Defendants failed to consider risks and security needs is entirely unsupported. While they may disagree with the manner in which the agencies weighed those issues before reaching a decision, the decisions were neither arbitrary nor capricious. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983).

Indeed, the record reflects that the challenged agency decisions were made in

27

connection with identified governmental responsibilities relating to technology modernization, operational review, payment integrity, and related initiatives. Agency officials evaluated what access certain personnel would require to perform those responsibilities and implemented access accordingly.

At Education, the Chief Information Officer expressly documented the basis for granting access and authorized access for personnel assigned to implement technology modernization and related initiatives. ECF 51-3, ED-25. Education's agreements governing assigned personnel further provided that agency data and systems would be accessed only for legitimate governmental purposes and that assigned personnel would comply with applicable legal requirements, including the Privacy Act. *Id.*, ED-3. Treasury also developed a structured engagement process identifying the systems relevant to assigned responsibilities and specifying the access required or those responsibilities. ECF 51-2, TR-56–60. The record at OPM similarly reflects active management of access permissions. OPM periodically reviewed employee access to sensitive systems and removed access where agency officials determined that particular employees no longer needed it. ECF 51-1, OPM-24–27, 53–54. Those actions are inconsistent with Plaintiffs' suggestion that OPM failed to consider privacy or security concerns. The record reflects deliberation concerning access needs, not the absence of deliberation alleged by Plaintiffs.

Plaintiffs generally complain that the administrative record should include additional materials. But it should come as no surprise that the record is not voluminous given that these were internal discretionary decisions to grant particular government employees access to internal agency data systems and was not a final agency action. Unlike in a decision that involved rulemaking, or creation of a new policy, there was no need for

28

a voluminous "record" of the decision to provide internal access and they were under no obligation to do so. As noted above, agencies routinely make discretionary decisions regarding which employees need access to a particular system—for example, whenever a new employee is hired or staffed to work on a new matter—and it is unrealistic to assume that an agency would document that decision with respect to each individual employee in the manner Plaintiffs suggest.

Ultimately, Count II rests on a disagreement with the agencies' conclusions, not a showing that the agencies failed to consider relevant factors. Plaintiffs contend that the agencies should have reached different decisions regarding who should receive access and what level of access should be granted. But the APA does not authorize courts to set aside agency action merely because a litigant disagrees with an agency's assessment of operational needs, personnel assignments, or IT requirements.

While Plaintiffs may disagree, because the administrative record demonstrates reasoned decision-making, Defendants are entitled to summary judgment on Count II.

## C.    Count III (No Action in Excess of Statutory Authority)

In Count Three, Plaintiffs allege that Defendants acted "in excess of statutory authority" under the APA, 5 U.S.C. § 706(2)(C), by allegedly violating a "non-discretionary duty to protect records on individuals from unauthorized disclosure." Am. Compl. ¶¶ 157–59. Ultra vires review is a "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), and the equivalent of "a Hail Mary pass—and in court as in football, the attempt rarely succeeds," *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). More specifically, ultra vires review of agency action is only available when an agency's error is "patently a misconstruction of [statute;]" "when the agency has disregarded a specific and unambiguous statutory

directive[;]" or "when the agency has violated some specific command of a statute." *Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) (citations and internal quotations omitted). "Garden-variety errors of law or fact are not enough." *Id.*

The Supreme Court has made it clear that an ultra vires claim is unavailable where an alternative remedial forum exists in which a plaintiff may pursue the challenge. *See Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (non-statutory review is available only when a party would be "wholly deprive[d] . . . of a meaningful and adequate means of vindicating its statutory rights"); *see also Lepre v. Dep't of Labor*, 275 F.3d 59, 72 (D.C. Cir. 2001) (a "critical" requirement for ultra vires review is "the lack of any alternative means of judicial review for the plaintiffs"); *Nyunt*, 589 F.3d at 449. Under this standard, Count III fails, as it merely repackages Plaintiffs' claims under the Privacy Act brought through the APA. *See* Am. Compl. ¶¶ 157–59. For the reasons explained above, Congress established a specific scheme for evaluating these claims. Because alternative forms of review were contemplated by Congress, review of a decision to determine if it was ultra vires is precluded.

Moreover, Plaintiffs have failed to plead a specific statutory bound that Defendants have allegedly exceeded. As discussed, each agency's DOGE team is comprised of agency employees. Plaintiffs have pointed to no statutory authority which prohibits access to agency data by agency employees. The decision to grant access to data and systems to certain government employees is entirely consistent with agency authority, and therefore precludes ultra vires review.

**CONCLUSION**

For the above stated reasons, the Court should dismiss Plaintiffs' claims or, in the alternative, enter judgment in favor of Defendants.

30

Dated: June 18, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division, Federal Programs Branch

NATALIE M. VILLALON
U.S. Gov. Specially Admitted
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 860-9963
Email: Natalie.M.Villalon@usdoj.gov

Kelly O. Hayes
U.S. Attorney

ARIANA WRIGHT ARNOLD
DMD Bar No. 23000
Assistant United States Attorney 36 S.
Charles St., 4th Floor
Baltimore, Maryland 21201
Tel: (410) 209-4813
Ariana.Arnold@usdoj.gov

*Counsel for Defendants*

31